IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE ESTATE OF ROBERT ETHAN   *
SAYLOR <u>et al.</u>   *
  *
v.   *   Civil Action No. WMN-13-3089
  *
REGAL CINEMAS, INC. <u>et al.</u>   *
  *

  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

<u>**MEMORANDUM**</u>

Before the Court are the following motions: (1) a motion to dismiss filed by three Frederick County Sheriff's Deputies: Defendants Richard Rochford, Scott Jewell, and James Harris (the Deputies), ECF No. 26; (2) a motion to dismiss, or for summary judgment, filed by Defendant Regal Cinemas, Inc. (Regal), ECF No. 27; and (3) a motion to dismiss, or for summary judgment filed by Defendant State of Maryland (the State), ECF No. 44. The motions are ripe.  Upon review of the filings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, that the motions filed by the Deputies and State will be granted in part and denied in part, and that Regal's motion will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the tragic death of 26-year-old Robert Ethan Saylor, an individual with Down Syndrome.  Mr. Saylor died after three off-duty Frederick County Deputy

Sheriffs, Defendants Richard Rochford, Scott Jewell, and James Harris, attempted to force him to leave a movie theater owned and operated by Defendant Regal because he was attempting to view a movie for a second time without paying for a second ticket.  At the time, the Deputies were working as security guards for the mall in which the theater was located, the Westview Promenade Mall.  A struggle ensued in the course of the attempted removal of Mr. Saylor from the theater and, by the end of that struggle, Mr. Saylor suffered a fractured larynx and died of asphyxiation.  The details of this encounter, as alleged in the First Amended Complaint, are as follows.

Mr. Saylor had an I.Q. of about 40, the physical and facial features common to individuals with Down Syndrome, and was easily recognizable as someone with this disability.  He was also both short and obese, standing at about 5 feet 6 inches tall and weighing almost 300 pounds.  Mr. Saylor lived in a separate apartment connected to his mother's home.  A full-time aide, Mary Crosby, was employed to assist Mr. Saylor with living in the community.  While Mr. Saylor often traveled about in the community, he did not like to be touched, particularly by strangers.  He also sometimes displayed anger when he was frustrated and could be difficult to redirect from one activity to another.  Ms. Crosby, other caretakers, and family members were well aware of these characteristics.

Mr. Saylor was an avid moviegoer and was a regular patron of the Regal Cinemas, having seen hundreds of movies there.  On the evening of January 12, 2013, Mr. Saylor, accompanied by Ms. Crosby, went to an early showing of the movie Zero Dark Thirty. When the movie was over, Mr. Saylor and Ms. Crosby exited the theater and Ms. Crosby inquired if Mr. Saylor was ready to go home.  Mr. Saylor became angry and Ms. Crosby called Mr. Saylor's mother to inquire how to proceed.  Mrs. Saylor suggested Ms. Crosby go and bring the car around to give Mr. Saylor the opportunity to calm down and she did so.

When Ms. Crosby returned with the car, she discovered that Mr. Saylor had gone back into the theater to see the movie a second time.  While she was in the lobby of the theater, the theater manager approached her and stated that Mr. Saylor had to purchase another ticket or leave the theater.  Ms. Crosby explained that Mr. Saylor had Down Syndrome and that no one should attempt to speak with him.  She also requested that the manager simply wait a bit to let her attempt to deal with Mr. Saylor.  Despite that request, the manager called for assistance from one of the Deputies who was working as a mall security guard and, Plaintiffs allege, on information and belief, that the manager asked the Deputy to remove Mr. Saylor from the theater.

That Deputy, believed to be Defendant Rochford, then approached Ms. Crosby and repeated the manager's admonition that Mr. Saylor would need to purchase another ticket or leave the theater.  According to the First Amended Complaint,

> [Ms. Crosby] told the Deputy about Mr. Saylor's disability and asked again that they just "wait out" Mr. Saylor's refusal to leave the theater.  She told the deputy that she had spoken with Mr. Saylor's mother, who was coming to the theater, and that Mr. Saylor would "freak out" if he was touched and that he would resist being forcibly ejected.  She told the deputy that if given sufficient time she and Mrs. Saylor could handle the situation.

ECF No. 19 ¶ 23.

Meanwhile, Mr. Saylor sat quietly in the same seat in which he had sat when watching the movie the first time.  Despite Ms. Crosby's warning, Defendant Rochford approached Mr. Saylor and told him that he needed to leave the theater.  Mr. Saylor refused and the Deputy asked the manager to call for the other two Deputies who were also working as mall security guards, indicating "'we are gonna have an issue here.'"  Id. ¶ 26. After ordering Ms. Crosby to stay out of the theater, the three Deputies approached Mr. Saylor and told him he had to leave the theater.

Mr. Saylor refused to leave and, according to the First Amended Complaint,

> two of the three deputies grabbed Mr. Saylor, one by each arm, and tried to drag him from the theater while

4

telling him he was going to jail.  As they neared the
rear of the theater with the struggle underway the
Deputies handcuffed Mr. Saylor with his hands behind
his back.  Mr. Saylor was heard to scream "mommy,
mommy" and say "it hurts."

At the back of the theater, Mr. Saylor –
handcuffed and held by the deputies – ended up on the
floor with at least one deputy on top of him.  As the
deputies manhandled Mr. Saylor, they fractured his
larynx making it difficult for him to breathe.
Because this was apparent, the deputies rolled him to
his side, removed his handcuffs, and called emergency
medical technicians.  It was too late – Mr. Saylor
suffocated.

Id. ¶¶ 27-28.  Mr. Saylor was later pronounced dead at Frederick

Memorial Hospital.

In the original complaint, ECF No. 1, Plaintiffs, Mr.

Saylor's parents, individually and as personal representatives

of Mr. Saylor's estate, named the Frederick County Sheriff's

Department and Frederick County as Defendants, in addition to

Regal and the Deputies.[1]  In their First Amended Complaint, ECF

No. 19, they eliminated the Sheriff's Department and the County

and, instead, added the State of Maryland, which is the

statutory employer of the Deputy Sheriffs.  The First Amended

---

[1] Plaintiffs also named as a Defendant in both the original
Complaint and the First Amended Complaint, Hill Management
Services, Inc. (Hill Management), the property manager for the
Westview Promenade Mall and the purported joint employer of the
Deputies.  Plaintiffs asserted survivor claims for negligence
(Count III) and gross negligence (Count VI) against this
Defendant.  Hill Management filed an answer, but no dispositive
motion and, for this reason, the claims against it will not be
addressed in this Memorandum.

Complaint asserts the following claims against the Deputies: survival claims on behalf of Mr. Saylor's estate for negligence (Count II), gross negligence (Count V), battery (Count VII), and an excessive force claim under 42 U.S.C. § 1983 (Count IX). Plaintiffs assert two survival claims against the State under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. (ADA), one based on a failure to train theory (Count X) and one on the theory that the State, as the joint employer of the Deputies, is liable for actions the Deputies took in violation of Title II (Count XI).  Plaintiffs also assert survival claims against Regal for negligence (Count I) and gross negligence (Count IV).  Finally, Plaintiffs, in their individual capacities, bring a Wrongful Death action against all Defendants (Count XII).

In their respective motions, the Deputies, Regal, and the State of Maryland all seek dismissal of all claims asserted against them.  Regal and the State also purport to move, in the alternative, for summary judgment.  To the extent Regal is actually seeking summary judgment, it appears to rely on witness statements given to the police as part of the investigation of this incident.  These statements suggest that Defendant Rochford, at least initially, attempted to coax Mr. Saylor to leave the theater in a polite and professional manner and that it was Mr. Saylor that first became disruptive.  ECF No. 28-1.

In response, Plaintiffs attach to their opposition other witness statements that report that Mr. Saylor was sitting peacefully before the Deputies attempted to extract him from his seat.  ECF No. 37-2.

While Regal submitted exhibits with its motion and captioned the motion as one seeking, in the alternative, summary judgment, in discussing the standard of review to be applied to its motion, Regal provides only the standard for a motion to dismiss under Rule 12(b)(6), making no mention of the standard for a summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure.  Instead of presenting that alternative standard, Regal suggests that the Court can consider its proffered witness statements without converting the motion to one under Rule 56 because those statements are being submitted to "address and rebut the reference to such statements and reliance thereon by Plaintiffs."  ECF No. 28 at 2.

Plaintiffs did make a single passing reference to "numerous witness accounts" in their First Amended Complaint.  ECF No. 19 ¶ 24.  Assuming these are the same accounts that Plaintiffs attached to their opposition, these are handwritten "Statements" apparently prepared at the theater shortly after the confrontation.  ECF No. 37-2.  In contrast, the documents submitted by Regal with its motion are typewritten "Supplemental Incident Reports" prepared by members of the Sheriff's

Department based on interviews they conducted with witnesses, mostly at the sheriff's office.  Not only are these documents different than those referenced in the Complaint, they are not the type of documents that are "integral to and explicitly relied upon in the complaint" which the Court would be permitted to consider when ruling on a motion to dismiss.  See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).  Accordingly, the Court will neither convert Regal's motion to one for summary judgment, nor consider the exhibits submitted by Regal with its motion.

Similarly, the State attached an exhibit to its motion and captioned its motion as one, in the alternative, for summary judgment.  The State, however, also provided no substantive discussion of the standard for such a motion except for the conclusory statement that "if it is determined that the motion should be treated as one for summary judgment, the Court should enter summary judgment in favor of Defendants as to all claims, there being no genuine issue of material fact."  ECF No. 44-1 at 6.[2]  The State's exhibit is a section of its General Order Manual addressing the "Investigation of Persons with Mental Illness."  ECF No. 44-2.  Not only is this document only marginally

---

[2] Because of the presence of tables of contents and other introductory materials, the pagination of the ECF documents is often different than that of the original documents.  The Court will reference the pagination of the original documents.

relevant to individuals with Down Syndrome and the incident that gave rise to this action,[3] it is certainly not dispositive as to whether the State had an appropriate policy and proper training procedures in place so as to entitle the State to the entry of judgment in its favor.  As with Regal's motion, the Court will not convert the State's motion to one for summary judgment, nor will it consider matters outside the Complaint in resolving this motion.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Such determination is a "context-specific task," Iqbal, 556 U.S. at 679, in which the factual allegations of the complaint must be examined to assess whether they are sufficient "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  "[A] court accepts all well-pled facts as true and construes these facts in

---

[3] As Plaintiffs note, this portion of the General Order relates to dealings with persons with mental illness who may be experiencing loss of memory, delusions, depression, hallucinations, hyperactivity, incoherence and extreme paranoia. ECF No. 44-2 at 2.  As such, it is of marginal relevance in dealing with individuals not with mental illness, but with developmental disabilities, like Mr. Saylor.

the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).  Such deference, however, is not accorded to labels and legal conclusions, formulaic recitations of the elements of a cause of action, and bare assertions devoid of further factual enhancement.  Iqbal, 556 U.S. at 678.

## III. DISCUSSION

### A. The Deputies' Motion to Dismiss

#### 1. Section 1983 Claim (Count IX)

To state a claim under 42 U.S.C. § 1983, a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States.  Wahi v. Charleston Area Med. Ctr., 562 F.3d 599, 615 (4th Cir. 2009).  Plaintiffs have alleged in their First Amended Complaint, and the Deputies do not dispute, that in their interaction with Mr. Saylor they, as "duly appointed sheriff's deputies . . . authorized to enforce the laws of the State of Maryland," were "acting under color of state law."  ECF No. 19 ¶ 75.  As to the constitutional right of which Mr. Saylor was deprived, Plaintiffs in their First Amended Complaint alleged that he was deprived of his Fourth Amendment rights "to be free from unreasonable seizures and the use of unreasonable force."  Id. ¶ 76.  In their opposition to the Deputies' motion,

10

they clarify that they are not bringing a claim for false arrest but are alleging the unreasonable use of force in the course of Mr. Saylor's arrest.  ECF No. 30 at 6-7.

To establish such a claim, a plaintiff must show that the force used in making the arrest was not "objectively reasonable in light of the facts and circumstances confronting [the arresting officers]."  Graham v. Connor, 490 U.S. 386, 397 (1989) (internal quotations omitted).  Objective reasonableness is highly fact-specific and requires a "totality of the circumstances" analysis.  Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).  The Supreme Court in Graham set out the following factors to be considered in conducting that analysis:  "the severity of the [suspected] crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  In determining whether the use of force was unreasonable, courts have also considered the extent of the injury caused by the use of that force.  Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

Furthermore, the Fourth Circuit has cautioned courts when analyzing the objective reasonableness of the amount of force used by a law enforcement officer not to adopt a "segmented view of [a] sequence of events," where "each distinct act of force

11

becomes reasonable given what [the officer] knew at each point in this progression." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). Such an approach, the court opined, "miss[es] the forest for the trees." Id. Instead, the Fourth Circuit instructed, "[t]he better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." Id.

Viewed under this analysis, the Court concludes that the Deputies' conduct, at least as alleged, could be found to have constituted an unreasonable use of force. The first Graham factor – the seriousness of the suspected crime – undoubtedly points in Plaintiffs' favor. The Deputies acknowledge that, at the time that they initiated this encounter, "the crimes Mr. Saylor was committing were relatively minor misdemeanors of trespass, disturbing the peace, and theft of services." ECF No. 26-1 at 13.

As to the second Graham factor – whether Mr. Saylor posed an immediate threat to the officers or others – the allegations in the First Amended Complaint would indicate that, before being approached by the Deputies, Mr. Saylor was sitting quietly in the theater, posing a threat to no one. Were it not for the

intervention of the Deputies, there is no reason to believe he would not have remained sitting quietly in his seat.

As to the third Graham factor – whether Mr. Saylor resisted arrest or was evading arrest by flight – it is true that, once the Deputies attempted to drag him from his seat, he did resist. The Court notes, however, that Mr. Saylor responded in precisely the way that Ms. Crosby informed the Deputies he would respond, because of his disability, if touched by strangers. Furthermore, just as Mr. Saylor posed no threat to anyone until approached by the Deputies, there was no indication that he would have fled the scene.  While the Deputies may justifiably quibble with the technical validity of Plaintiffs' conclusion that Mr. Saylor "effectively detained himself in the theater quietly," ECF No. 30 at 9, there was certainly little risk that Mr. Saylor would not have remained in the theater, at least until the end of the movie.

Turning to the seriousness of injury factor that courts also take into consideration, here, Mr. Saylor died as a direct result of the course of events set into motion by the Deputies. While it may not have been foreseeable that Mr. Saylor would suffer a fatal injury, the possibility of significant injury would certainly have been evident when the decision was made to drag an obese individual with a mental disability out of his chair and down a ramp, particularly when the Deputies were told

13

that, because of his disability, Mr. Saylor was likely to become upset and angry.[4]

The Court notes that, before entering the theater and confronting Mr. Saylor, there were a number of other alternatives available to the Deputies instead of pursuing a course they were told would lead to a potentially dangerous interaction.  They could have allowed Mr. Saylor's caregiver, Ms. Crosby, to enter the theater to attempt to persuade Mr. Saylor to leave, or at least allowed her to accompany them and function as a mediator in the confrontation.  It is alleged that they were aware that Mr. Saylor's mother was on the way and they could have simply waited for her to arrive and had her either convince her son to leave or, failing that, to pay for a ticket. While the Fourth Circuit has noted that the relevant inquiry is not whether the law enforcement officer took the "the most reasonable course of action . . . [n]onetheless, the availability of other reasonable, or even more reasonable, options is not completely irrelevant to our inquiry." Young v. Prince George's Cnty., Md., 355 F.3d 751, 757 n.2 (4th Cir. 2004).

---

[4] Plaintiffs characterize the Deputies' actions as "seizing and ultimately killing Mr. Saylor as a penalty for his attempt to integrate himself into the societal mainstream by coming to a movie theater."  ECF No. 30 at 21.  The Court finds this rhetoric particularly inappropriate and unhelpful.

The Court also notes that, when the Deputies were presented with these various alternatives, there was no emergent situation requiring any rapid response on their part.  This lack of an emergent situation makes this case distinguishable from the typical excessive force case and the cases on which the Deputies rely.  The Deputies suggest that "[t]he facts and circumstances in the instant case are similar to those in Brown v. Gilmore," 278 F.3d 362 (4th Cir. 2002).  ECF No. 39 at 5.  In Brown, the plaintiff was arrested for disorderly conduct based on her alleged failure to comply with an officer's repeated instructions to move her car from a busy roadway after a minor traffic accident.  In support of her excessive force claim, she asserted that the arresting officer, "handcuffed her, causing her wrist to swell, dragged her to the car and then pulled her into his cruiser."  Id. at 369.  Significantly, she "allege[d] no injury of any magnitude."  Id.  The Fourth Circuit held that "the circumstances justified the minimal level of force applied by [the officer]," id., and concluded that there was no constitutional infraction.  Id. at 370.

When describing those circumstances, the Fourth Circuit noted that it was "undisputed that the situation on the street was tense."  Id. at 369.[5]  The court also noted that "[t]he

---

[5] In holding that a reasonable officer would believe that he had probable cause to arrest the plaintiff, the court noted that her

officers here did not have the option of delaying decision in order to determine what a fact finder months or years later might make of the situation.  They had to get traffic moving on the spot."  Id. at 370.  In the situation confronting the Deputies at the Regal Cinema as alleged by Plaintiffs, there was no similar tense situation requiring any immediate response until the Deputies, themselves, created a tense situation.

This Court finds that a different excessive force decision from the Fourth Circuit, Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994), more closely parallels Plaintiffs' allegations against the Deputies.  The plaintiff in Rowland, as described by the court, was a "37 year old, mildly retarded" individual with "a severe speech impediment."  Id. at 171.  One afternoon, while the plaintiff was waiting for a bus at a downtown bus station, a police officer observed him pick up a five dollar bill that had been dropped by a woman at the station ticket window.  The officer then observed the plaintiff pocket the five dollar bill and walk away without attempting to return the money to the woman.  The officer approached the plaintiff and told him to return the money to the woman.

---

car had been blocking traffic on a major Myrtle Beach thoroughfare during Memorial Day weekend for over half-an-hour and that the request that the plaintiff move her car should have been expected "before the tempers of other motorists reached the boiling point."  Id. at 368.

While there were factual disputes as to precisely what happened next, the officer testified that he had observed the plaintiff simply wave the money in front of the openly distressed woman and then leave the station with the money.  The officer followed the plaintiff.  He claimed that the plaintiff then began to run and he chased him to a nearby construction site.  The plaintiff asserted that he never ran but was standing at a nearby corner when the officer approached him.  According to the plaintiff, the officer then grabbed his collar and jerked him around, yelling at him as he did so.  Out of fright, the plaintiff asserted he "instinctively tried to free himself." Id. at 172.  The officer asserted that the plaintiff first shoved him in an attempt to escape, and only then did he grab him by the collar.  The parties agreed, however, that the officer "ultimately used disabling force to gain control over [the plaintiff]."  Id. at 171.  In the course of the struggle, the officer wrenched the plaintiff's leg causing a serious knee injury.

The Fourth Circuit concluded that "a jury could find that no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time." Id. at 174.  Applying the first two Graham factors, the court observed that "there is no dispute here that the offense was a minor one" and that the plaintiff "posed no threat to the

17

officer or anyone else." Id. As to the third factor, while the
court acknowledged that there was some evidence that the
plaintiff offered resistance, the plaintiff maintained that "he
resisted only to the extent of instinctively trying to protect
himself from the defendant's onslaught." Id. "When all the
factors are considered in toto," the court held, "it is
impossible to escape the conclusion that a man suffered a
serious leg injury over a lost five dollar bill." Id.

Like the defendant in Rowland, the Deputies urge this Court
to review their encounter with Mr. Saylor as a segmented
sequence of events. The Deputies suggest that, when they
ordered him to leave the theater and he refused, it became
reasonable to arrest him. Once they determined to arrest him,
they suggest having "two Deputies grabbing one of Mr. Saylor's
arms and together trying to drag him out of the theater . . .
was certainly an objectively reasonable use of force." ECF No.
26-1 at 14. When, in response to his being dragged out of the
theater, Mr. Saylor "engaged in a course of struggle," id., the
Deputies suggest it was reasonable to handcuff Mr. Saylor's
hands behind his back. Finally, once the struggle was underway,
the Deputies suggest that the escalating use of force that
resulted in Mr. Saylor being on the ground with a Deputy on top
of him, however that escalation happened, was also reasonable.

The result of this sequence of events, however, was that a man died over the cost of a movie ticket.

In addition to arguing that there was no constitutional violation, the Deputies also assert that they are entitled to qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800 (1982).  Under Harlow, government officials performing discretionary functions are entitled to qualified immunity from liability for damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  457 U.S. at 818.  The entitlement to qualified immunity involves a two pronged inquiry: "first whether a constitutional violation occurred and second whether the right violated was clearly established."  Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010).  As this Court has already determined that the allegations in the First Amended Complaint could support a finding of a constitutional violation, the pertinent question is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  The question turns on the "objective legal reasonableness of the action, assessed in light

of the legal rules that were clearly established at the time it was taken." Pearson v. Callahan, 555 U.S. 223, 244 (2009).[6]

The Deputies assert that, in Maryland, a constitutional right becomes "clearly established" only by a decision of the United States Supreme Court, the Fourth Circuit Court of Appeals, or the Maryland Court of Appeals and that, in their assessment, there is no decision in these three classes of decisions holding that their use of force in the particular circumstances alleged here would be violative of any constitutional right.  ECF No. 26-1 at 20-21.  The Fourth Circuit has instructed, however, that while the "contours" of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, [t]his is not to say that an official action is protected by qualified immunity unless the very action in question has

---

[6] As an additional argument against the Deputies' entitlement to qualified immunity, Plaintiffs assert that, because the Deputies were off duty, they were acting outside of the scope of their government employment and thus, not entitled to qualified immunity under any circumstances.  ECF No. 30 at 14.  Like deputies in most if not all sheriff's departments in Maryland, off-duty deputies of the Frederick County Sheriff's Department revert to on-duty status where law enforcement action is taken. See ECF No. 39-1 (Frederick Cnty. Sheriff's Office Admin. Manual).  Arrest is a quintessential law enforcement action.  As such, the Deputies were acting as law enforcement officers and were potentially entitled to qualified immunity while so acting. See Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993) (finding off-duty police officer working as restaurant security guard was entitled to qualified immunity).

previously been held unlawful . . . ."  Jones, 325 F.3d at 531.

The court continued:

> The standard is again one of objective reasonableness:
> the "salient question" is whether "the state of the
> law" at the time of the events at issue gave the
> officer "fair warning" that his alleged treatment of
> the plaintiff was unconstitutional.  Officials can
> still be on notice that their conduct violates
> established law even in novel factual circumstances.
> Although earlier cases involving "fundamentally
> similar" or "materially similar" facts can provide
> especially strong support for a conclusion that the
> law is clearly established, they are not necessary to
> such a finding."  Even though the facts of a prior
> case may not be "identical," the reasoning of that
> case may establish a "premise" regarding an
> unreasonable use of force that can give an officer
> fair notice that his conduct is objectively
> unreasonable.

Id. at 531-32 (internal citations omitted).

The Court believes that the Fourth Circuit's decision in

Rowland, both by the similarity of its facts and its instruction

that the conduct of officers is not to be viewed as an

artificially divided sequence of events, gave fair warning to

the Deputies that their conduct was unreasonable, at least under

the facts as alleged in the First Amended Complaint.  For that

reason, the Court will deny the Deputies' motion to dismiss on

the ground of qualified immunity.

That is not to say that the Court might not reach a

different decision on a motion for summary judgment where the

Court would have the benefit of a fuller record.  The Court

notes that there appears to be some disagreement or uncertainty

as to precisely what Ms. Crosby may have told the Deputies prior to their confrontation with Mr. Saylor. See ECF No. 39 at 4 n.3 (noting that, while implied in Plaintiffs' Opposition, it was not alleged in the Complaint that Mr. Saylor's mother would pay for an additional ticket if need be). There is an apparent disagreement as to whether Mr. Saylor was sitting quietly before he was approached and how quickly he may have escalated the tension in the situation. See id. at 11 (referencing witness statements that contradicted the allegation that Mr. Saylor was sitting quietly and that he began cursing and yelling when requested to leave).

Perhaps the most significant unsettled question is the reason for the escalation in the Deputies' use of force. While it would seem apparent, given the nature of the injury suffered by Mr. Saylor and the fact that Mr. Saylor ended up on the floor underneath a Deputy, that the level of force used on Mr. Saylor increased dramatically, the cause and manner of that escalation is unclear. There even appears to be some confusion as to when Mr. Saylor was handcuffed. Plaintiffs seem to allege in the First Amended Complaint that it was near the back of the theater, but before he fell, see ECF No. 19 ¶¶ 27-28 ("As they neared the rear of the theater with the struggle underway the Deputies handcuffed Mr. Saylor with his hands behind his back" and then he ended up on the floor), but the Deputies seem to

22

imply that he fell first, and they then handcuffed him.  ECF No.
26-1 at 4 (after stating that "Mr. Saylor suddenly fell to the
ground and brought all three deputies down as well for a short
time," "[t]he Deputies used a chain of three (3) handcuffs to
handcuff Mr. Saylor behind his back, and tried to help him
stand").  Furthermore, while Plaintiffs allege that the Deputies
manhandled Mr. Saylor and fractured his larynx, the Deputies
suggest that some of Mr. Saylor's injuries might have been
caused by the lifesaving efforts of the EMS personnel.  Id. at
17 n.3.

        The Court is well aware that qualified immunity is "an
immunity from suit rather than a mere defense to liability" and
thus, the question of qualified immunity should be resolved "at
the earliest possible stage in litigation."  Hunter v. Bryant,
502 U.S. 224, 227 (1991).  Notwithstanding that principle, under
the facts as alleged by Plaintiffs, the Court finds the Deputies
are not entitled to qualified immunity.  If appropriate, the
court would certainly entertain a motion for summary judgment
raising the defense on a more fully developed record.

### 2. State Law Claims

        The state law survival claims asserted by Plaintiffs
against the Deputies are for negligence (Count II), gross
negligence (Count V), and battery (Count VII).  The Deputies
assert that that they are entitled to qualified statutory

immunity from liability as to all of these claims under the Maryland Tort Claims Act (MTCA). Under the MTCA, State personnel, including sheriffs and their deputies, are immune from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b); see also Md. Code Ann., State Gov't § 12-101(a)(6) (providing that sheriffs and their deputies are state personnel under the MTCA). For purposes of MTCA immunity, "malice" refers to so-called "actual malice," i.e., "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." Lee v. Cline, 863 A.2d 297, 310-11 (Md. 2004).

Plaintiffs argue that the Deputies are not immune from liability for any of the claims asserted against them on the ground that, in their interactions with Mr. Saylor, they were not acting within the scope of their public duties but, instead, were acting as private security guards. As noted above, however, supra at 20 n.6, at least by the time that the Deputies determined to arrest Mr. Saylor, they had reverted to their status as on-duty sheriffs' deputies. As the alleged wrongful conduct occurred after that point, statutory immunity is at least potentially available. With regard to their negligence claim, Plaintiffs' only argument to defeat immunity is their

24

argument that the Deputies were not acting within the scope of their public duties.  As the Court rejects that conclusion, the Court finds that the Deputies are entitled to immunity from liability on the negligence claim and that count will be dismissed.

As to the gross negligence claim, however, the immunity statute explicitly exempts that claim from its reach.  While the Deputies claim that there are insufficient factual allegations to support such a claim, the Court concludes that there are.  Maryland courts view gross negligence as "something more than simple negligence, and likely more akin to reckless conduct." Taylor v. Harford Cnty. Dep't of Soc. Servs., 862 A.2d 1026, 1035 (Md. 2004) (emphasis in original).  It is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."  Liscombe v. Potomac Edison Co., 495 A.2d 838, 846 (Md. 1985).  Here, at least as alleged by Plaintiffs, the Deputies ignored the warnings of Mr. Saylor's caregiver that confronting Mr. Saylor would lead to a hostile reaction.  They also ignored the risk of asphyxiation in handcuffing an obese individual behind his back, a risk Plaintiffs assert is "well known in the law enforcement

25

community" and that includes an increased risk of death.   ECF
No. 19 ¶ 58.

As to the battery claim, Plaintiffs have alleged that this
conduct was "undertaken deliberately and with actual malice."
Id. ¶ 67.  While the Deputies correctly note that bald
allegations of malice are insufficient to defeat immunity and
that a plaintiff "must allege with some clarity and precision
those facts which make the act malicious," Green v. Brooks, 725
A.2d 596, 610 (Md. Ct. Spec. App. 1999), the Court finds that
the Deputies' conduct, as alleged, could be considered to be
consistent with a finding of ill-will or intent to injure.  See
Okwa v. Harper, 757 A.2d 118, 129 (Md. 2000) (holding that a
plaintiff's allegations that he was handcuffed, "roughly dragged
toward an exit," and "forcibly put to the ground," if believed
by the finder of fact, could lead to the inference that the
defendant officers were motivated by an improper motive or had
an intent to bring harm).  As with qualified immunity under
§ 1983, however, this statutory immunity might prove applicable
on a fuller factual record.

The Deputies also argue that the battery claim should be
dismissed because their touching of Mr. Saylor was privileged
based upon their right to place him under arrest.  The right to
arrest, however, does not give rise to a privilege to use an
unreasonable amount of force.  See French v. Hines, 957 A.2d

26

1000, 1037 (Md. Ct. Spec. App. 2008) (holding that "the privilege that a law enforcement officer possesses to commit a battery in the course of a legally justified arrest extends only to the use of reasonable force, not excessive force. To the extent that the officer uses excessive force in effectuating an arrest, the privilege is lost"). Because the Court finds that Plaintiffs' allegations could support the conclusion that the force used was excessive, Plaintiffs' battery claim can also go forward. See Rowland, 41 F.3d at 174 (after permitting the plaintiff's § 1983 claims to go forward, holding that "[t]he parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well"); Young, 355 F.3d at 759 (same).

The Deputies' final argument regarding Plaintiffs' survivor claims is that the claims are barred by the doctrines of contributory negligence and/or assumption of risk. While possibly relevant to Plaintiffs' negligence claim, the Court has already determined that this claim will be dismissed on the ground of statutory immunity. The doctrines, of course, are not applicable to a claim of battery. See Saba v. Darling, 531 A.2d 696, 698 (Md. Ct. Spec. App. 1987) (noting that contributory negligence is not applicable to a claim of assault and battery); Janelsins v. Button, 648 A.2d 1039, 1045 (Md. Ct. Spec. App.

1994) (holding that the doctrine of assumption of risk does not bar recovery for intentional torts).

As to the gross negligence claim, the question is more complicated as Maryland courts apparently have yet to decide if contributory negligence is a bar to such a claim.  Plaintiffs point to a decision of the Maryland Court of Appeals, Liscombe, supra, that assumed without deciding that the doctrine would not be applicable to a gross negligence claim.  495 A.2d at 847. They also rely on a decision from the District of Columbia, whose common law is drawn from Maryland, holding that the doctrine would not apply.  Muldrow v. Re-Direct, Inc., 493 F.3d 160, 165-66 (D.C. Cir. 2007).  The Court, however, is aware of decisions pointing to a different result.  The Fourth Circuit has noted that "Maryland never has held that contributory negligence does not bar gross negligence" and opined that "many cases have suggested just the opposite in dicta." Ramos v. S. Maryland Elec. Co-op, Inc., 996 F.2d 52, 54-55 (4th Cir. 1993) (citing as examples, Harrison v. Montgomery County Bd. of Educ., 456 A.2d 894, 898 (Md. 1983) and Ladnier v. Murray, 572 F. Supp. 544, 547 (D. Md. 1983)).

The Court need not resolve this legal issue at this time as there is an insufficient factual basis on which to conclude, as

a matter of law, that the doctrine should apply.[7]  "'Ordinarily,
the question of whether the plaintiff has been contributorily
negligent is for the jury, not the judge, to decide.'"  Meyers
v. Lamer, 743 F.3d 908, 914 (4th Cir. 2014) (quoting Campbell v.
Balt. Gas & Elec. Co., 619 A.2d 213, 216 (Md. Ct. Spec. App.
1993)).  Certainly here, considering only the allegations in the
First Amended Complaint, there is an insufficient basis on which
to determine, inter alia, the effect of Mr. Saylor's
developmental disability on his ability to appreciate the
implications of his conduct and whether his own conduct was a
proximate cause of his death.

### 3. Wrongful Death Claim

As for Plaintiffs' Wrongful Death claim, Count XII, the
Deputies do not appear to challenge that Plaintiffs are proper
plaintiffs for a wrongful death action, or that this action was
timely filed under the statute.  Instead, the Deputies suggest
that Plaintiffs have improperly joined all of their separate
wrongful death claims in a single claim in a single count.  ECF
No. 26-1 at 22.[8]  The Court disagrees.

---

[7] The Deputies make no serious argument that the applicability of
the doctrine of assumption of risk could be decided on a motion
to dismiss.

[8] The Deputies also challenge Plaintiffs' entitlement to punitive
damages under the Wrongful Death Statute.  ECF No. 26-1 at 21
n.4.  Maryland courts have consistently held that "punitive
damages are not recoverable in cases arising under the wrongful

Maryland's Wrongful Death Statute provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another."  Md. Code Ann., Cts. & Jud. Proc. § 3-902(a).  A "wrongful act" is defined as "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Id. § 3-901(e).  Thus, to the extent that Plaintiffs prevail on any claim brought on the estate's behalf as a survivor action, they will have established a "wrongful act."  The only additional contested element that Plaintiffs would then need to prove to establish a wrongful death action is that they sustained damages from the loss of their son.  See Stewart v. United Electric Light and Power Co., 65 A. 49 (1906). Plaintiffs have adequately alleged that element, ECF No. 19 ¶ 101.

## B. The State's Motion to Dismiss

### 1. Wrongful Death Claim (Count XII)

The State first argues that the wrongful death claim against it must be dismissed as the State has not waived its Eleventh Amendment immunity for tort action brought in federal court.  While the State has made a limited waiver of its

---

death statute."  Cohen v. Rubin, 460 A.2d 1046, 1056 (Md. Ct. Spec. App. 1983).  To the extent that Plaintiffs are seeking punitive damages in their individual capacities, see First Am. Compl., Prayer for Relief at (b), that prayer will be stricken.

sovereign immunity in the MTCA, that waiver is expressly limited to suits brought in the state courts.  Md. Code Ann., State Gov't § 12-104(a)(1).  Plaintiffs make no response to this argument and the State's motion will be granted as to Count XII.

### 2. Failure to Train Claim under Title II of the ADA Count X)

As to Plaintiffs' "failure to train" claim under Title II of the ADA, the State is correct that the Fourth Circuit has yet to explicitly recognize such a claim in this particular context. ECF No. 44-1 at 10-11 (citing Waller v. City of Danville, 556 F.3d 171, 177 n.3 (4th Cir. 2009)).  There is no indication in Waller, or in any other Fourth Circuit decision, however, that would indicate that the Fourth Circuit would not recognize an ADA Title II failure to train claim under the appropriate circumstances.  For the reasons that follow, the Court finds that such a claim is viable and that Plaintiffs have sufficiently pled the elements of such a claim.

Title II of the ADA prohibits discrimination by any public entity, including states and their instrumentalities and agencies.  42 U.S.C § 12131.  "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity." 42 U.S.C § 12132.  To state a claim under Title II, a plaintiff must allege that, "(1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability."  Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005).  There is no dispute that Mr. Saylor was an individual with a disability.  At issue is whether the State deprived him of the benefits of a service, program, or activity of which he was qualified to receive.

The "services, programs, and activities" of public entities have been held to include "all core functions of government" and that "[a]mong the most basic of these functions is the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law." Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003).  Specifically, courts have recognized the applicability of Title II in the context of the arrest of individuals with disabilities.  Waller, 556 F.3d at 174.  Claims in this context typically fall within two general categories.  The first type of claim is that of "wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity."  Id.

An example would be where an individual with a disability resulting in slurred speech is arrested for driving under the influence.  See Jackson v. Inhabitants of Town of Sanford, Civ. No. 94-12, 1994 WL 589617, *6 (D. Me. Sept. 23, 1994).  The second type of claim is that of failure to provide a "reasonable accommodation", that is, "where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." Waller, 556 F.3d at 174. Examples of this type of claim would be a paraplegic arrestee's claim for injuries received when transported in a police van without wheelchair restraint, Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 2012), or the failure to provide the means of effective communications to a deaf individual during an police investigation.  See Seremeth v. Bd. Of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 339 (4th Cir. 2012) (holding that such a claim falls within the ambit of Title II but finding that exigent-circumstances rendered the accommodations that were provided reasonable).

Relying on the legislative history of Title II, courts have also recognized an implicit duty to train officers as to how to interact with individuals with disabilities in the course of an investigation or arrest:

33

"In order to comply with the non-discrimination
mandate, <u>it is often necessary to provide training to
public employees about disability</u>.  For example,
persons who have epilepsy, and a variety of other
disabilities, are frequently inappropriately arrested
and jailed because police officers have not received
proper training in the recognition of and aid of
seizures.  Such discriminatory treatment based on
disability can be avoided by proper training."

<u>Lewis v. Truitt</u>, 960 F. Supp. 175, 178 (S.D. Ind. 1997) (quoting

H.R. Rep. No. 101-485, pt. III, 101st Cong., 2nd Sess. 50,

reprinted in 1990 U.S.C.C.A.N. 473) (emphasis added by this

Court); <u>see also</u> <u>Hogan v. City of Easton</u>, Civ. No. 04-759, 2004

WL 1836992, at *7 (E.D. Pa. Aug. 17, 2004) (concluding that "the

Complaint states a valid claim under the ADA based on the

failure of the [defendants] to properly train its police

officers for encounters with disabled persons").

Plaintiffs premise their Title II claim on the contention

that "Mr. Saylor was qualified to receive the benefit of

deputies properly trained to interact with members of the

community with developmental disabilities," that the State

denied him the benefit of that proper training, and that denial

proximately caused his death.  ECF No. 45 at 7-8.  Plaintiffs

argue that they have sufficiently alleged both types of arrest

cases.  They argue that Mr. Saylor was wrongfully arrested in

that his refusal to leave the theater was "a manifestation of

his disability, not criminal intent" and thus, he was arrested

"'because of his disability.'"  <u>Id.</u> at 16 (quoting <u>Lewis</u>, 960 F.

34

Supp. at 179).  They also argue that, once the Deputies determined to take Mr. Saylor into custody, the manner in which they did so failed to accommodate his disability.

The State proffers a number of challenges to Plaintiffs' Title II failure to train claim.  First, relying on <u>Waller</u> and <u>Paulone v. City of Frederick</u>, 787 F. Supp. 2d 360, 378 (D. Md. 2011), the State argues that, because the Fourth Circuit has yet to recognize such a cause of action, "Plaintiffs' claim brought under that legal theory necessarily fails and should be dismissed."  ECF No. 44-1 at 11.  In <u>Waller</u>, however, the Fourth Circuit stated only that "we do not reach the question of whether the ADA supports a claim for failure to train," because they found that, in the case before it, the officers met the duty of reasonable accommodation.  556 F.3d at 177 n.3. Similarly, in the portion of the <u>Paulone</u> decision quoted by the State, this Court simply noted that the Fourth Circuit had "yet to recognize" such a claim.  787 F. Supp. 2d at 378. Furthermore, the <u>Paulone</u> quotation was actually taken from a discussion of claims brought against Frederick County and this Court alluded to the possibility that "[b]ecause the State, and not the County, is liable for any ADA violation by the Sheriff's personnel, it follows that the State, and not the County, would

be liable for any failure to train." Id.[9]  That the Fourth Circuit has yet to have the opportunity to reach the issue is no indication that it would not follow other courts and recognize such a claim.

The State next invokes limitations recognized by courts on the requisite scope of modifications and accommodations that must be adopted by public entities for the benefit of individuals with disabilities.  Quoting Tennessee v. Lane, the State notes that "'Title II does not require States to employ any and all means to make . . . services accessible to persons with disabilities.'"  ECF No. 44-1 at 15 (quoting 541 U.S. 509, 531-32 (2004)).  Quoting Sears v. Bradley County Government, the State protests that Title II does not "put government agencies 'on notice of an exhaustive set of particular accommodations and policies to be proactively implemented with respect to every conceivable disability.'"  Id. (quoting 821 F. Supp. 2d 987, 994 (E.D. Tenn. 2011)).

---

[9] In a previous decision in that action, this Court found that the State of Maryland had a duty under the ADA to provide deaf interpreters in court-ordered alcohol education programs and that by alleging that the State "breached that duty by failing to train [its Division of Parole and Probation] to provide such free service" the plaintiff stated a claim for negligent supervision and training. Paulone v. City of Frederick, 718 F. Supp. 2d 626, 638 (D. Md. 2010).  Because that claim was brought as a negligence claim under state law, the Court subsequently held that the failure to train claim against the State was barred by sovereign immunity.  Paulone v. City of Frederick, 2010 WL 3000989, at *3 (D. Md. July 26, 2010).

The accommodation envisioned by Plaintiffs does not approach the employment of "any and all means" or an anticipation of "every conceivable disability."  Plaintiffs suggest that following the advice of the caregiver of a clearly disabled individual and simply waiting would have been the most logical accommodation.  From the allegations in the First Amended Complaint, it would not appear that the Deputies were trained to make any modification at all in their treatment of individuals with developmental disabilities.[10]  They did not

---

[10] As noted above, the State submitted with its motion a copy of the section of the Frederick County Sheriff's Office General Order regarding the "Investigation of Persons with Mental Illness," ECF No. 44-2, and argues that the failure to train claim against the State should be dismissed because "the Sheriff had a policy in the General Order Manual that provided specific protocols for interacting with persons suffering from mental illness or disease."  ECF No. 44-1 at 14 (emphasis in original). While the Court has determined that it will not consider this exhibit at this stage in the litigation, it notes that the General Order recognizes that an appropriate response when dealing with person with mental illness includes:

> Obtaining relevant information from family members, friends, others at the scene who know the individual and his/her history.
>
> . . .
>
> Remain[ing] calm and avoid overacting
>
> . . .
>
> Actions that deputies should avoid include . . . [t]ouching the person (unless essential to safety); [c]rowding the person or moving into his or her zone of comfort

appear to have made any adjustment in their response to Mr.
Saylor.

In challenging Plaintiffs' failure to train claim, the
State relies heavily on a decision of the First Circuit,
Buchanan v. Maine, 469 F.3d 158 (1st Cir. 2006).  See ECF No.
44-1 at 12; ECF No. 47 at 2-3, 9.  In Buchanan, deputies of the
county sheriff's office fatally shot a mentally ill individual
after making a warrantless entry into his home for the purpose
of checking on his safety and welfare.  469 F.3d at 161.  Among
other claims, the plaintiff asserted under Title II that the
county failed to adequately train its officers on the needs of
the mentally ill public.  469 F.3d at 176.  In affirming the
grant of summary judgment for the county,[11] the court concluded

---

ECF No. 44-2 at 2-4.  The General Order also instructs, "[o]nce
sufficient information has been collected about the nature of
the situation, and the situation has been stabilized, there are
a range of options deputies should consider when selecting an
appropriate disposition."  Id. at 4.  While one of those
"options" is "[a]rrest, if a crime has been committed," other
options offered include: "[o]utright release" and "[r]elease to
care of family care giver . . . ."  Id.  Thus, should these
guidelines be considered relevant to individuals with
developmental disabilities, the argument could be made that the
Deputies were not trained to follow or simply failed to follow
these guidelines in dealing with Mr. Saylor.

[11] Unlike those in Maryland, sheriff deputies in Maine are
considered county agents, not state agents, for purposes of §
1983.  The claims against the State of Maine in Buchanan
involved, not the actions of the sheriff's deputies, but rather
the services rendered by the deceased's mental health case
worker, a state employee, prior to the shooting incident.  As
reasonable accommodations, the plaintiff asserted that the case

in language quoted by the State, that "'[a]n argument that
police training, which was provided, was insufficient does not
present a viable claim that Buchanan was "denied the benefits of
the services . . . of a public entity" by reason of his mental
illness.'"  ECF No. 47 at 2 (quoting Buchanan, 469 F.3d at 177).
The State also suggests that its proffer of the portion of the
General Order Manual dealing with mental illness should be
dispositive of the training issue because "Buchanan dispelled
the notion that the ADA requires anything more than the same
type of policy provided by the State."  ECF No. 47 at 2.

Among other grounds, Buchanan is distinguishable from the
case at bar in that it was decided on summary judgment with the
benefit of a fully developed record.  See 469 F.3d at 167
(specifically noting the "development of facts and a summary
judgment record before the court").  The court had before it,
not only the sheriff's department's policy titled "Response to
Deviant Behavior," but also a record that the deputies were

_____

worker should have, inter alia, made weekly check-ups, performed
additional medical check-ups, and made other adjustments to his
treatment plan.  Buchanan, 469 F.3d at 175.  The portion of the
Buchanan opinion cited in the State's Reply for the proposition
that the ADA does not "impose on the States a 'standard of care'
for whatever medical services they render," ECF No 47 at 2
(quoting Buchanan, 469 F.3d at 174), addressed the claims
related to the care provided by this mental health care worker,
not the conduct of the deputies.  This difference is based, in
part, on the principle that "courts normally should defer to the
reasonable judgments of public health officials," 469 F.3d at
174 (emphasis added), and, thus, this language quoted by the
State has little relevance to the case at bar.

actually trained on both that policy and the "Use of Force," and

"also received additional training with respect to the

identification of mentally ill persons and methods to employ

when dealing with such persons." Id. at 177. With the benefit

of that record, the court concluded it was able to "bypass the

question of whether Title II of the ADA imposes duties on a

county sheriff's department to draft policies and train officers

on the needs of the mentally ill public" because, "[w]hether

obliged to do so by Title II or not, the County did in fact have

such policies and such training." Id. Furthermore, this Court

notes that, unlike the State's suggestion here that issuing a

policy addressing dealings with individuals with mental illness

absolves its responsibility to develop a policy relating to

those with developmental disabilities, see supra at 9 n.3, the

county in Buchanan was relying on a policy and training that

more directly addressed the disability at issue.

### 3. Vicarious Liability Under Title II

In Count XI, Plaintiffs assert that, as a joint employer of

the Deputies, the State is liable for their acts done in

violation of Title VII. ECF No. 19 ¶ 93. The State's primary

argument for the dismissal of this claim is simply that the

Deputies did not violate the statute. See ECF No. 44-1 at 19

("Absent a violation by the individual officers, there can be no

governmental liability."). Because the Court has concluded that

the First Amended Complaint provides sufficient allegations to establish that the Deputies violated Title II, and because it is undisputed that the State is deemed the employer of the Deputies, see Paulone, 787 F. Supp. 2d at 378, the Court will deny the State's motion as to this claim.  See also, Rosen v. Montgomery Cnty., 121 F.3d 154, 157 n.3 (4th Cir. 1997) ("Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent.").

### 4. Damages Against the State under Title II

Finally, the State contends that Plaintiffs cannot recover monetary damages from the State because a plaintiff must show intentional discrimination on the part of the defendant before such damages can be recovered.  ECF No. 44-1 at 19.  In making that argument, however, the State acknowledges that the Fourth Circuit has yet to resolve whether compensatory damages are available for failure to provide a reasonable accommodation claims.  ECF No. 44-1 at 20.

This Court has reached the issue and has concluded that "[a] successful plaintiff in a suit under Title II of the ADA . . . is generally entitled to a 'full panoply' of legal and equitable remedies." Paulone, 787 F. Supp. 2d at 373. Following the majority of circuits that have reached the issue, this Court held that "damages may be awarded if a public entity 'intentionally or with deliberate indifference fails to provide

41

meaningful access or reasonable accommodation to disabled persons.'" Id. (quoting Mark H. v. Lemahieu, 513 F.3d 922, 938 (9th Cir. 2008), and collecting cases). A plaintiff is entitled to damages, "even if the violations resulted from mere 'thoughtlessness and indifference' rather than because of any intent to deny Plaintiff's rights." Id. (quoting Proctor v. Prince George's Hosp. Ctr., 32 F. Supp. 2d 820, 828 (D. Md. 1998)). At this stage in the litigation, the allegations are sufficient to meet the "deliberate indifference" standard.[12]

### C. Regal's Motion to Dismiss

The claims brought against Regal are claims of negligence (Count I) and gross negligence (Count IV). While cast in terms of state law claims, they are clearly premised on an alleged violation of Title III of the ADA. In their First Amended Complaint, Plaintiffs allege that, as a place of public accommodation, Regal was "required to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford their goods, services, facilities, privileges, advantages, or accommodations to

---

[12] The State also argues, correctly, that punitive damages are not available under Title II. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 497 n.16 (4th Cir. 2005). To the extent that Plaintiffs are seeking punitive damages from the State, that prayer will be stricken.

individuals with disabilities" and that Regal's failure "to
modify its policies, practices, and procedures to permit Mr.
Saylor the time and assistance he required to leave the movie
theater (or to have his aide or mother buy him another $12.00
ticket) without the intervention of law enforcement was
negligent."  ECF No. 19 at ¶¶ 35-36.[13]  For the reasons that
follow, the Court finds that Title III cannot be used to support
a negligence claim in this context and, furthermore, that the
actions of Regal were not a proximate cause of Mr. Saylor's
death.

Title III of the ADA provides that "[n]o individual shall
be discriminated against on the basis of disability in the full
and equal enjoyment of the goods, services, facilities,
privileges, advantages, or accommodations of any place of public
accommodation by any person who owns, leases (or leases to), or
operates a place of public accommodation."  42 U.S.C. §12182(a).
Regal concedes that its theater is a "place of public
accommodation" and thus, it is subject to the requirements of
Title III.  Regal correctly notes, however, that while
individuals with disabilities can pursue actions for injunctive

---

[13] In opposing the motion to dismiss, Plaintiffs attempt to argue
that, even if Title III is found not to supply a statutory duty
to support their negligence claims, Regal breached a general
duty of reasonable care.  ECF No. 37 at 18-19.  The negligence
claim in the First Amended Complaint, however, clearly is
premised solely on an alleged breach of a duty under Title III
and the Court will consider it as it was pled.

relief to remedy discriminatory conditions in public
accommodations, it is well established that Title III does not
create a private cause of action for money damages.  See Goodwin
v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir. 2006) (citing an
"unbroken skein of cases makes manifest that money damages are
not an option for private parties suing under Title III of the
ADA").

Recognizing that Title III cannot support an independent
claim for money damages, Plaintiffs suggest that the alleged
breach of the statutory duty created by Title III constitutes
prima facie evidence of common law negligence.  In making this
argument, Plaintiffs rely primarily on two decisions that have
recognized the viability of a negligence claim premised on a
defendant's failure to comply with the certain "Accessibility
Guidelines" promulgated under the ADA (ADAAGs), Smith v. Wal-
Mart Stores, Inc. 167 F.3d 286 (6th Cir. 1999) and Theatre
Management Group, Inc. v. Dalgliesh, 765 A.2d 986 (D.C. 2001).
ECF No. 37 at 8-9.  In Smith, an elderly individual with a
disability fell in a Wal-Mart restroom which was not equipped
with safety features mandated under the ADAAGs, specifically,
grab bars and bathroom stalls large enough to provide
maneuvering space.  167 F.3d at 292-93.  While acknowledging
that a private party may not recover damages under Title III of
the ADA, the Sixth Circuit held that the plaintiff had "a

44

private right of action against Wal–Mart under Georgia law for its failure to implement any ADA-mandated requirements designed for the protection of persons such as herself." Id. at 295.

In Dagliesh, a partially disabled person was injured when he fell while walking down a ramp in defendant's theater.   The trial court allowed the plaintiff to introduce as evidence of negligence the fact that the slope of the ramp exceeded that permitted under the ADAAGs.   The District of Columbia Court of Appeals "sustain[ed] the trial judge's admission of the ADA standard as evidence of the care required in the circumstances." 765 A.2d at 987.

Maryland law also allows, in certain circumstances, that "the breach of a statutory duty may be considered some evidence of negligence." Pananish v. W. Trails, Inc., 517 A.2d 1122, 1132 (Md. Ct. Spec. App. 1986).   Before that breach of statutory duty can be used in that manner, however, three requirements must be met:

> First, the plaintiff must be a member of the class of
> persons the statute was designed to protect.   Second,
> the injury suffered must be of the type the statute
> was designed to prevent.   Third, the plaintiff must
> present legally sufficient evidence to demonstrate
> that the statutory violation was the proximate cause
> of the injury sustained.

Id. (citations omitted).   The requirement that the "injury suffered must be of the type the statute was designed to prevent" has generally limited the application of this principle

45

to the violation of statutes related to public safety or health related issues and each of the Maryland cases on which Plaintiffs rely is so limited.  See, e.g. Brooks v. Lewin Realty III, Inc., 835 A.2d 616, 627 (Md. 2003) (violation of Baltimore City Housing Code as evidence of negligence in lead paint poisoning case); Wietzke v. Chesapeake Conference Ass'n, 26 A.3d 931, 954-55 (Md. 2011) (violation of county code regulating "land-disturbing activity" as evidence of negligence in claim arising from the flooding of a basement); Pahanish, 517 A.2d at 1132 (horse stable's failure to comply with state licensing and inspection regulations as evidence of negligence in claim arising from a fall from a horse); Hammond v. Robins, 483 A.2d 379, 381 (Md. Ct. Spec. App. 1984) (violation of county animal control ordinance as evidence of negligence where unleashed dog caused bicycle accident); Flaccomio v. Eysink, 100 A. 510, 515 (Md. 1916) (violation of food and drug safety statute could provide evidence of negligence in adulterated beverage claim).

Regal maintains, and the Court agrees, that as an anti-discrimination statute, Title III was not designed to prevent the type of injury suffered here.  Smith and Dalgliesh, the ADA cases on which Plaintiffs rely, are not inconsistent with that conclusion.  In both, it was violation of public safety regulations promulgated under the ADA and not the more general

anti-discrimination provisions of the statute itself that was admitted as evidence of negligence.

In opposing Regal's motion, Plaintiffs argue that the court in Dalgliesh actually rejected the argument made by Regal here that the use of violations of statutes as evidence of negligence is limited to public safety statutes.  There is language in Dalgliesh that, at first glance, appears to support the Plaintiffs' view.  Plaintiffs represent that the court in Dalgliesh "held that even 'statutes without [a public safety] objective but setting forth an arguable standard of care are admissible to prove negligence.'"  ECF No. 37 at 9 (quoting Dalgliesh, 765 A.2d at 990, alteration by Plaintiffs).  The sentence from which that quotation was lifted, however, was not a holding.  The court, referring to a previous opinion on this issue, indicated that the previous decision "summarized the law as being that 'code violations, especially [of] those [enactments] with the public safety as an objective, are evidence of negligence,' implying that statutes without that objective but setting forth an arguable standard of care are admissible to prove negligence." Dalgliesh (quoting Jimenez v. Hawk, 683 A.2d 457, 461 (D.C. 1996), first emphasis added in Dalgliesh, second by this Court).  The Dalgliesh court went on to note that "[u]ltimately, however, this case does not compel us to resolve the issue of evidentiary use of statutes having no

47

public safety objective, because it is evident to us that the ADA — and specifically the physical accessibility guidelines promulgated under it — possess such an aim." Id. at 991 (emphasis added). The actual holding of the decision was that "[s]ince, as we conclude, the ADA standard governing ramps embodies a public safety objective, it satisfied any admissibility requirement of such purpose that can be gleaned from our decisions." Id. Thus, this decision is consistent with Maryland case law and is of little support for Plaintiffs' position. See also, James v. Peter Pan Transit Mgmt, Inc., Civ. No. 97-747, 1999 WL 735173, at *9 (E.D.N.C. Jan. 20, 1999) (opining that "[t]he ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "therefore, it is unlikely that the North Carolina courts would find that the ADA is a safety statute or that violation of the ADA constitutes negligence per se").[14]

Should the Court find that a violation of the ADA could be used as evidence of negligence, as Plaintiffs suggest, the Court would, nonetheless, conclude that the claim would fail because Regal's conduct was not the proximate cause of Mr. Saylor's

[14] Unlike Maryland courts, North Carolina courts have held that the violation of a public safety statute is negligence per se. Id. North Carolina, however, recognizes the same distinction as Maryland between statutes that are public safety statutes and those that are not.

injury and death.   In <u>Pittway Corporation v. Collins</u>, the

Maryland Court of Appeals provided a thorough and comprehensive

review of the principles of "proximate cause."   973 A.2d 771,

786-792 (Md. 2009).   The court explained:

> Proximate cause involves a conclusion that someone
> will be held legally responsible for the consequences
> of an act or omission.   To be a proximate cause for an
> injury, the negligence must be 1) a cause in fact, and
> 2) a legally cognizable cause.   In other words, before
> liability may be imposed upon an actor, we require a
> certain relationship between the defendant's conduct
> and the plaintiff's injuries.   The first step in the
> analysis to define that relationship is an examination
> of causation-in-fact to determine who or what caused
> an action.   The second step is a legal analysis to
> determine who should pay for the harmful consequences
> of such an action.

<u>Id.</u> at 786 (internal quotations and citations omitted).

Where, as here, it is alleged that two or more independent

negligent acts bringing about an injury, the "substantial

factor" test controls the determination of "causation-in-fact."

<u>Id.</u> at 787.   Factors to be considered in determining whether an

actor's conduct was a "substantial factor" in bring about a

particular harm include:

> "(a) the number of other factors which contribute in
> producing the harm and the extent of the effect which
> they have in producing it;
>
> (b) whether the actor's conduct has created a force or
> series of forces which are in continuous and active
> operation up to the time of the harm, or has created a
> situation harmless unless acted upon by other forces
> of which the actor is not responsible."

Id. (quoting Restatement (Second) of Torts § 433).

If causation-in-fact is established, which it arguably is here, the inquiry turns to whether the defendant's negligence actions constitute a legally cognizable cause of the plaintiff's injuries.  This part of the proximate cause analysis considers "whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected."  Id.  "The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct.  Other public policy considerations that may play a role in determining legal causation include "the remoteness of the injury from the negligence [and] the extent to which the injury is out of proportion to the negligent party's culpability. . . ."  Id. at 788.  Under this analysis, a "defendant may not be liable if it appears highly extraordinary and unforeseeable that the plaintiffs' injuries occurred as a result of the defendants' alleged tortious conduct."  Id. (emphasis added).  "Where it appears to the court in retrospect that it is highly extraordinary that an intervening cause has come into operation, the court may declare such a force to be a superseding cause."  Id. (quoting Restatement (Second) of Torts § 435 cmt. c).

In determining whether an intervening negligent act rises to the level of a superseding cause that would absolve the

50

initial tortfeasor of liability, it is important to note that
courts consider not only the unforeseeability of the intervening
act, but also "the fact that its intervention brings about harm
different in kind from that which would otherwise have resulted
from the actor's negligence." Id. (quoting Restatement (Second)
of Torts § 442). The Maryland Court of Appeals emphasized that
it "does not limit the superseding cause analysis to a
consideration of either the foreseeability of the harm suffered
by the plaintiffs or the foreseeability of the intervening acts
in its approach to determining superseding causation. Rather,
[it] consider[s] both the foreseeability of the harm suffered by
the plaintiffs as well as the foreseeability of intervening acts
in determining superseding causation." Id. at 792 (emphasis in
original) (citations omitted).

Here, the Court notes that the alleged conduct of Regal is
extremely limited. Plaintiffs allege that after talking with
Ms. Crosby and telling her that Mr. Saylor needed to purchase
another ticket or leave, the theater manager called for
assistance from an off-duty deputy sheriff and asked him "to
remove Mr. Saylor." ECF No. 19 ¶ 22. Then, at the request of
the original deputy, the manager called for the assistance of
two other deputies. Id. ¶ 26. The Court finds that it was
"highly extraordinary and unforeseeable" that Mr. Saylor would
die as a result of that conduct.

Perhaps the clearest indication that Regal's conduct was not a proximate cause of Mr. Saylor's death is the manner in which Plaintiffs felt compelled to argue foreseeability in opposing Regal's motion.  Plaintiffs argue that "Regal's violation of Title III proximately caused Mr. Saylor's death" on the ground that "[o]nce Regal refused the necessary modification and demanded that the deputies intervene and forcibly remove Mr. Saylor from the theater, it was foreseeable that Mr. Saylor would be injured."  ECF No. 37 at 17 (emphasis added).  The First Amended Complaint, however, simply alleges that, on information and belief, the theater employee "asked" the security guard "to remove Mr. Saylor."  ECF No. 19 at ¶ 22.  It does not allege that the employee "demanded" that he be removed and it certainly does not allege that he demanded that he be "forcibly" removed.  In their strained effort to establish proximate cause on the part of Regal, Plaintiffs continue, "[m]oreover, it was foreseeable that handcuffing an obese Mr. Saylor on the ground while applying pressure to his back would fracture his larynx."  ECF No. 37 at 18.  To suggest that a theater manager's request to a law enforcement officer to remove a patron from a theater would result in the patron being handcuffed, ending up on the ground, with an officer on his back, and, with a fractured larynx presumes a degree of

clairvoyance on the part of the manager that the law does not impose.

The Court is aware that the proximate cause analysis is generally "reserved for the trier of fact." Pittway, 973 A.2d at 792. Nevertheless, "it becomes a question of law in cases where reasoning minds cannot differ." Id. Furthermore, as commentators quoted by the Maryland Court of Appeals opined, the proximate cause analysis, particularly the concept of "'legal causation,' depends 'essentially on whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred.'" Id. (quoting William Lloyd Prosser & W. Page Keeton, The Law of Torts § 42, at 273). Here, imposing liability on Regal would imply that, where a citizen makes a request of a law enforcement officer to intervene in a situation, that citizen should be held liable for the officer's use of excessive or deadly force should that citizen's request be found to have been negligently made. While the Court is painfully aware that law enforcement officers do, at times, employ excessive and deadly force, the Court does not believe that it has come to the point that citizens must now anticipate that possibility when simply requesting the assistance of the police.

The Court will dismiss the negligence claim against Defendant Regal. The Court will also dismiss the gross

53

negligence claim against Regal.  In addition to the reasons given above for dismissing the negligence claim, the Court finds that there is no support in the First Amended Complaint beyond Plaintiffs' bald and conclusory allegations for the conclusion that Regal acted with either malice or a "wanton or reckless disregard for human life or for the rights of others." See Wells v. State, 642 A.2d 879, 884 (Md. Ct. Spec. App. 1994).

## IV. CONCLUSION

For the above stated reasons the following claims will be dismissed: the claim against the Deputies for Negligence (Count II); the Wrongful Death claim against the State (Count XII); and all claims against Regal (Counts I and IV).  In addition, Plaintiffs' prayer for punitive damages against the Deputies under their Wrongful Death claim and against the State as to all claims will be stricken.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: October 16, 2014