**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| THE ESTATE OF ROBERT ETHAN SAYLOR, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> REGAL CINEMAS, INC., *et al.*, <br><br> Defendants. | Case No. 1:13-cv-03089-WMN |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Sharon Krevor-Weisbaum (Fed. Bar No. 04773)
Joseph B. Espo (Fed. Bar No. 07490)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
skw@browngold.com
jbe@browngold.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

    The Events of January 12, 2013 ................................................................. 2

    The Deputies' Training ............................................................................. 15

    The Deputies' Secondary Employment with Hill Management ................. 17

PROCEDURAL HISTORY ................................................................................ 18

STANDARD OF REVIEW ............................................................................... 19

ARGUMENT ................................................................................................... 19

I.      The Deputies' Motion for Summary Judgment Should Be Denied Because They Violated Mr. Saylor's Fourth Amendment Rights, and Their Actions Are Not Protected by Qualified Immunity ............................................. 19

    A.    Defendants Rochford, Jewell, and Harris Violated Mr. Saylor's Fourth Amendment Rights, Enforced through 42 U.S.C. § 1983, by Employing Excessive Force to Remove Him from the Theater .............. 19

        1.    The Deputies' Use of Force against Mr. Saylor Was Excessive and Unreasonable Under the Totality of the Circumstances. ........................................................................ 20

            a.    Mr. Saylor Did Not Commit a "Severe Crime." .............. 21

            b.    Mr. Saylor Did Not Pose an Immediate Threat to the Safety of the Deputies or Others. ............................... 22

            c.    Mr. Saylor Was Not Resisting Arrest or Attempting to Flee. ........................................................................... 25

            d.    The Deputies Acted With Unreasonable Haste Under the Circumstances. .................................................. 26

            e.    The Deputies Unreasonably Failed to Consider Mr. Saylor's Disability. ................................................... 27

            f.    Mr. Saylor Suffered Catastrophic Injuries and Died. ....... 31

2.      The Deputies' Changed Circumstances Argument is Unavailing ................................................................................. 31

B.      Defendants Rochford, Jewell, and Harris Are Not Entitled to Qualified Immunity Because Their Actions Violated Clearly Established Law ................................................................................. 33

C.      Defendants Rochford, Jewell, and Harris Are Also Liable for the Plaintiffs' State-Law Claims ........................................................ 40

        1.      The Evidence Supports the Plaintiffs' Claims for Gross Negligence and Battery ............................................... 40

                a.      Gross Negligence ........................................................... 40

                b.      Battery ........................................................................... 41

                c.      Patti and Ronald Saylor Have Standing to Bring a Wrongful Death Claim ................................................... 43

        2.      The Deputies Are Not Immune from Liability for the Plaintiffs' State-Law Claims ........................................... 44

        3.      The Plaintiffs' State-Law Claims Are Not Barred by Contributory Negligence or Assumption of the Risk ................. 45

                a.      Contributory Negligence Does Not Bar the Estate's Gross Negligence Claim ................................................. 46

                b.      The Saylors' Wrongful Death Claim Is Not Barred by Contributory Negligence or Assumption of the Risk ................................................................................. 48

II.      The State of Maryland Violated Title II of the ADA by Failing to Properly Train the Deputies, Which Resulted In the Deputies' Failure to Accommodate Mr. Saylor During an Arrest and Also Is Vicariously Liable for the Deputies' Violations ................................................................. 50

A.      The Deputies Discriminated against Mr. Saylor on the Basis of His Disability Because the State Failed to Properly Train Them Regarding Interactions with Developmentally Disabled Individuals ....... 51

B.      It Is for the Jury to Determine the Credibility of the Parties' Experts ........................................................................................ 59

C.      The Deputies Failed to Accommodate Mr. Saylor's Disability Throughout Their Encounter with Him ................................... 61

D.     The State's Liability Under the ADA for The Deputies' Actions and Inactions Does Not Turn on Whether or Not the Deputies Are Entitled To Qualified Immunity................................................................ 66

E.     Failure to Train Claims Are Cognizable Under the ADA ........................ 67

F.     Even Absent a Failure to Train the State is Responsible In *Respondeat Superior* for the Deputies' Violations of the ADA .............. 67

III.     Defendant Hill Management Is Liable for Negligence, Gross Negligence, and Battery ...................................................................................................... 67

A.     A Jury Could Find that Hill Management Was a Joint Employer of the Deputies During the Arrest of Mr. Saylor.......................................... 68

B.     Hill Management Was Indisputably the Employer of the Deputies When They First Confronted Mr. Saylor, Before They Initiated an Arrest, and Is Therefore Liable for the Deputies' Negligence and Gross Negligence in Initiating a Confrontation with Mr. Saylor.............. 73

CONCLUSION ..................................................................................................................... 75

# TABLE OF AUTHORITIES

## Cases

*A Helping Hand, LLC v. Baltimore Cty., Md.,*
   515 F.3d 356 (4th Cir. 2008) ................................................................. 51

*Adams v. Montgomery Coll. (Rockville),*
   834 F. Supp. 2d 386 (D. Md. 2011) ........................................................ 61

*Alexander v. City and County. of San Francisco,*
   29 F.3d 1355 (9th Cir. 1994) ................................................................. 36

*Allen v. Muskogee, Okl.,*
   119 F.3d 837 (10th Cir. 1997) ............................................................... 59

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) ............................................................................... 19

*Ashton v. Brown,*
   339 Md. 70 (1995) ................................................................................. 43

*Atkins v. Virginia,*
   536 U.S. 304 (2002) ............................................................................... 29

*Auto. Trade Ass'n of Md. v. Harold Folk Enter., Inc.,*
   301 Md. 642 (1984) ............................................................................... 68

*Bahl v. Cty. of Ramsey,*
   695 F.3d 778 (8th Cir. 2012) ................................................................. 66

*Bailey v. Kennedy,*
   349 F.3d 731 (4th Cir. 2003) ................................................................. 38

*Barbre v. Pope,*
   402 Md. 157 (2007) ............................................................................... 40

*Barclay v. Briscoe,*
   427 Md. 270 (2012) ............................................................................... 73

*Bates ex rel. Johns v. Chesterfield Co., Va.,*
   216 F.3d 367 (4th Cir. 2000) .......................................................... passim

*Beall v. Holloway-Johnson,*
   446 Md. 48 (2016) ........................................................................... 41, 42

*Blood v. Hamami P'ship, LLP,*
   143 Md. App. 375 (2002) ...................................................................... 49

*Board of Comm'rs of Bryan Cty. v. Brown,*
    520 U.S. 397 (1997) ................................................................................ 52, 58

*Brazerol v. Hudson,*
    262 Md. 269 (1971) ...................................................................................... 24

*Bryan v. MacPherson,*
    630 F.3d 805 (9th Cir.2010) ........................................................................ 27

*Buchanan v. Maine,*
    469 F.3d 158 (1st Cir. 2006) ........................................................................ 57

*Campbell v. Balt. Gas & Elec. Co.,*
    95 Md. App. 86 (1993) .................................................................................. 46

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...................................................................................... 19

*City and County of San Francisco, California, et. al. v. Sheehan,*
    135 S.Ct. 1765 (2015) ...................................................................... 35, 36, 38

*City of Canton v. Harris,*
    489 U.S. 378 (1989) ............................................................................. passim

*City of Los Angeles v. Heller,*
    475 U.S. 796 (1986) ...................................................................................... 66

*City of Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985) ...................................................................................... 59

*Constantine v. Rectors & Visitors of George Mason Univ.,*
    411 F.3d 474 (4th Cir. 2005) ........................................................................ 50

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ...................................................................................... 33

*De Boise v. St. Louis Cty., Mo.,*
    135 S. Ct. 2348 (2015) .................................................................................. 64

*De Boise v. Taser Int'l, Inc.,*
    760 F.3d 892 (8th Cir. 2014) ................................................................. 64, 66

*Dehn v. Edgecombe,*
    152 Md. App. 657 (2003) .............................................................................. 49

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001) ............................................................... 27, 36

*Dix v. Spampinato,*
  28 Md. App. 81 (1975) ........................................................................... 48

*Dodson v. South Dakota Dept. of Human Services,*
  703 N.W.2d 353 (S.D. 2005) ................................................................. 47

*Doe v. Bd. of Educ. of Prince George's Cty.,*
  982 F. Supp. 2d 641 (D. Md. 2013)
  *aff'd,* 605 F. App'x 159 (4th Cir. 2015)................................................. 74

*Dowe v. Total Action Against Poverty in Roanoke Valley,*
  145 F.3d 653 (4th Cir. 1998) ................................................................. 20

*Duncan v. Storie,*
  869 F.2d 1100 (8th Cir.1989) ................................................................ 21

*Embrey v. Holly,*
  293 Md. 128 (1982) ............................................................................... 73

*Estate of Armstrong v. The Village of Pinehurst,*
  810 F.3d 892 (2016)...................................................................... passim

*Graham v. Connor,*
  490 U.S. 386 (1989)...................................................................... passim

*Grayson v. Peed,*
  195 F.3d 692 (4th Cir. 1999) ................................................................. 66

*Great Atlantic Tea v. Imbraguglio,*
  346 Md. 573 (1997) ............................................................................... 69

*Green v. Brooks,*
  125 Md. App. 349 (1999) ...................................................................... 44

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,*
  335 Md. 135 (1994) ............................................................................... 75

*Henry v. Purnell,*
  652 F.3d 524 (4th Cir. 2011) ................................................................. 41

*Hines v. French,*
  157 Md. App. 536 (2004) ...................................................................... 43

*Holscher v. Mille Lacs Cty.,*
  924 F. Supp. 2d 1044 (D. Minn. 2013)................................................... 56

*Hope v. Pelzer,*
  536 U.S. 730 (2002).......................................................................... 39, 40

*Horridge v. St. Mary's Cty. Dep't of Soc. Servs.*,
   382 Md. 170 (2004) ............................................................................ 74

*J.V. v. Albuquerque Pub. Sch.*,
   -- F.3d --, No. 15-2071, 2016 WL 683282 (10th Cir. Feb. 19, 2016) ...................................... 52

*Jacobs v. N.C. Admin. Office of the Courts*,
   780 F.3d 562 (4th Cir. 2015) ............................................................ 19

*Janelsins v. Button*,
   102 Md. App. 30 (1994) .................................................................... 46

*Jones v. Buchanan*,
   325 F.3d 520 (4th Cir. 2003) ................................................... passim

*Keating v. Helder*,
   No. CIV. 08-5243, 2011 WL 3703264 (W.D. Ark. Aug. 23, 2011) ........................................ 56

*Lee v. Cline*,
   384 Md. 245 (2004) .......................................................................... 44

*Liscombe v. Potomac Edison Co.*,
   303 Md. 619 (1985) ............................................................ 41, 46, 49

*Lolli v. Cty. of Orange*,
   351 F.3d 410 (9th Cir. 2003) ............................................................ 21

*Long v. Cty. of Los Angeles*,
   442 F.3d 1178 (9th Cir. 2006) .......................................................... 59

*Lovelace v. Anderson*,
   366 Md. 690 (2001) ................................................... 68, 69, 70, 72

*Lynch v. Rosenthal*,
   396 S.W. 2d 272 (Mo. Ct. App. 1965) ......................................... 47, 48

*Mackall v. Zayre Corp.*,
   293 Md. 221 (1982) ................................................................. 68, 73

*Mark H. v. Lemahieu*,
   513 F.3d 922 (9th Cir. 2008) ............................................................ 50

*Martin v. City of Broadview Hts.*,
   712 F.3d 951 (6th Cir. 2013) ............................................................ 27

*McCoy v. City of Monticello*,
   411 F.3d 920 (8th Cir. 2005) ............................................................ 66

*McHugh v. Olympia Entm't, Inc.*,
   37 F. App'x 730 (6th Cir. 2002) ........................................................ 49

*Merritt v. Old Dominion Freight Line, Inc.*,
   601 F.3d 289 (4th Cir. 2010) .......................................................... 19

*Meyers v. Baltimore Cty., Md.*,
   713 F.3d 723 (4th Cir. 2013) ................................................... passim

*Morais v. City of Philadelphia*,
   2007 WL 853811 (E.D. Pa. 2007) ................................................... 65

*Morris v. Opsahl*,
   No. 12-CV-2134-RPM, 2014 WL 675419  (D. Colo. Feb. 21, 2014) ................. 54

*Mosser v. Fruehauf Corp.*,
   940 F.2d 77 (4th Cir. 1991) ........................................................... 59

*Mummert v. Alizadeh*,
   435 Md. 207 (2013) ..................................................................... 49

*Nelson v. Carroll*,
   355 Md. 593 (1999) ..................................................................... 42

*Patzner v. Burkett*,
   779 F.2d 1363 (8th Cir. 1985) ........................................................ 36

*Paulone v. City of Frederick*,
   787 F. Supp. 2d 360 (D. Md. 2011) ......................................... 50, 52, 61

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .................................................................... 33

*Proctor v. Prince George's Hosp. Ctr.*,
   32 F. Supp. 2d 820 (D. Md. 1998) ................................................... 61

*Quezada v. Cty. of Bernalillo*,
   944 F.2d 710 (10th Cir. 1991) ........................................................ 49

*Reid v. Wash. Overhead Door, Inc.*,
   122 F. Supp. 2d 590 (D. Md. 2000) .................................................. 47

*Rich v. State*,
   205 Md. App. 227 (2012) .............................................................. 24

*Richardson v. McGriff*,
   361 Md. 437 (2000) ..................................................................... 43

*Roberts v. City of Omaha,*
  723 F.3d 966 (8th Cir. 2013) ................................................................ 52

*Romanesk v. Rose,*
  248 Md. 420 (1968) ................................................................ 41

*Rosen v. Montgomery Cty.,*
  121 F.3d 154 (4th Cir. 1997) ................................................................ 67

*Rowland v. Perry,*
  41 F.3d 167 (4th Cir. 1994) ................................................................ passim

*Russo v. City of Cincinnati,*
  953 F.2d 1036 (6th Cir. 1992) ................................................................ 56, 58, 60

*Saba v. Darling,*
  72 Md. App. 487 (1987) ................................................................ 46

*Santiago v. Lane,*
  894 F.2d 218 (7th Cir.1990) ................................................................ 49

*Saucier v. Katz,*
  533 U.S. 194 (2001) ................................................................ 33, 34

*Sawyer v. Humphries,*
  22 Md. 247 (1991) ................................................................ 69

*Seremeth v. Board of County Commissioners of Frederick County,*
  673 F.3d 333 (4th Cir. 2012) ................................................................ 65

*Shadrick v. Hopkins Cty., Ky.,*
  805 F.3d 724 (6th Cir. 2015) ................................................................ 56

*Shoemaker v. Smith,*
  353 Md. 143 (1999) ................................................................ 44, 45

*Smith v. Gross,*
  319 Md. 138 (1990) ................................................................ 49

*Smith v. Ray,*
  781 F.3d 95 (4th Cir. 2015) ................................................................ 20, 22, 25, 39

*Sornberger v. City of Knoxville,*
  434 F.3d 1006 (7th Cir. 2006) ................................................................ 52

*State v. Wiegmann,*
  350 Md. 585 (1998) ................................................................ 24

*Stout v. Reuschling*,
  No. CIV.A. TDC-14-1555,
  2015 WL 1461366 (D. Md. Mar. 27, 2015) ......................................... 22

*Taylor v. Harford County Dep't of Soc. Servs.*,
  384 Md. 213 (2004) ............................................................. 41

*Tennessee v. Garner*,
  471 U.S. 1 (1985)........................................................ 20, 32, 33

*Thomas v. City of Wichita, Kan.*,
  No. 13-1040-CM, 2014 WL 3565476 (D. Kan. July 18, 2014)............... 53

*Thomas v. Cumberland Cty.*,
  749 F.3d 217 (3d Cir. 2014) .................................................. 58

*Tolan v. Cotton*,
  __ U.S. __, 134 S. Ct. 1861 (2014)........................................... 34

*Tyger Const. Co. v. Pensacola Const. Co.*,
  29 F.3d 137 (4th Cir. 1994) .................................................. 59

*Waller v. City of Danville*,
  556 F.3d 171 (4th Cir. 2009) ................................................. 64

*Waterman v. Batton*,
  393 F.3d 471 (4th Cir. 2005) ................................................. 32

*Whitehead v. Safway Steel Products*,
  304 Md. 67 (1985) ........................................................... 68

*Williams v. City of New York*,
  121 F. Supp. 3d 354 (S.D.N.Y. 2015) ......................................... 58

*Williams v. Prince George's County*,
  112 Md. App. 526 (1996) ..................................................... 43

*Williamson Truck Lines, Inc. v. Benjamin*,
  244 Md. 1 (1966) ............................................................ 46

*Wingard v. Penn. State Police*,
  No. CIV.A. 12-1500, 2013 WL 3551109 (W.D. Pa. July 11, 2013) ......... 65

*Wooldridge v. Price*,
  184 Md. App. 451 (2009) ..................................................... 49

*Young v. City of Providence ex rel. Napolitano*,
  404 F.3d 4 (1st Cir. 2005).................................................... 59

*Young v. Prince George's Cty., Maryland,*
   355 F.3d 751 (4th Cir. 2004) ................................................................... 20, 29, 42

## Statutes

42 U.S.C. § 12102(1)(A) ............................................................................. 54

42 U.S.C. § 12131 ....................................................................................... 50

42 U.S.C. § 12131(2) .................................................................................. 61

42 U.S.C. § 12132 ....................................................................................... 50

42 U.S.C. § 1983 .................................................................................... passim

Md. Code Ann., Cts. & Jud. Proc. § 3-902 ............................................... 43

Md. Code Ann., Cts. & Jud. Proc. § 3904 ................................................ 43

Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) ........................................... 44

## Rules

Fed.R.Civ.P. 56(a) ..................................................................................... 19

## Regulations

28 C.F.R. § 35.130(b)(7) ............................................................................. 61

## Other Authorities

Americans With Disabilities: 2010," U.S. Department of Commerce, U.S. Census Bureau
   (July 2012), *available at* http://www.census.gov/prod/2012pubs/p70-131.pdf ...................... 58

## **INTRODUCTION**

At least one fact is undisputed in this case.  Because he did not pay for a movie ticket, Robert Ethan Saylor, a young man with Down syndrome, died during his ensuing brief interaction with three off-duty Frederick County Sheriff's Deputies.  However, because many of the material facts surrounding the short encounter preceding Mr. Saylor's death are in dispute, and because the Defendants are not entitled to judgment as a matter of law, their Motions for Summary Judgment should be denied.

Examples of those material factual disputes abound.  For instance, the Parties dispute whether Mr. Saylor's staff member, Mary Crosby, asked for security assistance or whether an employee of Regal Cinema asked a security guard to eject Mr. Saylor; whether Ms. Crosby told the off-duty sheriff's deputies who were called that Mr. Saylor could become violent; whether the sheriff's deputies had been properly trained to interact with an individual who has a developmental disability; and whether the sheriff's deputies used force on Mr. Saylor that, in light of the circumstances, was unreasonable.

Stripping away the complexities of such legal analyses as the right to qualified immunity, failure-to-train liability, and the contours of gross negligence, and applying the traditional summary judgment standard, this case clearly is one that requires the fact-finding of a jury.  The Court need only determine whether, viewing the multitude of factual disputes in the light most favorable to the Plaintiffs, a reasonable jury could find the Defendants liable for the Plaintiffs' claiMs.  Because the facts, construed in the Plaintiffs' favor, could lead a jury to decide that the Defendants violated Mr. Saylor's Fourth Amendment rights, state-law rights, and statutory rights under the Americans with Disabilities Act, the Defendants' Motions should be denied.

## STATEMENT OF FACTS

**The Events of January 12, 2013**

On January 12, 2013, Robert Ethan Saylor was 26 years old.  Ex. 1, Death Certificate.

Mr. Saylor was a large man, standing about five feet six inches tall and weighing approximately

294 pounds.  Ex. 2, Autopsy Report at 2.  Mr. Saylor had Down syndrome, which caused him to

have various developmental and intellectual disabilities, including an I.Q. of about 40.  Ex. 3,

Deposition of Patricia Saylor, 31:3-11, 32:10-33:11.  Mr. Saylor was recognizable as being a

person with Down syndrome, as he had physical and facial features common to persons with this

disability.  Indeed, Defendants Rochford, Jewell, and Harris all testified that they knew

Mr. Saylor had Down syndrome when they saw him.  Ex. 4, Deposition of Richard Rochford,

42:13-16; Ex. 5, Deposition of Scott Jewell, 50:5-7; Ex. 6, Deposition of James Harris, 37:9-17.

Similarly, Kevin Rhodes, the on-duty manager of the Regal Cinemas Westview Stadium 16 at

Westview Promenade in Frederick County ("Regal Theater") on January 12, stated that he could

tell that Mr. Saylor had Down syndrome from his "personality and physical appearance."  Ex. 7,

Deposition of Kevin Rhodes, 21:21-22:7.

Mr. Saylor was also diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD")

as a child, and Oppositional Defiance Disorder ("ODD"), Impulse Control Disorder, and Anxiety

Disorder Not Otherwise Specified in adulthood.  Ex. 8, Deposition of Breck Borcherding, M.D.,

16:13-17:18; Ex. 3, P. Saylor Dep., 34:12-36:5.  Due to his disabilities, Mr. Saylor often reacted

negatively to demands or rules placed on him by authority figures.  Ex. 8, Borcherding Dep.,

27:3-18.  According to Dr. Borcherding, who was Mr. Saylor's treating psychiatrist, when

Mr. Saylor engaged in oppositional behavior, trying to confront it directly "generally escalated

his rigidity and resistance to getting something done."  *Id.,* 28:7-29:2.  Indeed, pushing

Mr. Saylor too hard could trigger more oppositional behavior in response.  *Id.,* 29:12-30:13.

Instead, giving Mr. Saylor "time and space to recover" was usually the most effective response when he became oppositional. *Id.,* 34:15-22.

Mr. Saylor's disabilities did not prevent him from living a full and active life.  He attended school through the age of 21, Ex. 3, P. Saylor Dep., 65:14-16, 69:13-20.  At the time of his death, he was living independently in an apartment attached to his mother Patricia ("Patti") Saylor's home, *id.,* 115:14-21, 142:18-143:5.  Mr. Saylor enjoyed going out in the community; for instance, Mr. Saylor enjoyed trips to Wal-Mart, liked taking photos and sight-seeing, and loved going to the movies.  *Id.,* 13:18-14:16, 102:4-6; Ex. 9, Deposition of Mary Crosby, 51:15-19, 64:19-65:7.

Mr. Saylor used a variety of support services to assist him with living in the community, which were outlined in a person-centered plan that was developed by Mr. Saylor in conjunction with an interdisciplinary team of people who knew him and understood his needs.  Ex. 10, Deposition of Celia Feinstein, 45:5-19.[1]  These services included full-time staff to assist him in his activities of daily living, such as going to stores, preparing meals, and taking outings.  Ex. 3, P. Saylor Dep., 18:3-17.  One of those staff members was Mary Crosby, who was with Mr. Saylor on the day of his death, and who had been working for Mr. Saylor for approximately three months.  Ex. 9, Crosby Dep., 23:14-17, 35:21-36:1, 60:9-62:2; Ex. 3, P. Saylor Dep., 99:3-100:18.

On Saturday, January 12, 2013, Ms. Crosby arrived at the Saylor residence in the morning.  Ex. 9, Crosby Dep., 61:2-5.  Mr. Saylor and Ms. Crosby watched television and did a craft activity, after which they took a drive to Cunningham Falls to take photographs.  *Id.,* 60:19-

---

[1] The Plaintiffs designated Celia S. Feinstein as an expert regarding community integration of persons with disabilities.  She has a Master of Arts in Sociology, Health & Mental Health Program Evaluation, and is the Co-Executive Director of the Institute on Disabilities/UCEDD at Temple University in Philadelphia.  Ex. 25, CV of Celia Feinstein.

61:1, 64:19-65:7.  After spending some time at Cunningham Falls, they went to Burger King for lunch, stopping at an outdoor display on the way to take more photographs.  *Id.,* 65:20-66:17. They arrived back at Mr. Saylor's home at approximately 5:00 p.m., *id.,* 66:18-22, and then agreed to go see the film "Zero Dark Thirty" later that evening, *id.,* 67:1-14.  Ms. Saylor gave Ms. Crosby enough cash for both Mr. Saylor and herself to attend the movie at the Regal Theater.  *Id.*

When Ms. Crosby and Mr. Saylor arrived at the Westview Promenade on January 12, they parked to the right of the Regal Theater entrance and farther back in the parking lot, as the shopping center was busy that evening.  Ex. 9, Crosby Dep. 73:3-77:11; Ex. 11, Google earth printout (FCSO Ex. 15 to Crosby Dep.).  They walked from the parked car to the theater together.  Ex. 9, Crosby Dep., 77:6-11; Ex. 11.  Once inside, Ms. Crosby purchased tickets for herself and Mr. Saylor to see "Zero Dark Thirty," as well as candy for Mr. Saylor, using the money Ms. Saylor had given them.  *Id.,* 59:7-60:11.  She and Mr. Saylor then made their way into Theater 9,[2] where Mr. Saylor sat in his favorite seat, one step up in the stadium seating area. *Id.,* 53:20-54:9, 81:5-7.

The movie ended at approximately 10:00 p.m.  *Id.,* Crosby Dep., 62:1-2.  Mr. Saylor smiled broadly and clapped at the end, and then he and Ms. Crosby stood up and began to exit the theater.  *Id.,* 82:18-22.  Because Mr. Saylor had liked "Zero Dark Thirty" so much, he started to get upset that the movie was over and they had to leave.  *Id.,* 83:1-5.  Once outside the theater, on their way to the parking lot, Mr. Saylor slowed his pace, and repeatedly started to walk back towards the Regal Theater before turning around and rejoining Ms. Crosby.  *Id.,* 83:13-84:2.

---

[2] Ms. Crosby did not know the number of the theater in which she and Mr. Saylor saw the movie, but the Plaintiffs do not dispute that it was Theater 9.  *See* Dkt. 102-1, Deputies' Memorandum in Support of Motion for Summary Judgment ("DMSJ") at 6.

Then, when Ms. Crosby asked Mr. Saylor if he was ready to go home, he punched a store window out of anger and frustration. *Id.,* 84:3-21; Ex. 11. Not sure how best to deal with Mr. Saylor's change in mood, Ms. Crosby called Ms. Saylor. Ex. 9, Crosby Dep., 84:22-85:1; Ex. 3, P. Saylor Dep., 110:21-111:19. Ms. Saylor reassured Ms. Crosby that everything would be fine, said she should just "wait [Mr. Saylor] out," and encouraged Ms. Crosby to call Christopher Perry, another member of Mr. Saylor's staff who had been working with him for multiple years and thus had more experience with handling different types of situations. Ex. 9, Crosby Dep. 47:4-17, 88:12-89:3; Ex. 3, P. Saylor Dep., 112:6-9, 116:6-8, 117:9-15.

Ms. Crosby then spoke to Mr. Perry. Mr. Perry knew that on previous occasions Mr. Saylor had not wanted to walk the full distance to the car, so he surmised that was true again. Ex. 23, Deposition of Christopher Perry, 64:20-66:9, 68:3-6. Therefore, Mr. Perry suggested that Ms. Crosby go and get the car by herself and then drive to the front of the Regal Theater, where she could pick Mr. Saylor up. Ex. 9, Crosby Dep., 89:4-19; Ex. 12, Excerpt from Case Summary Report, Initial Interview with Christopher Matthew Perry; Ex. 23, Perry Dep., 64:20-66:9. He advised Ms. Crosby to keep an eye on Mr. Saylor, and if he wandered away a bit, to put her hazard lights on and follow him once she had parked the car by the theater entrance. Ex. 9, Crosby Dep., 89:4-19. Mr. Perry's advice was in keeping with Mr. Saylor's person-centered plan, which did not require arms-length or eyesight supervision at all times. Ex. 3, P. Saylor Dep., 14:6-15:6; Ex. 10, Feinstein Dep., 53:7-54:7. Indeed, Mr. Saylor's family and staff would customarily leave him on his own in public places for short periods when they used the rest room or went to retrieve the car. Ex. 3, P. Saylor Dep., 14:17-15:6.

Ms. Crosby followed Mr. Perry's advice and went to get her car, repeatedly turning around to check on Mr. Saylor while she walked.  Ex. 9, Crosby Dep., 97:9-98:8.  As she parked her car by the theater entrance, Ms. Crosby saw Mr. Saylor walk back inside.  *Id.,* 100:4-9.

Mr. Saylor walked directly back to Theater 9 and to his regular seat.  Ex. 27, Screenshots from Regal Security Video footage, at Screenshots 1-3; Ex. 9, Crosby Dep., 53:20-54:9, 103:4-8, 105:4-14, 131:19-21; Ex. 4, Rochford Dep., 74:18-75:1; Ex. 16, Deposition of Charlotte Masser, 32:6-33:1.  Kevin Rhodes, the manager on duty at the Regal Theater on January 12, 2013, was cleaning Theater 9 when an usher told him that there was a customer in the theater.  Ex. 7, Rhodes Dep., 42:14-19.  Mr. Rhodes asked Mr. Saylor if he was there for the next movie, and Mr. Saylor responded that he had just seen the movie and wanted to watch it again.  *Id.* 44:11-17.  Mr. Rhodes told Mr. Saylor that he would need to buy another ticket, and discussed with him how he might purchase one if he did not have any cash.  *Id.* 45:6-13.  Mr. Rhodes and Mr. Saylor walked out of Theater 9 together, *id.* 46:1-5, with Mr. Rhodes telling Mr. Saylor he needed to purchase another ticket. Ex. 15, Deposition of David K. Masser, 18:16-19:12; Ex. 16, C. Masser Dep., 19:17-20; 22:16-23:1.  Mr. Rhodes went into another theater, while Mr. Saylor made his way back into Theater 9 to his regular seat.  Ex. 7, Rhodes Dep., 46:6-9; Ex. 15, D. Masser Dep., 23:8-13; Ex. 16, C. Masser Dep., 19:17-20; 25:3-9; 31:19-33:1.

As Mr. Perry had suggested, Ms. Crosby, after getting her car, put her hazard lights on and went back into the Regal Theater.  Ex. 9, Crosby Dep., 100:10-101:11.  She assumed that Mr. Saylor had returned to Theater 9, so she began to walk in that direction.  *Id.,* Crosby Dep., 103:4-8; Ex. 13, Excerpts from Case Summary Report, Initial Interview with Mary Crosby, Second Interview with Mary Crosby, and Supplement Notes/Interview with Mary Crosby, at

State 0062, 0071, 0087.  Ms. Crosby also called Ms. Saylor to notify her that Mr. Saylor had gone back into the theater.  Ex. 3, P. Saylor Dep. 120:20-121:2; Ex. 13 at State 0071.

As Ms. Crosby tried to walk into Theater 9, she was stopped from entering by Mr. Rhodes,[3] who was walking out of the theater.  Ex. 9, Crosby Dep., 103:14-17; Ex. 13 at State 0087.  Mr. Rhodes told Ms. Crosby that Mr. Saylor was sitting in Theater 9, and that "[h]e didn't pay for a ticket and he has to leave."  Ex. 9, Crosby Dep. 103:14-17, 106:3-6; Ex. 13 at State 0062, 0071, 0087.  Mr. Rhodes also said that he had asked Mr. Saylor to leave, but Mr. Saylor "said no."  Ex. 9, Crosby Dep., 106:9-12.  Ms. Crosby told Mr. Rhodes that Mr. Saylor had Down syndrome and did not understand, and asked him to let her handle the situation.  Ex. 9, Crosby Dep. 107:14-18; Ex. 13 at State 0062.  She suggested that they just "wait [Mr. Saylor] out," and said she would call Ms. Saylor and inform her of the situation.  Ex. 9, Crosby Dep. 107:14-18; Ex. 13 at State 0062, 0087.  Without ever giving Ms. Crosby an opportunity to talk to Mr. Saylor to try to persuade him to leave, and despite the fact that under Regal Cinemas' policy Mr. Saylor's conduct did not warrant it, Mr. Rhodes called security.  Ex. 7, Rhodes Dep., 99:11-17; Crosby Dep. 107:19-108:2; Ex. 13 at State 0087; Ex. 26, "Removing Guests" (Rhodes Dep. Ex. 10) (only involve the authorities when the situation poses imminent danger of harm or there are distinct threats of harm).

Ms. Crosby called Ms. Saylor and told her that Mr. Saylor had gone back into Theater 9, and that the theater management was asking him to leave and had called security because he did not have a ticket.  Ex. 9, Crosby Dep., 109:18-110:15.  Ms. Saylor told Ms. Crosby that she would come to the Regal Theater and once she got there either buy a ticket for Mr. Saylor or

---

[3] While Ms. Crosby did not know the manager's name, the Plaintiffs do not dispute that it was Mr. Rhodes who approached Mr. Saylor and then told Ms. Crosby that Mr. Saylor would need to purchase another ticket or leave the theater.

persuade him to leave.  *Id.*  In the meantime, Ms. Saylor advised Ms. Crosby to "make sure no

one [from security or the theater] goes in there [to remove him]," so that Mr. Saylor could calm

down.  *Id.*; *see also* Ex. 13 at State 0071 (Ms. Saylor advised Ms. Crosby not to let anyone talk

to Mr. Saylor about leaving the theater and "to just wait him out.").

After Ms. Crosby finished her phone call with Ms. Saylor, she walked back over to

Mr. Rhodes, who was talking to a security guard who had arrived outside Theater 9.[4]  Ex. 9,

Crosby Dep., 110:18-22, 116:22-117:7.  Ms. Crosby later learned that the security guards at the

Regal Theater that evening were the off-duty sheriff's deputies who are defendants in this case,

Sergeant ("Sgt.") Richard Rochford, Lieutenant ("Lt.") Scott Jewell, and Deputy First Class

("DFC") James Harris ("the Deputies").[5]  Ex. 9, Crosby Dep., 111:13-17.  At the time,

Ms. Crosby did not note anything on the Deputies' persons that identified them as law

enforcement agents rather than civilian security guards or "bouncers."  Ex. 9, Crosby Dep.,

111:9-20.  Other witnesses in Theater 9 believed the Deputies were civilian security guards and

could not tell that they were sheriff's deputies.  Ex. 14 at State 0070, State 0075.  A security

video from the Regal Theater on the night of January 12, 2013, shows that the deputies were

wearing tan khaki pants and dark shirts or jackets, and that Sgt. Rochford's shirt/jacket did not

have the words "Deputy Sheriff" across the back of it.  Ex. 27, at Screenshots 5-9.

Ms. Crosby told Mr. Rhodes and Sgt. Rochford that she did not have any more cash or

other form of payment with her, so she could not purchase another ticket for Mr. Saylor, but that

his mother was on her way and that she would either pay for Mr. Saylor's ticket or get him to

leave as soon as she arrived.  Ex. 9, Crosby Dep., 116:22-117:7, 119:17-120:1.

---

[4] Though Ms. Crosby did not know the security guard's name at the time, she later identified him as Defendant Rochford.  Ex. 9, Crosby Dep., 121:3-17.

[5] Because Ms. Crosby was talking to Ms. Saylor when the Deputies arrived, she was unsure whether all three arrived together.  Ex. 9, Crosby Dep., 114:4-5.

Ms. Crosby also attempted to explain Mr. Saylor's disabilities to Mr. Rhodes and Sgt. Rochford. *Id.*, 118:18-119:2; Ex. 13 at State 0087. She advised them that Mr. Saylor did not like to be touched by people he did not know, that he would curse and might get angry if they tried to go in and confront him, and the best thing to do was to "wait him out." *Id.* at State 0062, 0071; Ex. 9, Crosby Dep, 118:18-119:2, 182:5-14. She asked them not to go into Theater 9. However, Mr. Rhodes told Ms. Crosby that the movie was about to start and "he has to get out now." *Id.*, Crosby Dep., 120:2-4, 121:3-8. Sgt. Rochford then smirked and said to Mr. Rhodes, "Better get the boys. We're going to have some trouble tonight." *Id.*, Crosby Dep., 121:3-21. Ms. Crosby pleaded with them for "no trouble," and again asked if they could "just wait this out" until Ms. Saylor arrived. *Id.*, Crosby Dep., 122:10-20. No one responded to Ms. Crosby. *Id.* In addition, not one of the three deputies ever asked Ms. Crosby any questions about Mr. Saylor or his disability. *Id.*, 141:19-21. As Sgt. Rochford went into Theater 9, Ms. Crosby called Ms. Saylor again to update her on the status of the situation. *Id.*, 122:21-123:3.

When Sgt. Rochford entered Theater 9 the lights were still on. Ex. 14 at State 073, 075; Ex. 4, Rochford Dep. 32:12-33:3. Mr. Saylor was sitting quietly, not disturbing any other patrons, and Sgt. Rochford did not think he was armed. Ex. 15, D. Masser Dep., 24:2-21; Ex. 16, C. Masser Dep., 32:1-5; 34:4-35:1; Ex. 4, Rochford Dep., 41:12-42:8, 76:20-78:9; Ex. 14 at State 0051. Sgt. Rochford began to speak to Mr. Saylor, telling him that he needed to leave the theater or else the Deputies would have to remove him. Ex. 15, D. Masser Dep., 31:17-32:11. Mr. Saylor responded that he would not leave. *Id.*, D. Masser Dep., 31:17-32:11; Ex. 14 at State 0051. This back-and-forth between Mr. Saylor and Sgt. Rochford continued for a brief time,

during which time Lt. Jewell and DFC Harris joined Sgt. Rochford.[6, 7]  Ex. 5, Jewell Dep., 49:1-12; Ex. 6, Harris Dep., 40:18-41:2; Ex. 9, Crosby Dep, 128:8-11; Ex. 13 at State 0063. Eventually, Sgt. Rochford told Mr. Saylor that he was going to be arrested.  Ex. 4, Rochford Dep., 44:4-46:1; Ex. 7, Rhodes Dep. 149:5-8.; Ex. 15, D. Masser Dep., 41:20-42:1.

Sgt. Rochford put his hands on Mr. Saylor's upper arm and forearm to get him out of his seat, and in response Mr. Saylor flailed his arm because he did not like to be touched.  Ex. 4, Rochford Dep., 80:19-81:10; Ex. 23, Perry Dep., 62:8-18.  Lt. Jewell and DFC Harris then moved in to assist Sgt. Rochford in forcibly removing Mr. Saylor from his seat, at which point Mr. Saylor cursed and resisted the Deputies' attempts to get him out of the theater.  Ex. 4, Rochford Dep., 80:19-82:21.  As they removed Mr. Saylor from his seat, at least one witness saw one of the Deputies twist Mr. Saylor's arm behind his back, Ex. 14 at State 0077-78, and several witnesses reported that the Deputies tried to handcuff Mr. Saylor after they got him out of his seat and they were all still in the seating area, *id.* at State 0044, 0045, 0050, 0064, 0067, 0069, 0070.

Because she was speaking with Ms. Saylor on the phone, advising her that security was on the scene, Ms. Crosby remained outside the theater when Sgt. Rochford entered Theater 9. Ex. 9, Crosby Dep., 122:21-123:3, 124:9-21, 125:18-126:3.  Ms. Crosby testified that, two to

---

[6] Like Sgt. Rochford, the other Deputies did not believe that Mr. Saylor was armed.  Ex. 5, Jewell Dep., 89:9-16; Ex. 6, Harris Dep., 70:16-19.

[7] How long Sgt. Rochford spoke to Mr. Saylor before deciding to initiate an arrest is a dispute of material fact.  *See*, *e.g.*, Ex. 4, Rochford Dep., 43:20-44:3 ("several minutes"); Ex. 6, Harris Dep., 40:18-41:2 (4-6 minutes); Ex. 9, Crosby Dep., 128:8-11 (2-3 minutes); Ex. 28, 1/28/13 Handwritten Statement of Kevin Rhodes at State 379 (2 minutes); Ex. 13 at State 0063; Ex. 14 at State 0075, 0067.  What is clear is that at 10:46 p.m. Mr. Rhodes was getting Sgt. Rochford from another theater (Ex. 27 at Screenshot 4-6); and the time between when Sgt. Rochford entered Theater 9 at 10:50 p.m. and the time when the first emergency unit was dispatched at 10:53 p.m. was only three minutes.  Ex. 9, Crosby Dep. at 122:21-123:6; Ex. 29, Patti Saylor phone records; Ex. 17, Lane Dep., 23:1-6.

three minutes after the Deputies entered Theater 9, she heard yelling and cussing coming from the theater, followed by someone saying, "I'm going to arrest you." *Id.*, 126:15-20, 128:9-11. Ms. Crosby then heard, "Ouch. That hurts. Get off. Mom." *Id.*, 130:6-10. At that point Ms. Crosby had crossed the threshold into the theater, and from where she was standing in the sloped hallway leading into the auditorium, she saw the Deputies and Mr. Saylor round the corner, with the Deputies grabbing Mr. Saylor while he tried to fight them off because he did not like being touched by strangers. *Id.*, 130:11-131:9; Ex. 13 at State 0071-72. Other witnesses testified that, as the Deputies got Mr. Saylor out of his seat and dragged him towards the sloped hallway out of the theater, Mr. Saylor was "squealing," "cry[ing]," yelling "ouch, ouch," and calling for his mother. *See* Ex. 14 at State 0076 (stating that Mr. Saylor was heard to "whine and cry" and call for his mother); State 0077 (stating that Mr. Saylor was in a "panic" and called for his mother); State 0047 (Mr. Saylor screamed "mommy"); State 0044 (Mr. Saylor yelled "ouch, ouch"); State 0073 (Mr. Saylor screamed, "it hurt, call my mom"); State 0079 (Mr. Saylor yelled for his mother).

As the Deputies and Mr. Saylor entered the sloped hallway leading out of Theater 9, they all fell to the ground. Ex. 7, Rhodes Dep., 154:10-13; Ex. 9, Crosby Dep., 143:17-20. According to Mr. Rhodes, one of the Deputies landed on top of Mr. Saylor. Ex. 14 at State 0069; Ex. 7, Rhodes Dep., 62:8-12. Ms. Crosby turned away in tears, and when she turned back around Mr. Saylor was lying on his stomach, and the Deputies were working to handcuff his hands behind his back. Ex. 9, Crosby Dep., 144:2-7; Ex. 4, Rochford Dep., 86:16-87:5. One witness described Mr. Saylor as "pinned down" by the Deputies, with one Deputy placing his knee on Mr. Saylor's lower back and the other two Deputies holding his shoulders down. Ex. 14 at State 0047. The Deputies had difficulty handcuffing Mr. Saylor due to his size, but eventually

succeeded by linking three sets of handcuffs together.  Ex. 4, Rochford Dep., 84:18-85:6; Ex. 6,

Harris Dep., 53:9-20; Ex. 5, Jewell Dep., 59:17-60:15.  Almost immediately, Mr. Saylor went

silent and the Deputies realized that he had stopped breathing and his face had turned a grayish-

purple color.  Ex. 4, Rochford Dep., 99:6-16; Ex. 6, Harris Dep., 54:19-55:17; Ex. 9, Crosby

Dep., 146:10-147:10; Ex. 5, Jewell Dep., 61:1-16; Ex. 7, Rhodes Dep., 63:4-64:6; *see also*

Ex. 14 at State 0045 (after witness heard Mr. Saylor receive his *Miranda* rights, "it got quiet in

the theater"; *id.* at State 0047, 0070, and 0078 (Mr. Saylor was silent after handcuffs were put on

him).  The Deputies then took the handcuffs off of Mr. Saylor and turned him from his stomach

to his back, and Sgt. Rochford began to perform chest compressions to try to resuscitate him.

Ex. 4, Rochford Dep., 99:6-101:5; Ex. 7, Rhodes Dep., 64:2-6; Ex. 6, Harris Dep., 55:5-17;

Ex. 5, Jewell Dep., 61:1-62:4.  The Deputies also called for an ambulance.  Ex. 4, Rochford

100:17-101:9; Ex. 5, Jewell Dep., 62:5-10:4; Ex. 6, Harris Dep., 55:18-21.

     Mr. Saylor soon began breathing again on his own and the color returned to his face, so

Sgt. Rochford ceased his resuscitation efforts.  Ex. 4, Rochford Dep., 100:17-101:5, 102:17-

103:5; Ex. 5, Jewell Dep., 61:17-62:4.  The Deputies placed Mr. Saylor on his side with his

knees tucked up, in what is called the "recovery position," to aid in his breathing.  Ex. 4,

Rochford Dep., 103:19-104:14; Ex. 6, Harris Dep., 56:1-6; Ex. 5, Jewell Dep., 61:17-62:4.

Multiple witnesses testified that Mr. Saylor's breathing was rhythmic and sounded like snoring.

Ex. 4, Rochford Dep., 103:19-104:14; Ex. 5, Jewell Dep., 61:17-62:4; Ex. 9, Crosby Dep.,

148:22-149:8; Ex. 14 at State 0036, 0057, 0076, 0080, 0090, 0091, 0092.  Ms. Crosby, who was

standing approximately four to five feet away from Mr. Saylor and the Deputies at that point,

saw that one of the Deputies was holding Mr. Saylor up in the recovery position with his foot,

but another Deputy said, "he's fine now, you can put him down," so the Deputy removed his foot

and Mr. Saylor "flop[ped]" onto his back.  Ex. 9, Crosby Dep., 149:16-153:4.  At the Deputies'

direction, Ms. Crosby attempted to revive Mr. Saylor by speaking to him and rubbing his

stomach, but he remained unresponsive.  *Id.*, Crosby Dep. 153:11-154:13; Ex. 13 at State 0063,

0072; Ex. 5, Jewell Dep., 62:20-63:7.

     When the first emergency medical personnel arrived, they assessed Mr. Saylor and found

him lying on his side and unresponsive.  While his pulse was normal, he was breathing in a

snoring-like manner, Ex. 17, Deposition of George Lane, 25:21-30:17; Ex. 4, Rochford Dep.,

103:19-104:14, and did not respond to physical stimuli, such as rubbing his sternum, Ex. 17,

Lane Dep., 26:15-27:11.  Because Mr. Saylor had snoring respirations, normally an indication

that something is blocking the airway, a pulse oximeter ("pulse ox") was used, which showed a

reading of 65 percent, which is quite low.  *Id.*, 30:4-31:5, 31:14-22; Ex. 17, Lane Dep., 74:12-17.

A nonrebreather mask was placed on Mr. Saylor because of the snoring respirations and pulse ox

level.  *Id.*, Lane Dep., 39:3-12.  By the time paramedic Jeffrey Buchanan arrived on the scene

and assessed Mr. Saylor, Mr. Saylor had agonal respirations, which follow snoring respirations

and indicate that oxygen exchange in the lungs has diminished and respiratory failure or arrest is

imminent.  Ex. 18, Deposition of Jeffrey Buchanan, 19:15-20:11.  The emergency personnel

rolled Mr. Saylor to his back to continue their assessment, and shortly thereafter Mr. Saylor

stopped breathing and did not have a pulse.  Ex. 17, Lane Dep., 44:4-10; Ex. 18, Buchanan Dep.,

21:2-9.  The emergency medical personnel therefore began their resuscitation protocol, moved

Mr. Saylor to a cot, and carried him to the waiting ambulance.  Ex. 17, Lane Dep., 45:11-13,

47:2-5; Ex. 18, Buchanan Dep., 30:11-12.  Cardiopulmonary resuscitation ("CPR") was

continued during this time and throughout the ambulance ride on the way to Frederick Memorial

Hospital, and Mr. Buchanan also intubated Mr. Saylor to improve the transmittal of oxygen to

his lungs.[8]  Ex. 4, Rochford Dep., 103:19-104:21; Ex. 18, Buchanan Dep., 37:10-13, 44:7-19, 46:4-47:5.  Mr. Buchanan testified that there were no complications with the intubation.  *Id.* 55:4-10.  Mr. Saylor was still unconscious and not breathing on his own when they arrived at the hospital.  Ex. 19, pp. 3, 4.

Once at Frederick Memorial Hospital, Mr. Saylor was admitted to the emergency department.  Ex. 24, Frederick Memorial Hospital Records.  His parents, Patti and Ronald Saylor, and his sister, Emma Saylor, had arrived before the ambulance and were in the waiting room.  Ex. 3, P. Saylor Dep., 135:11-20; Ex. 20, Deposition of Ronald Saylor, 45:19-46:9; Ex. 21, Deposition of Emma Saylor, 21:17-19.  Medical personnel in the emergency room continued to perform CPR on Mr. Saylor, but they were unable to revive him.  Ex. 3, P. Saylor Dep., 135:21-136:7; Ex. 20, R. Saylor Dep., 47:13-48:12.  At 11:58 p.m., with his family at his bedside, resuscitation efforts ceased and Mr. Saylor was pronounced dead.  Ex. 24 at Fred. Mem. Hosp. 0016, 0021.

On January 13, 2013, the day after his death, an autopsy was performed on Mr. Saylor. Ex. 2.  Mary G. Ripple, M.D., the Deputy Chief Medical Examiner for the State of Maryland, and Erin M. Carney, M.D., an associate pathologist, performed the autopsy.  *Id.*  It was the pathologists' opinion that Mr. Saylor died of asphyxia.  *Id.* at Autopsy 9.  As the report noted:

> Autopsy findings of petechial hemorrhages, anterior lower neck bruising with associated subcutaneous hemorrhage, abraded contusion of inner lower lip, fracture of a part of the voice box with hemorrhage, mucosal hemorrhage in the upper airway, aspirated blood in the airways and peripheral lung parenchyma, lung congestion and hemorrhage, and fluidity of blood, along with the investigative report of this obese individual going unresponsive while handcuffed and prone, are consistent with a positional asphyxial component to death.

---

[8] Intubation involves the placement of a plastic tube inside a patient's trachea.  The tube has an inflatable cuff and is a more efficient way of getting oxygen into the patient's lungs.  It also prevents air from entering the patient's stomach, which can cause vomiting and compromise the airway.  Ex. 18, Buchanan Dep., 46:17-47:2.

*Id.* The pathologists certified Mr. Saylor's death as a homicide because, "but for the actions of other individuals, Mr. Saylor would not have died." *Id.* at Autopsy 10; *see also* Ex. 22, Deposition of Mary G. Ripple, M.D., 55:2-9.

**The Deputies' Training**

The State of Maryland oversees the training of all police officers in the State, including sheriff's deputies, via the Maryland Police and Correctional Training Commission ("MPCTC"). Ex. 30, Deposition of Albert L. Liebno, Jr., 9:15-10:9. The MPCTC requires that an officer entering a force complete certain mandated objectives, after which he must receive 18 hours of ongoing training each year. *Id.*, 15:2-16, 19:9-18. The only required topic within those 18 hours is that every three years, officers must receive training on sexual offenses. *Id.*, 20:3-10. Outside of that required topic, the MPCTC approves training programs submitted by police academies across the State, and does random audits on a two-year cycle of programs that were approved during that two-year time period. *Id.*, 20:11-21:11. Prior to 2011, the MPCTC did not mandate any training regarding interacting with individuals with disabilities. *Id.*, 28:11-18. In 2011, a requirement was added to the MPCTC's entry level objectives for training on disabilities in general. *Id.*, 25:7-18. The MPCTC neither mandates nor recommends training on positional asphyxia. *Id.*, 34:16-21.

Until 2014, after Mr. Saylor's death, the MPCTC did not have any training standards for Maryland law enforcement agencies regarding interacting with persons with developmental disabilities. Dkt. 98-22, Answer to Interrogatory No. 14 (Def. Ex. T); Ex. 30, Liebno Dep., 27:10-28:3. As of 2013, the Frederick County Sheriff's Office ("FCSO") had a General Order titled "General Order 41.4 – Investigation of Persons with Mental Illness" ("General Order on Mental Illness"), Ex. 31 (Ex. 15 to Rochford Dep.), but no General Order or policy on how sheriff's deputies should interact with individuals with disabilities. The FCSO also provides an

in-service training on mental illness every three years.  Ex. 32, Deposition of Charles A. Jenkins, 69:9-16, 72:15-18.  The last time that training was provided prior to Mr. Saylor's death was 2011.  *Id.*, 69:17-19; Dkt. 98-22, Answer to Interrogatory No. 16 (Def. Ex. T).  The training is titled "Mental Health Refresher," and lasts four hours.  *Id.*  It is not clear how much, if any, of the "Mental Health Refresher" block is devoted to dealing with individuals with developmental disabilities.  Ex. 33, Report of Andrew Scott at 11.  There is no follow-up by the FCSO in the years after a training is provided to determine whether sheriff's deputies recall what they have learned.  Ex. 32, Jenkins Dep., 71:21-72:14.

Sgt. Rochford, Lt. Jewell, and DFC Harris all failed to recall the last time they had received training regarding individuals with mental illness or mentally challenged individuals. Ex. 4, Rochford Dep., 50:13-51:1; Ex. 5, Jewell Dep., 12:18-13:13; Ex. 6, Harris Dep., 81:6-9. Sgt. Rochford testified that the training on mental illness he received was "very basic."  Ex. 4, Rochford Dep., 134:14-135:3.  All of the Deputies received the "Mental Health Refresher" training in 2011.  Ex. 33; Ex. 34, Training Logs of Rochford, Jewell, and Harris.  Prior to 2011, Sgt. Rochford and DFC Harris received a training titled "Mental Health and Mobile Crisis" in 2008, and Lt. Jewell received the same training in 2010.  *Id.*; Ex. 33.  The Deputies also received a training in 2013, after Mr. Saylor's death, called "Autism Awareness."  Dkt. 98-22, Answer to Interrogatory No. 14 (Def. Ex. T).  Sheriff Jenkins testified that training regarding autism "would have been sufficient to serve as a block of mental illness training."  Ex. 32, Jenkins Dep., 72:19-73:19.  He also testified that, until recently, no one had identified that there were differences in the training that should be provided for mental illness as opposed to developmental disabilities. *Id.* 74:5-13.

**The Deputies' Secondary Employment with Hill Management**

The FCSO permits sheriff's deputies to take on secondary employment.  Ex. 4, Rochford Dep., 10:10-17.  Sgt. Rochford, Lt. Jewell, and DFC Harris all maintained secondary employment with Hill Management ("Hill"), which is a management company for commercial properties, including the Westview Promenade.  Ex. 35, Deposition of Teresa Rosier, 9:4-6, 11:3-17, 24:1-10; Ex. 36, Payroll Records (Ex. 72 of Rosier Dep.). The payroll forms filled out at the Deputies' hiring were all signed by Hill agents.  Ex. 36; Ex. 35, Rosier Dep., 25:11-27:3. Required federal forms completed at Sgt. Rochford's and DFC Harris's hiring for secondary employment also listed Hill as their employer.  Ex. 37, Tax Forms (Ex. 71 to Rosier Dep.).

In order to hire off-duty sheriff's deputies, Hill has agreed to a "Sworn Security Related Secondary Employer Waiver" with the FCSO.  Ex. 38, Waiver (Ex. 73 to Rosier Dep.).  The waiver notes that "Deputies while working secondary employment will be considered employees of the secondary employer." *Id.*  Bart Rupperthol, a FCSO deputy who also worked for Hill, scheduled and submitted paperwork for the other deputies who would work as off-duty security guards. Ex. 35, Rosier Dep., 18:3-20:3.  Hill determined the number of off-duty deputies who would work at any given time and their hours. *Id.,* 20:4-18.  Hill had the authority to notify its liaison with the FCSO that it did not want a particular deputy working at the Westview Promenade. *Id.*, 35:16-36:6.  Deputies working off-duty for Hill were not permitted to wear their FCSO uniforms, but could wear "a generic type shirt…that may reflect deputy sheriff on the back and contain a symbol on the front such as a badge."  Ex. 38.

Hill's contract to provide security to the Regal Theater authorized Hill to employ security guards at Westview Promenade. *Id.*  When Regal Cinemas wished to have increased security, it requested the additional security from Hill. *Id.*  Hill agreed to provide the additional security,

which was billed to Regal by Hill.  *Id.*  Hill assured Regal that it was "proactive in taking measures to ensure the safety of patrons and employees at the Westview Promenade."  *Id.*

## PROCEDURAL HISTORY

On October 17, 2013, Patricia and Ronald Saylor ("Patti and Ron Saylor" or "the Saylors"), individually and as personal representatives of the Estate of Robert Ethan Saylor ("the Estate"), filed a complaint against the Deputies, the Frederick County Sherriff's Office ("FCSO"), Regal Cinemas, and Hill Management, bringing federal claims for violations of 42 U.S.C. § 1983 against the Deputies for their use of excessive force against Mr. Saylor and violations of the Americans with Disabilities Act ("ADA") against the FCSO, as well as state-law claims for wrongful death against all the Defendants, negligence and gross negligence against Regal Cinemas, the Deputies, and Hill Management, and battery against the Deputies and Hill Management.  *See* Dkt. 1, Complaint.  On March 10, 2014, the Plaintiffs filed their First Amended Complaint, substituting the State of Maryland ("the State") for the FCSO.  *See* Dkt. 17-1, 1st Amended Complaint.  All of the Defendants save for Hill Management filed motions to dismiss, and on October 16, 2014, this Court issued a Memorandum Opinion, granting in part and denying in part the motions filed by the Deputies and the State, and granting Regal Cinemas' motion in full.  *See* Dkt. 48, Memorandum Opinion on Motions to Dismiss ("Mem. Op."); Dkt. 49, Order on Motion to Dismiss.  The Court granted the Deputies' motion as to the Plaintiffs' negligence claim and the State's motion as to the Plaintiffs' wrongful death claim, but denied the Deputies' and State's motions on the Plaintiffs' remaining claiMs.

On February 22, 2016, the Deputies, the State, and Hill Management filed separate Motions for Summary Judgment.  *See* Dkt. 102-1, DMSJ at 6; Dkt. 100, State's Memorandum in Support of Motion for Summary Judgment ("State's MSJ"); Dkt. 99-2, Hill's Memorandum in

Support of Motion for Summary Judgment ("Hill's MSJ").  The Plaintiffs respond to all three

motions herein.

## STANDARD OF REVIEW

"Summary judgment is appropriate only when there is no genuine dispute regarding any

material fact, and the moving party is entitled to judgment as a matter of law." *Meyers v.*

*Baltimore Cty., Md.*, 713 F.3d 723, 730 (4th Cir. 2013) (citing Fed.R.Civ.P. 56(a); *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322 (1986); *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289,

295 (4th Cir. 2010)).  "A dispute is genuine if a reasonable jury could return a verdict for the

nonmoving party[, and] [a] fact is material if it might affect the outcome of the suit under the

governing law." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015).

When reviewing a motion for summary judgment, the court must view the evidence in the light

most favorable to the party opposing the motion and draw all reasonable inferences in its favor.

*Id*.  When doing so, it is important that the court consider "all of the evidence in the record." *Id.*

at 569.  The judge's function at summary judgment is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial.'" *Anderson v.*

*Liberty Lobby,* 477 U.S. 242, 249 (1986).

## ARGUMENT

I.     **The Deputies' Motion for Summary Judgment Should Be Denied Because They
       Violated Mr. Saylor's Fourth Amendment Rights, and Their Actions Are Not
       Protected by Qualified Immunity**

   A.     **Defendants Rochford, Jewell, and Harris Violated Mr. Saylor's Fourth
          Amendment Rights, Enforced through 42 U.S.C. § 1983, by Employing
          Excessive Force to Remove Him from the Theater**

Were it not for the actions of Defendants Rochford, Jewell, and Harris, Mr. Saylor would

still be alive.  By choosing to arrest him and employing excessive force in doing so, the Deputies

violated Mr. Saylor's Fourth Amendment right to be free from excessive force, and ultimately

caused his death.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989) (claim of excessive force in

context of an arrest, brought via § 1983, implicates the Fourth Amendment); *Young v. Prince*

*George's Cty., Maryland*, 355 F.3d 751, 758 (4th Cir. 2004) (same).[9]  While the Deputies argue

that no reasonable factfinder could find against them on this claim, the record shows that

sufficient issues of material fact exist to require a trial on Plaintiffs' claiMs.

### 1.  The Deputies' Use of Force against Mr. Saylor Was Excessive and Unreasonable Under the Totality of the Circumstances.

"Determining whether the force used to effect a particular seizure is 'reasonable' under

the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on

the individual's Fourth Amendment interests' against the countervailing governmental interests

at stake." *Graham*, 490 U.S. at 396 (citation omitted); *see also* Dkt. 48, Mem. Op. at 11.

> Because '[t]he test of reasonableness under the Fourth Amendment is not capable
> of precise definition or mechanical application,' however, its proper application
> requires careful attention to the facts and circumstances of each particular case,
> including the severity of the crime at issue, whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether he is actively
> resisting arrest or attempting to evade arrest by flight.

*Graham,* 490 U.S. at 396.  The question is "'whether the totality of the circumstances justifie[s] a

particular sort of . . . seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)); *Smith*

*v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (same).   Courts often apply the *Graham* factors in

determining whether a challenged use of force was objectively reasonable.  *See Jones v.*

*Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003) ("To resolve this question of whether the necessity

---

[9] The Deputies do not dispute that they were acting under color of state law when they arrested
Mr. Saylor.  *See* Dkt. 11-1, Deputies' Memorandum in Support of Motion to Dismiss, at 10.
Accordingly, the only contested issue regarding the elements of the Estate's § 1983 claim is
whether the Deputies in fact deprived Mr. Saylor of his Fourth Amendment rights.  *See Dowe v.*
*Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998).

for force outweighed Jones's constitutional rights, we examine each of the *Graham* factors in turn.").

The analysis of objective reasonableness is a very fact-specific inquiry. *Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir.1989) ("The alleged use of excessive force is generally an issue of fact."); *see also* Dkt. 48, Mem. Op. at 11 (noting that "[o]bjective reasonableness is highly fact-specific"). Accordingly, summary judgment in the context of an excessive force case is often inappropriate, as the inquiry "nearly always requires a [factfinder] to sift through disputed factual contentions, and to draw inferences therefrom." *Lolli v. Cty. of Orange*, 351 F.3d 410, 415-16 (9th Cir. 2003) (quotation marks and citation omitted).

### a.    Mr. Saylor Did Not Commit a "Severe Crime."

Neither of the alleged crimes initially at issue – trespassing and theft of services[10] – was serious. Indeed, the Deputies acknowledged that these crimes were "only minor misdemeanors." Dkt. 102-1, DMSJ at 44. Mr. Saylor was attempting to watch "Zero Dark Thirty" for a second time without paying for a second $11.00 ticket. The non-seriousness of this "theft" is illustrated by Regal Theater's distribution of *two* free tickets to each patron who was "inconvenienced" by the cancelation of the showing of "Zero Dark Thirty" due to Mr. Saylor's death.[11]

The Defendants seek to magnify Mr. Saylor's "crimes" by adding assault. Sgt. Rochford testified that "at some point in time…[Mr. Saylor] struck me in the chest." Ex. 4, Rochford Dep., 81:18-82:4. However, he also testified, "I don't remember him hitting me." *Id.* Mr. Rhodes also testified that Mr. Saylor pushed Sgt. Rochford. Ex. 7, Rhodes Dep., 53:10-12;

---

[10] The Deputies listed these as the possible crimes Mr. Saylor had committed. *See*, *e.g.*, Ex. 4, Rochford Dep., 150:6-12, 191:14-19; Ex. 5, Jewell Dep., 72:5-11; Ex. 6, Harris Dep., 44:19-45:15.

[11] It was also Regal's policy to refund the money of any patron who was asked to leave the theater. Ex. 26 at Regal 49.

*see also id.* at 103:18-104:1 (stating Mr. Saylor "stiff-armed" Sgt. Rochford).  By contrast, Lt.

Jewell testified that Mr. Saylor did not attempt to strike any of the Deputies, and DFC Harris

stated that Mr. Saylor raised his fist but made no attempt to swing at Sgt. Rochford or advance

his fist in any way.  Ex. 5, Jewell Dep., 56:20-57:5; Ex. 6, Harris Dep., 48:21-49:10.  It is thus a

disputed issue of material fact whether Mr. Saylor's actions ever amounted to anything more

than minor, non-violent misdemeanors.[12]  Where, as here, the offense at issue is minor, the

Fourth Circuit has repeatedly recognized that "the first *Graham* factor weigh[s] in plaintiff's

favor[.]"  *Estate of Armstrong v. The Village of Pinehurst*, 810 F.3d 892, 899-900 (2016)

((quoting *Jones*, 325 F.3d at 528).

> **b.      Mr. Saylor Did Not Pose an Immediate Threat to the Safety of the Deputies or Others.**

Generally, a nonviolent misdemeanor offense is not the type of crime that gives an officer

any reason to believe that an individual is potentially dangerous.  *Smith*, 781 F.3d at 102.  To

escape this settled precedent, the Deputies put forward as an undisputed fact that Mr. Saylor

"pushed or struck Sgt. Rochford when the Sgt. simply touched Mr. Saylor's arm after many

minutes of verbal requests for compliance," such that the Deputies' subsequent use of force was

justified by Mr. Saylor's "assault."  Dkt. 102-1, DMSJ at 44, 45; *see also id.* at 19 ("All accounts

of what happened after Sgt. Rochford touched Mr. Saylor's arm…are consistent").  To the

---

[12] The Deputies cite *Bates ex rel. Johns v. Chesterfield Co., Va.*, 216 F.3d 367 (4th Cir. 2000) for the premise that pushing a police officer weighs the first *Graham* factor in favor of the officer. Dkt. 102, Dkt. 102-1, DMSJ at 44.  In *Bates*, however, there was no dispute that the plaintiff pushed a police officer.  *See id.* at 44-45.  In addition, in *Bates* the officer did not know that the plaintiff was autistic.  216 F.3d at 372.  As explained below, *see* § I.B.a., the Deputies did know that Mr. Saylor had Down syndrome, which knowledge influences any analysis of the reasonableness of their actions.  Thus, "[t]he authority cited by Defendants, offered to show that there was no excessive force under their version of events, is unhelpful in assessing the issue when the facts must be viewed in the light most favorable to [Mr. Saylor]."  *Stout v. Reuschling*, No. CIV.A. TDC-14-1555, 2015 WL 1461366, at *9 (D. Md. Mar. 27, 2015).

contrary, the record reflects material disputes as to whether Mr. Saylor pushed or struck Sgt. Rochford at all, and as to how long Sgt. Rochford spoke to Mr. Saylor before deciding to use force.  Moreover, the Fourth Circuit has counseled that the force used must be proportional to the level of resistance offered "and the danger that resistance posed to the officers."  *Armstrong*, 810 F.3d at 903.

It is undisputed that, prior to Sgt. Rochford's confrontation of Mr. Saylor, Mr. Saylor had been sitting quietly in the theater.  He was not disturbing, much less threatening, any of the other patrons.  None of the Deputies believed that Mr. Saylor was armed.  Ex. 4, Rochford Dep., 76:20-78:9; Ex. 5, Jewell Dep., 89:9-16; Ex. 6, Harris Dep., 70:16-19.  Further, the Deputies had encountered only verbal resistance from Mr. Saylor before they began to physically remove him from his seat.  Verbal resistance alone, including yelling and cursing, "constitutes a mere nuisance and not an immediate threat to the safety of the officers or others under *Graham*," and thus does not justify the use of force.  *Jones*, 325 F.3d at 530 (internal quotation marks and citation omitted).  The Fourth Circuit has repeatedly "declined to equate conduct that a police officer characterized as resistance with an objective threat to safety entitling the officer to escalate force."  *Id.* at 905.

The Deputies contend that Ms. Crosby had told Sgt. Rochford "that Mr. Saylor may become violent."  Dkt. 102-1, DMSJ at 46.  Yet Ms. Crosby testified only that she told Sgt. Rochford that Mr. Saylor did not like to be touched and may curse and become angry if confronted.  Ex. 13 at State 0062, 0071; Ex. 9, Crosby Dep., 118:18-119:2, 182:5-14.  Viewing this evidence in the light most favorable to the Plaintiffs, there was simply no objectively reasonable basis for the Deputies to believe that Mr. Saylor posed a threat to anyone

23

necessitating the use of force.[13]   Indeed, Ms. Crosby's having told them specifically that

Mr. Saylor had Down syndrome and did not like to be touched, made the Deputies choice the

least reasonable method of dealing with him.   *See* Dkt. 48, Mem. Op. at 12-13 ("Were it not for

the intervention of the Deputies, there is no reason to believe [Mr. Saylor] would not have

remained sitting quietly in his seat.").   The Deputies also argue that Ms. Crosby was crying when

Mr. Rhodes saw her and "admitted she had been frightened by Mr. Saylor's aggression," such

that it was reasonable for them to believe that Mr. Saylor was a threat.   Dkt. 102-1, DMSJ at 47.

However, the only time Ms. Crosby testified that she cried was when Mr. Saylor and the

Deputies fell to the ground and Mr. Saylor went silent.   Ex. 9, Crosby Dep., 144:2-7.   Ms. Saylor

stated that during her first call with Ms. Crosby, when Ms. Crosby and Mr. Saylor were outside

the Regal Theater together, Ms. Crosby sounded like she had been crying, but did not say

anything about being frightened.   Ex. 3, P. Saylor Dep. 112:10-18.   However, during their second

call, when Ms. Crosby told Ms. Saylor that Mr. Saylor had gone back into Theater 9, Ms. Crosby

was not crying and did not sound upset.   Ex. 3, P. Saylor Dep., 126:9-21. This call took place

---

[13] The Deputies also claim that by resisting their arrest Mr. Saylor posed a threat to their safety, and that "[t]he purpose of criminalizing resistance to a lawful arrest is to protect police officers from the substantial risk of physical injury."   Dkt. 102-1, DMSJ at 46 (quoting *Rich v. State*, 205 Md. App. 227, 255 (2012)).   However, under Maryland law, an individual may resist an unlawful arrest, *see State v. Wiegmann*, 350 Md. 585, 604 (1998), and it is a dispute of material fact whether the Deputies' arrest of Mr. Saylor was lawful.   Mr. Rhodes has given conflicting statements as to whether he requested that the Deputies remove Mr. Saylor from Theater 9. *Compare* Ex. 7, Rhodes Dep. at 99-100 (stating that he asked Sgt. Rochford to help out Ms. Crosby, but did not believe Mr. Saylor's conduct warranted law enforcement intervention), *with* Ex. 41, Handwritten statement of Rhodes (Ex. 4 to Rhodes Dep.) (stating that Mr. Rhodes asked for Sgt. Rochford's assistance of his own accord because the movie was about to start). Because a trespass requires unauthorized entry on the property of another, *see Brazerol v. Hudson*, 262 Md. 269, 273 (1971), Mr. Saylor's arrest was lawful only if Mr. Rhodes, as the agent of Regal, had determined that Mr. Saylor's presence in the theater was unauthorized and asked the Deputies to remove him.   A reasonable juror could find that the Deputies' arrest of Mr. Saylor was unlawful, such that any resistance from Mr. Saylor was permitted and cannot serve as the basis for the Deputies' escalation of force.

around the same time that Ms. Crosby first spoke with Mr. Rhodes, and thus contradicts his

testimony regarding Ms. Crosby's emotional state.  In addition, Ms. Crosby never told

Mr. Rhodes that she was frightened by Mr. Saylor; rather, she said that she could handle the

situation.  In addition, there is simply no evidence that Ms. Crosby was "unwilling" to go back

into Theater 9 out of fear of Mr. Saylor.  She testified that she did not enter the theater because

she was concerned that Mr. Rhodes had requested security, so she called Ms. Saylor to update

her on the situation.  Ex. 9, Crosby Dep., 107:19-109:20.  Later, Ms. Crosby did enter Theater 9,

traveling halfway up the ramp.  *Id.*, 130:6-131:9.  Viewing this evidence in the light most

favorable to the Estate, there was nothing in Ms. Crosby's words or demeanor that would

indicate to a reasonable officer that Mr. Saylor could be violent.[14]

> **c.      Mr. Saylor Was Not Resisting Arrest or Attempting to Flee.**

Mr. Saylor was not resisting arrest or attempting to flee when the Deputies escalated the

encounter with him and forcibly removed him from his seat.   Once Sgt. Rochford touched

Mr. Saylor, Mr. Saylor "flail[ed] his arm back," Ex. 4, Rochford Dep., 81:1-8, but such

resistance did not justify the Deputies' immediate escalation of force, either.  *See Smith*, 781

F.3d at 103 (finding that individual's pulling of her arm from officer's grasp "did not give him

---

[14] The Deputies also claim that though they did not have personal knowledge of Mr. Saylor's history, that history somehow became part of the totality of the circumstances because "[i]t would have been part of what the caretaker told the Deputies about Mr. Saylor and how she described specifically what would happen if he became angry." Dkt. 102-1, DMSJ at 47.  They also posit that "it would be unreasonable, when evaluating the individual with whom the Deputies were dealing, through the eyes of the Deputies at the time, to make an unjustified assumption that his manner and his actions were for some reason inconsistent with his typical volatile and aggressive manner when he was upset[.]"  *Id.* at 48. There is absolutely no evidence in the record to support these unfounded hypotheses regarding what Ms. Crosby told the Deputies or what they believed.  It is the Deputies who have made "unjustified assumptions," and the Court should disregard them.

license to significantly escalate the situation").  In addition, Mr. Saylor never attempted to flee.

His clear desire was to stay put and be left alone.

> **d.**      **The Deputies Acted With Unreasonable Haste Under the Circumstances.**

There was no exigency that required the Deputies to immediately remove Mr. Saylor.  In

fact, Sgt. Rochford admitted that when he entered Theater 9, the movie had not yet started and

the lights were still on.  Ex. 4, Rochford Dep. 32:12-33:3.  Moreover, Mr. Saylor sat quietly in

his seat waiting for the movie to begin.  Ex. 15, D. Masser Dep., 24:2-21; Ex. 4, Rochford Dep.,

41:12-42:8.  Clearly, then, in contrast  to a situation where officers are "forced to make split-

second decisions," *Graham*, 490 U.S. at 397, in this instance the Deputies had time to do as

Ms. Crosby advised and wait for Ms. Saylor to arrive.  Indeed, in its earlier opinion this Court

noted that this case presented "no emergent situation requiring any rapid response" on the part of

the Deputies.  *See* Dkt. 48, Mem. Op. at 15.  With the benefit of a more fully developed record,

that finding holds true.

Similarly, any consideration of the reasonableness of the Deputies' actions must take into

consideration the length of time Sgt. Rochford spoke with Mr. Saylor before determining that

arrest, and the concomitant use of force, were the only way to deal with the situation.  While the

Deputies claim that Sgt. Rochford spoke to Mr. Saylor for 10 minutes, Dkt. 102-1, DMSJ at 17,

DFC Harris indicated that the conversation "seemed like it went on for four or five, six minutes

maybe."  Ex. 6, Harris Dep. 40:18-41:2.  In one of his statements, Mr. Rhodes estimated that

Sgt. Rochford spoke to Mr. Saylor for two minutes.  Ex. 28, at State 379.  Similarly, Ms. Crosby

estimated that Sgt. Rochford spoke to Mr. Saylor for two to three minutes after the other

Deputies entered the theater, before they proceeded to force Mr. Saylor out of his seat.  Ex. 9,

Crosby Dep. 128:8-130:10.  Further, after speaking with Mr. Saylor for a short time, neither

Sgt. Rochford nor the other Deputies asked Ms. Crosby to assist them or sought her advice as to

what steps to take next. Ex. 4, Rochford Dep., 67:21-68:3. It is therefore also an issue of

material fact whether the Deputies acted reasonably in determining after only a few minutes that

they could not convince Mr. Saylor to leave the theater, and that the only effective means of

dealing with his minor crimes was to arrest him through use of force.

<blockquote>

**e.    The Deputies Unreasonably Failed to Consider Mr. Saylor's Disability**

</blockquote>

"The problems posed by, and thus the tactics to be employed against, an unarmed,

emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily

different from those involved in law enforcement efforts to subdue an armed and dangerous

criminal who has recently committed a serious offense." *Armstrong*, 810 F.3d at 900 (quoting

*Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir.2010) (alteration omitted)). In at least some

circumstances, an individual's mental state means that "increasing the use of force

may…exacerbate the situation." *Id.* (quoting *Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th

Cir. 2001)). Therefore, to end a crisis it is often best to either use officers "trained in the art of

counseling," *id.* (quoting *Deorle*, 272 F.3d at 1283), or for the officers involved to at least "de-

escalate the situation and adjust the application of force downward," *id.* (quoting *Martin v. City

of Broadview Hts.*, 712 F.3d 951, 962 (6th Cir. 2013)).

Here, it is undisputed that the Deputies knew that Mr. Saylor had Down syndrome and

that because of his disability he reacted to them differently than most non-disabled individuals.

For instance, Sgt. Rochford testified that Mr. Saylor refused to engage in conversation, which

Sgt. Rochford admitted could be attributed to his Down syndrome. Ex. 4, Rochford Dep., 43:9-

14. DFC Harris thought that the information he received regarding Mr. Saylor's disability was

"backed up" by the way he interacted with Sgt. Rochford. Ex. 6, Harris Dep., 37:9-17. He

"noticed that Mr. Saylor did not look at Sgt. Rochford when he was answering his questions, and he, he would yell the answers…it wasn't a conversational tone….it was a very more or less one-sided conversation."  Ex. 6, Harris Dep., 37:18-38:8.

In addition, Ms. Crosby informed the Deputies that the best course would be to wait Mr. Saylor out.  She specifically asked them not to go into the theater, and she made it clear that Mr. Saylor did not like to be touched and that doing so could cause him to curse and become angry.  Ex. 9, Crosby Dep, 118:18-119:2, 182:5-14.  However, despite their knowledge of Mr. Saylor's disability and their understanding that it would affect Mr. Saylor's actions and reactions, the Deputies chose to pursue the very course of action against which they had been warned.  First, Sgt. Rochford entered the theater against Ms. Crosby's advice and spoke to Mr. Saylor.  Based on Ms. Crosby's warnings, Sgt. Rochford's very belief that he "could go in and talk to him and try to reason with him" was unreasonable.  Ex. 4, Rochford Dep., 32:12-33:3.  When, predictably, Mr. Saylor did not respond in a positive manner, Sgt. Rochford did not consider going back to Mr. Rhodes and discussing alternative ways of addressing the situation, nor did he ask Ms. Crosby for assistance or advice.  *Id.*, 67:11-68:3.  Then, despite Ms. Crosby having specifically told Sgt. Rochford that Mr. Saylor did not like to be touched by strangers, Sgt. Rochford "put [his] hand on [Mr. Saylor's]…upper arm."  *Id.*, 44:4-46:1.  As expected, this caused Mr. Saylor to become more agitated and upset.  Rather than "de-escalat[ing] the situation and adjust[ing] the application of force downward" at that moment, however, the Deputies escalated their use of force, hauled Mr. Saylor from his seat, and dragged him from the theater.  *See Armstrong*, 810 F.3d at 900.

The Deputies argue that their actions were reasonable because "Mr. Saylor had no right to a 'special accommodation' or special treatment," relying on *Bates* in support.  Dkt. 102-1,

DMSJ at 50.  However, as noted above, *see* n.12, in *Bates* the officers did not know the plaintiff was autistic, and the court found that "in the midst of a rapidly escalating situation, the officers cannot be faulted for failing to diagnose [his] autism."  216 F.3d at 372.  Here, the Deputies were all well aware of Mr. Saylor's disability, and the only reason the situation escalated was the Deputies' own actions.  In addition, in *Bates* the court found that the officers' use of force was reasonable because the plaintiff had already scratched, spit at, bit, and kicked them.  *Id*.  By contrast, Mr. Saylor had done nothing to threaten the Deputies or others when Sgt. Rochford confronted him and then initiated the use of force.

It should also be noted that, contrary to the Deputies' characterization of this case, the Plaintiffs do not suggest that Mr. Saylor should have been exempted from enforcement of all applicable laws.  *See* Dkt. 102-1, DMSJ at 50 (stating that "the 'deficiencies' of 'mentally retarded' individuals 'do not warrant an exemption from criminal sanctions.'" (quoting *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)).  Rather, as the Deputies have admitted, they had a range of options at their disposal to address Mr. Saylor's misdemeanor violations.  For instance, they could have issued Mr. Saylor a citation, or obtained Mr. Saylor's identifying information and then sworn out a statement of charges for trespass before a commissioner.  Ex. 4, Rochford Dep., 55:15-19, 59:1-60:1; Ex. 5, Jewell Dep., 64:1-15.  While the law does not require that officers "choose the most reasonable course of action…. the availability of other reasonable, or even more reasonable, options is not completely irrelevant to [the objective reasonableness] inquiry." *Young v. Prince George's Cty., Md.*, 355 F.3d 751, 758 n.2 (4th Cir. 2004).  Moreover, General Orders issued by the Frederick County Sherriff's Office make clear that the Deputies' use of discretion would have been preferable in this case.  For instance, the General Order on Limits of Authority explicitly states that "[i]n lieu of formal action, a deputy may exercise discretion and

29

choose informal action to solve a problem.  Such action may take the form for a referral,

informal resolution or warning."  Ex. 39, General Order 1.2 (Ex. 16 to Rochford Dep.)  The

Deputies all admitted to familiarity with the General Order or that they knew they had this

discretion.  Ex. 4, Rochford Dep., 65:5-16; Ex. 6, Harris Dep., 72:18-73:10; Ex. 5, Jewell Dep.,

64:1-4.  [15]Despite being empowered to choose alternatives to arresting Mr. Saylor, however, they

ignored the General Orders.   Ex. 4, Rochford Dep. 48:11-49:6 (admitting that he did not

consider the General Order on Mental Illness); Ex. 5, Jewell Dep. 86:17-87:6 (same); Ex. 6,

Harris Dep., 65:1-14 (same) and 72:18-74:4 (admitting that he did not consider the General

Order on Limits of Authority).

 Choosing an alternative course of dealing with Mr. Saylor would not have constituted a

"special accommodation" or exception to generally applicable laws.[16]  Rather, it was well within

the Deputies' discretion, and in keeping with the directives of the FCSO.  Moreover, it was

mandated by the requirement that the Deputies act in accordance with "the facts and

circumstances confronting them," *Graham*, 490 U.S. at 396, including consideration of

---

[15] In addition, the General Order on Investigation of Persons with Mental Illness ("General Order on Mental Illness") directs that "[t]he arrest of a mentally disordered individual may not be the best alternative in minor law violations."  Ex. 31.  The Deputies admitted they were familiar with this General Order as well.  Ex. 4, Rochford Dep., 50:5-17; Ex. 6, Harris Dep., 65:1-5; Ex. 5, Jewell Dep., 85:2-86:12.  While this General Order was not directly applicable to Mr. Saylor's situation because he had a developmental disability rather than a mental illness, it still should have put the Deputies on notice that they had alternatives to arrest at their disposal.  *See* Ex. 6, Harris Dep., 66:6-19 (admitting that a reasonable officer would contemplate the General Order on Mental Illness when making decisions in the field, but that he failed to do so).  In fact, the State suggests that the General Order on Mental Illness was sufficiently broad to apply to those with developmental disabilities, which implies that the Deputies should have considered it.  *See* Dkt. 100, State's MSJ at 16 (stating that that the General Order on Mental Illness included issues of developmental disabilities "by <u>content</u> if not by title.").

[16] As discussed below, *see* § III infra, under the ADA the Deputies were required to reasonably accommodate Mr. Saylor's disability.  The argument here, that consideration of Mr. Saylor's disability among all of the pertinent factors does not amount to a "special accommodation," should not be understood to relieve the Deputies, and by extension the State, of their duty to reasonably accommodate Mr. Saylor.

Mr. Saylor's mental state, *Armstrong*, 810 F.3d at 900.  Their failure to take into account

Mr. Saylor's disability and to adjust their tactics accordingly constituted an objectively

unreasonable use of force.

### f.      Mr. Saylor Suffered Catastrophic Injuries and Died.

Finally, as directed by the Fourth Circuit, the extent of Mr. Saylor's injuries "is also a

relevant consideration."  *Jones*, 325 F.3d at 527.  Here, of course, Mr. Saylor lost his life, and as

stated in the autopsy report, that death would not have occurred "but for the actions of other

individuals," namely the Deputies.  Ex. 2 at Autopsy 10.  Moreover, the Deputies knew of the

risks of positional asphyxia, yet that is exactly how they positioned Mr. Saylor.[17]  *See* Ex. 4,

Rochford Dep., 89:13-90:12; Ex. 5, Jewell Dep., 78:21-79:2; Ex. 6, Harris Dep., 83:12-84:1.  As

this Court stated:

> While it may not have been foreseeable that Mr. Saylor would suffer a fatal
> injury, the possibility of significant injury would certainly have been evident
> when the decision was made to drag an obese individual with a mental disability
> out of his chair and down a ramp, particularly when the Deputies were told that,
> because of his disability, Mr. Saylor was likely to become upset and angry.

Dkt. 48, Mem. Op. at 13-14.  The evidence that has been developed in this case only

serves to support the Court's earlier conclusion, and indicates that the Deputies' use of

force was objectively unreasonable.

### 2.      The Deputies' Changed Circumstances Argument is Unavailing

As detailed, the totality of the circumstances surrounding the Deputies' use of force on

the night of January 12, 2013, indicates that the Deputies did not act in an objectively reasonable

manner.  As the Fourth Circuit held in *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), and this

Court recognized in its previous decision in this case, the objective reasonableness of force

---

[17] In addition, Sgt. Rochford testified that he knew that obese individuals have a particular risk of
experiencing positional asphyxia.  Ex. 4, Rochford Dep., 89:20-90:6.

should be analyzed "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Id.* at 173.  Here, those circumstances – minor offenses, no threat of violence to the Deputies or others, no risk of flight, a lack of exigency, the Deputies' knowledge of Mr. Saylor's disability and his likely reactions, as well as their lack of consideration of the propriety of using extreme measures– all indicate that the Deputies' use of force was disproportional to the situation.  Indeed, it cannot be overemphasized that Mr. Saylor "died over the cost of a movie ticket."  Dkt. 48, Mem. Op. at 19.  This ultimate "intrusion" on Mr. Saylor's Fourth Amendment rights simply cannot be balanced against the minor "governmental interests" in ensuring that patrons pay for movie tickets.  *Garner*, 471 U.S. at 7-8.

The Deputies attempt to evade this inescapable conclusion by arguing that "changed circumstances" permitted "the reasonableness of force to change" in their encounter with Mr. Saylor.  Dkt. 102-1, DMSJ at 43.  According to the Deputies, because Mr. Saylor "became first verbally aggressive and then physically aggressive," their actions were reasonable.  *Id.*  The Deputies base this line of argument on the Fourth Circuit's holding in *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005) that the reasonableness of an officer's actions should be judged based on the information possessed by the officer at the time the particular force is employed, rather than being limited to what he knew "when he *began* to employ force."  *Id.* at 481.  But the holding in *Waterman* did not change the law in this Circuit that a court must consider "the proportionality of force in light of all the circumstances," *Rowland*, 41 F.3d at 173, and it does not make the Deputies' use of force in this case reasonable.  Throughout their encounter with Mr. Saylor, there were no "changed circumstances."  Ms. Crosby had asked the Deputies to wait before acting, and described Mr. Saylor's likely reaction if they confronted him.  The Deputies ignored this information and were met with exactly the reaction Ms. Crosby had predicted.

Further, while the Deputies say obliquely that "the situation escalated in seriousness," Dkt. 102-1, DMSJ at 41, thus justifying their actions, the fact is that the Deputies themselves escalated the situation. The Court should not countenance the Deputies' circular argument that their force was warranted by a situation of their own making.

Instead, in keeping with the Fourth Circuit's decision in *Rowland* and the Supreme Court's directives in *Graham* and *Tennessee v. Garner*, the Deputies' use of force should be assessed "in full context." *Rowland*, 41 F.3d at 173; *see also Graham*, 490 U.S. at 396 (evaluating all relevant factors); *Garner*, 471 U.S. at 8-9 (considering "whether the totality of the circumstances" justify the force used). Viewed in such a manner, the Deputies' use of force was not objectively reasonable, and they consequently violated Mr. Saylor's Fourth Amendment right to be free from the use of excessive force.

### B. Defendants Rochford, Jewell, and Harris Are Not Entitled to Qualified Immunity Because Their Actions Violated Clearly Established Law

Where, as here, a court must resolve questions of qualified immunity at the summary judgment stage, it must adopt a two-pronged inquiry. First, the court must determine whether the plaintiff's facts, as alleged, establish a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (citing *Saucier*, 533 U.S. at 201).[18] "The relevant, dispositive inquiry

---

[18] Under the holding in *Pearson*, a court need not address the two qualified immunity prongs in a specific order; rather, it is within the court's discretion to determine "which of the two prongs…should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The Supreme Court has counseled, however, that the formerly-mandated sequence of first considering whether a constitutional right was violated, before determining whether that right was clearly established, is often still the best approach to analyzing questions of qualified immunity. *Id.*; *see also Armstrong*, 810 F.3d at 898 (calling this "the better approach" (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The Supreme Court has emphasized that "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (per curiam). Thus, especially in cases raising issues of qualified immunity, it is important that the court draw inferences in favor of the nonmovant. *Id*.

As discussed above, viewing the evidence in the light most favorable to the Estate, the Deputies violated Mr. Saylor's Fourth Amendment right against seizures involving excessive force when they forcibly removed him from his seat and dragged him from Theater 9, all because he had failed to pay for an $11.00 movie ticket. Mr. Saylor's alleged crime was minor, he posed no threat to the Deputies or other theater patrons, he offered minimal resistance, and the Deputies had at their disposal a range of options outside of arrest and force to address the situation. Further, it was the Deputies themselves that escalated the situation, in complete disregard of Mr. Saylor's disability.

As for the second prong of qualified immunity, the key inquiry when determining whether a right was clearly established is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This inquiry requires that the "'clearly established' right at issue" be defined "on the basis of the 'specific context of the case,'" which must not "import[] genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866 (quoting *Saucier*, 533 U.S. at 201). Here, in contravention of this rule, the Deputies import multiple disputed factual propositions into their description of this case.[19]

---

[19] The Deputies also attempt to "segment" the Estate's claims in an artificial way, addressing first the Deputies' conduct in light of Mr. Saylor's disability, and then the complaint's allegations regarding the relationship between the application of forceful pressure applied to a

Moreover, the Deputies attempt to apply *City and County of San Francisco, California, et. al. v. Sheehan*, 135 S.Ct. 1765 (2015) and *Meyers*, 713 F.3d 723 (4th Cir. 2013), when the case on point is the one not cited in their brief, *Rowland v. Perry*. *See* Dkt. 48, Mem. Op. at 16-18 (discussing *Rowland*).

In *Sheehan*, the petitioner Teresa Sheehan lived in a group home for individuals with mental illness. 135 S. Ct. at 1769. Sheehan began acting erratically and threatened to kill her social worker. *Id.* at 1770. Her social worker called for assistance and two police officers arrived. *Id.* After the officers entered Sheehan's room, she picked up a knife and threatened to kill them, so the officers closed Sheehan's door to wait for additional officers to arrive. *Id.* at 1770–71. While waiting, the officers worried that with the door closed, Sheehan may hurt herself, flee out the window, or gather more weapons. *Id.* at 1770. The officers opened the door and used pepper spray on Sheehan, who was still holding the knife. *Id.* at 1771. Sheehan did not drop the knife, and the officers shot her multiple times. *Id.* Sheehan survived and sued the officers under 42 U.S.C. § 1983, claiming that they violated her Fourth Amendment rights.[20] *Id.* The Court held that the officers were entitled to qualified immunity because it was not clearly established that the officers' failure to accommodate Sheehan's disability when they entered her room for a second time violated the Fourth Amendment. *Id.* at 1775. "Considering the specific

---

suspect's back and positional asphyxia. *See* Dkt. 102-1, DMSJ at 53, 55 (citing Comp. Count IX and ¶ 78); *see also Rowland*, 41 F.3d at 173 (rejecting a "segmented view of events"). However, the Estate's claim is that all of the Deputies' actions on the night of January 12, 2013, taken together and in light of the totality of the circumstances, violated Mr. Saylor's rights, and those rights were clearly established. The Deputies fail to address this claim head-on in their qualified immunity analysis.

[20] Sheehan also sued the City of San Francisco for violating Title II of the ADA by failing to reasonably accommodate her disability during her arrest. *Sheehan*, 135 S. Ct. at 1772. However, the Court dismissed that question as improvidently granted because the parties had failed to brief the issue. *Id*. at 1774.

situation confronting Reynolds and Holder, they had sufficient reason to believe that their conduct was justified." *Id*. at 1778.

Unlike Ms. Sheehan, Mr. Saylor was unarmed and made no threats. *Id*. at 1770. Further, in granting qualified immunity, the Court discussed and distinguished other cases on which the Ninth Circuit had based its decision denying qualified immunity, but which the Supreme Court found were too dissimilar to *Sheehan* to give the officers fair warning that their actions were unconstitutional. These cases support the Estate's position. For instance, in *Deorle v. Rutherford,* qualified immunity was not available to an officer who "use[d]…a beanbag gun to subdue 'an emotionally disturbed' person who 'was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense.'" *See Sheehan*, 135 S. Ct. at 1776 (quoting *Deorle*, 272 F.3d at 1275). Similarly, in *Alexander v. City and County. of San Francisco*, 29 F.3d 1355, 1361 (9th Cir. 1994), officers who provoked a confrontation where "there were no 'exigent circumstances'" were not granted qualified immunity. *Id*.[21]

The Deputies' reliance on *Meyers v. Baltimore County* is also misplaced. There, police responded to a 911 call reporting domestic violence involving Ryan Meyers, an individual with bipolar disorder. *Meyers*, 713 F.3d at 727. In attempting to obtain Meyers's surrender, one of

---

[21] The Deputies claim that Mr. Saylor's claimed right is that of having his disability "accommodated" when the Deputies used force. Dkt. 102-1, DMSJ at 53. But the Estate does not claim that Mr. Saylor's disability, alone, made the Deputies' use of force unreasonable. Rather, the Deputies should have considered Mr. Saylor's disability as one of the many "facts and circumstances confronting them," which they wholly failed to do. *Graham*, 490 U.S. at 397. *See Bates*, 216 F.3d at 373 ("Just like any other relevant personal characteristic—height, strength, aggressiveness—a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus."); *see also Patzner v. Burkett*, 779 F.2d 1363, 1371 (8th Cir. 1985) ("Although Deputy Burkett may have had probable cause to believe Patzner had committed a misdemeanor, this does not give her license to ignore, in fact exploit, Patzner's disability in effecting the arrest.").

the officers tased him a total of 10 times – three times before he fell to the ground and an additional seven times after he was face-down on the ground with three officers sitting on his back – ultimately resulting in Meyers's death.  *Id.* at 728-29.  The Fourth Circuit found that the officer's first three uses of his taser did not constitute excessive force because the officer "was faced with the task of subduing an armed, agitated, physically imposing suspect in the confined space of a living room without risking his own safety or that of his fellow officers."  *Id.* at 733. On this basis, the Deputies argue that their use of force was reasonable, because they, too, were "dealing with an agitated, physically imposing suspect who had a mental illness, in a confined space…and [doing] so while trying to protect their own safety, the safety of other individuals, and the safety of Mr. Saylor."  Dkt. 102-1, DMSJ at 55.

However, material facts – both disputed and not – distinguish this case from the situation confronting the officers in *Meyers*.  First, Meyers was "agitated" when the officers arrived – he was alone inside the living room, pacing and holding a baseball bat, while his father and brother stood in the front yard.  *Meyers*, 714 F.3d at 727.  Here, Mr. Saylor was sitting quietly in the movie theater and did not become "agitated" until Sgt. Rochford confronted him against Ms. Crosby's advice.  Second, Meyers was not only "physically imposing," but had caused injury to his father, had a physical fight with his brother, and was armed with a baseball bat.  *Id.* at 728.  Indeed, Meyers posed a significant enough threat that his mother "had fled and would not return until the police had removed [him] from the premises."  *Id.* at 727.  Mr. Saylor, while a large man, was unarmed and seated, and neither threatened nor assaulted anyone, even after the Deputies initiated the use of force against him.  Thus, in contrast to Meyers, there was nothing to indicate to a reasonable officer that Mr. Saylor posed a safety risk to the Deputies or other patrons.  Finally, the movie theater where Mr. Saylor detained himself is a far cry from the type

of "confined space" the officers in *Meyers* faced.  In sum, the Fourth Circuit's holding in *Meyers* that the officer's first three uses of his taser were reasonable has no bearing on the Deputies' claim to qualified immunity in this case.  Instead, the court's further holding regarding the officer's seven subsequent deployments of his taser is more pertinent here.  The court denied the officer qualified immunity because it was clearly established that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner." *Id*. at 734 (quoting *Bailey v. Kennedy,* 349 F.3d 731, 744–45 (4th Cir. 2003)).

Ultimately, the facts of both *Sheehan* and *Meyers* are too dissimilar to those of this case to have any real bearing on this Court's qualified immunity analysis, which must focus on the specific context and facts present here.  *See Sheehan*, 135 S. Ct. at 1779 (Scalia, J., concurring in part and dissenting in part) (stating that the Court would not have granted certiorari "to decide only the second, fact-bound [question presented]" regarding qualified immunity).  Instead, as at the motion to dismiss stage, *Rowland v. Perry* remains the precedent most pertinent to the Deputies' claim to qualified immunity.[22]  As discussed above, viewing all the factors "*in toto*," the court in *Rowland* held that the officer had violated Rowland's Fourth Amendment rights where Rowland "suffered a serious leg injury over a lost five dollar bill." *Id.*, 41 F.3d at 174. The court considered all of the circumstances, including that "the offense was a minor one," "Rowland posed no threat to the officer or anyone else," and the resistance offered, if any, was minimal.  *Id*.  On the basis of these facts, and taking into account the lack of evidence "that this relatively passive, retarded man was a danger to the larger, trained police officer," the court held

---

[22] It is telling that the Deputies do not once cite *Rowland* in their brief, not even to attempt to distinguish it.

"that a jury could find that no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time," and denied qualified immunity.  *Id.*

Decided almost two decades before the events at issue in this case, *Rowland* gave the Deputies fair warning that their use of force against Mr. Saylor violated clearly established law. As in *Rowland*, Mr. Saylor's crime was minor – the "theft" of an $11.00 movie ticket.  Like Rowland, Mr. Saylor posed no threat to the Deputies or others when the use of force was initiated.  While Mr. Saylor resisted the Deputies' attempts to forcibly remove him from the theater, he did so only after the Deputies escalated the situation.  In addition, Mr. Saylor's resistance was the result of his disability, which the Deputies knew because Ms. Crosby had told them how he was likely to react if touched.  The similarities between *Rowland* and this case belie any claim by the Deputies that they could not have known that their conduct violated the Fourth Amendment.

Moreover, the law is clear that qualified immunity does not apply only where "the very action in question has previously been held unlawful…; [rather] in the light of pre-existing law the unlawfulness must be apparent."  *Jones*, 325 F.3d at 531 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  Thus, "draw[ing] fine distinctions between the facts of the present case and those of *Rowland*" would not save the Deputies' claim that the unconstitutionality of their conduct was not clearly established.  *Smith v. Ray*, 781 F.3d at 104.  As the Fourth Circuit has explained,

> our determination that the officer was not entitled to qualified immunity in *Rowland* was not based on any case that was factually on all fours.  Rather, it was based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself.

*Id.*  If it was clearly established in 1994 that officers could not needlessly escalate a situation with aggressive tactics, thereby creating "a violent exchange," then it was certainly apparent to the Deputies "in the light of pre-existing law" that their similar course of action in 2013 was unconstitutional.  *See Jones*, 325 F.3d at 531-32 ("Even though the facts of a prior case may not be 'identical,' the reasoning of that case may establish a 'premise' regarding an unreasonable use of force that can give an officer fair notice that his conduct is objectively unreasonable." (quoting *Hope*, 536 U.S. at 743)).

Because the Deputies violated Mr. Saylor's Fourth Amendment right to be free from excessive force by applying force that was disproportional under the circumstances, and because it was clearly established that their conduct was unlawful, the Court should deny their claim to qualified immunity.

**C.      Defendants Rochford, Jewell, and Harris Are Also Liable for the Plaintiffs' State-Law Claims**

With the benefit of a more developed record, it is clear that the Plaintiffs' state law survival claims for gross negligence, battery, and wrongful death survive summary judgment. The existence of genuine issues of material fact pertinent to these claims dictates that they be decided by a jury.

**1.      The Evidence Supports the Plaintiffs' Claims for Gross Negligence and Battery**

**a.      Gross Negligence**

Under Maryland law, gross negligence is conduct that is "more than simple negligence, and likely more akin to reckless conduct."  *Barbre v. Pope*, 402 Md. 157, 187 (2007).  It is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the

consequences without the exertion of any effort to avoid them." *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985) (quoting *Romanesk v. Rose*, 248 Md. 420, 423 (1968)); *see also* Dkt. 48, Mem. Op. at 25 (quoting same).  Gross negligence "is generally a question for the jury." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (quoting *Taylor v. Harford County Dep't of Soc. Servs.*, 384 Md. 213, 229 (2004)).

Here, viewed in the light most favorable to the Plaintiffs, the evidence shows that Ms. Crosby asked the Deputies not to go into Theater 9 to confront Mr. Saylor, and told them that his mother would be there shortly to deal with the situation.  In addition, Ms. Crosby clearly stated that Mr. Saylor did not like to be touched, and warned the Deputies what his likely reaction would be if they did touch him.  Despite the lack of exigency in the situation and the absence of any threat to the Deputies or others, the Deputies did not wait for Ms. Saylor to arrive, but instead ignored Ms. Crosby's pleas, advice, and warnings, and proceeded to grab Mr. Saylor and then escalate the situation by forcibly removing him from his seat.  Further, the Deputies did not consider or follow the General Order on Limits of Authority, which gave them discretion to employ alternatives to arrest.  Ex. 39.  This evidence demonstrates that throughout the encounter with Mr. Saylor on January 12, 2013, the Deputies displayed "a thoughtless disregard of the consequences" of their actions and acted with gross negligence.  *Liscombe*, 303 Md. at 635.  *See Beall v. Holloway-Johnson*, 446 Md. 48, 65 (2016) (finding officer acted with gross negligence where plaintiff's evidence showed officer violated a General Order and acted without exigent circumstances where individual had "committed only traffic offenses and posed no articulated immediate harm to others").

### b.      Battery

Under Maryland law, a battery claim requires "proof that 'one intends a harmful or offensive contact with another without that person's consent.'"  *Beall*, 446 Md. at 66 (quoting

*Nelson v. Carroll,* 355 Md. 593, 600 (1999)).  The intent element of battery "requires not a specific desire to bring about a certain result, but rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Nelson*, 355 Md. at 602-03.  While "accidental conduct that 'inadvertently results in a harmful or offensive contact with another will not give rise to liability…*volitional conduct* where there is an intent to invade the other person's legally protected interests'" will do so. *Beall*, 466 Md. at 67 (quoting *Nelson*, 355 Md. at 603).  Generally, "intent is a subjective element…left for the jury's determination." *Id.* (quoting *Nelson*, 355 Md. at 603).

Here, the same evidence that supports the Plaintiffs' gross negligence claims sustains their claims for battery.  The Deputies ignored Ms. Crosby's advice and warnings, chose not to wait for Ms. Saylor, and failed to consider or follow the General Order on Limits of Authority. They then initiated physical contact with Mr. Saylor, which Ms. Crosby had told them Mr. Saylor would find difficult or unbearable.  Accordingly, viewed in the light most favorable to the Plaintiffs, there is sufficient evidence for a jury to find that the Deputies committed battery against Mr. Saylor.  *See Beall*, 355 Md. at 67 (finding "legally sufficient evidence to permit a rational jury to conclude that a battery occurred" where officer violated General Order and disregarded commander's oral directive, which were intentional acts, and initiated contact with individual's vehicle).

In addition, where, as here, the evidence supports a claim for excessive force under the Fourth Amendment, a state-law battery claim should go forward.  *See Rowland*, 41 F.3d at 174 (stating that "[t]he parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well"); *Young*, 355 F.3d at 759 (same).  For the

same reasons that summary judgment should be denied on the Estate's excessive force claim under § 1983, it should also be denied on the Plaintiffs' battery claims.[23]

### c.   Patti and Ronald Saylor Have Standing to Bring a Wrongful Death Claim

The Deputies argue that the Saylors do not have standing to bring a wrongful death claim on the basis of the violation of Mr. Saylor's rights under the Fourth Amendment, because they themselves did not suffer a constitutional injury.[24]  Dkt. 102-1, DMSJ at 59.  The Maryland wrongful death statute allows a parent to maintain an action against a person whose wrongful act causes the death of her child.  Md. Code Ann., Cts. & Jud. Proc. §§ 3-902, 3-904.  Here, the Deputies' wrongful acts caused Mr. Saylor's death, and as Mr. Saylor's surviving parents, the Saylors have standing under the wrongful death statute to bring a claim on that basis.  The fact that the same wrongful acts form the basis of the Plaintiffs' battery, gross negligence, and Fourth Amendment claims[25] does not affect their standing or the viability of their claim.

---

[23] The Deputies maintain that the Plaintiffs' battery claims fail because the Plaintiffs do not make a claim for false imprisonment.  *See* Dkt. 102-1, DMSJ at 58.  However, the cases the Deputies cite in support of this argument – *Williams v. Prince George's County*, 112 Md. App. 526, 537 (1996), *Hines v. French*, 157 Md. App. 536, 551 (2004), and *Ashton v. Brown*, 339 Md. 70 (1995) – all involved claims that the harmful or offensive contact inherent in a false arrest or imprisonment also constituted battery.  Here, the Plaintiffs claim that the harmful or offensive contact inherent in the use of excessive force satisfies the requirements for battery under state law.  The other case cited by the Deputies, *Richardson v. McGriff*, 361 Md. 437 (2000), confirms that the "objective reasonableness" principle that governs Fourth Amendment excessive force claims "is the appropriate one to apply as well" to a claim for battery.  *Id*. at 452.

[24] The Deputies cite no caselaw in support of this contention, instead focusing on the Article III standing requirements, which simply have no bearing on the Saylors' ability to bring a wrongful death claim under state law.

[25] The Deputies state that the Saylors' constitutional rights are not at issue here, which the Plaintiffs do not dispute.  Nowhere in Count XII of the Amended Complaint, for wrongful death, do the Plaintiffs allege any violation of the Saylors' constitutional rights.

## 2.     The Deputies Are Not Immune from Liability for the Plaintiffs' State-Law Claims

Under the Maryland Tort Claims Act, State personnel are immune from tort liability for acts or omissions that are within the scope of their public duties and "made without malice or gross negligence," and for which the State has waived its immunity.  Md. Code Ann., Cts. & Jud. Proc. § 5-522(b).  The Deputies are not immune from liability for the state-law torts brought by the Plaintiffs – gross negligence, battery, and wrongful death – because the evidence, viewed in the light most favorable to the Plaintiffs, indicates that the Deputies acted with malice or gross negligence in regards to Mr. Saylor.

As discussed above, the Plaintiffs have amassed sufficient evidence to maintain their claim for gross negligence.  *See* § I.C.1.a.  Thus, the immunity provision is explicitly waived as to that claim.  *See* Dkt. 48, Mem. Op. at 25 ("As to the gross negligence claim, however, the immunity statute explicitly exempts that claim from its reach.").  Similarly, because the evidence establishes that the Deputies acted with gross negligence, they are not immune from liability on the Saylors' wrongful death claim.

The Plaintiffs have also claimed that the Deputies' battery of Mr. Saylor "was undertaken deliberately and with actual malice."  1st Am. Comp. § 67.  To show actual malice, the evidence must show "that petitioners' conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure [Mr. Saylor.]" *Shoemaker v. Smith*, 353 Md. 143, 164 (1999); *see also Lee v. Cline*, 384 Md. 245, 269 (2004).  "Malice may be inferred from the surrounding circumstances," but mere assertions of maliciousness or improper motive are insufficient.  *Green v. Brooks*, 125 Md. App. 349, 377 (1999).

Here, when Mr. Rhodes said Mr. Saylor had to leave the theater, Sgt. Rochford smirked and said, "Better get the boys. We're going to have some trouble tonight." Ex. 9, Crosby Dep., 121:3-21. The Deputies proceeded to confront Mr. Saylor – a man whom they knew had a disability that would affect his understanding of the situation and his reaction to it – even though no exigency required that they immediately remove him from Theater 9. The Deputies also knew that they had at their disposal alternatives to arrest, such as waiting for Ms. Saylor to arrive or issuing a citation to Mr. Saylor, but they chose instead to use force against Mr. Saylor after only a few minutes of conversation.[26] Sgt. Rochford found Mr. Saylor's cursing offensive, and therefore touched Mr. Saylor, though Ms. Crosby had specifically warned that Mr. Saylor did not like to be touched. When Mr. Saylor reacted badly, the Deputies quickly escalated the force used and forcibly dragged him from his seat and out of the theater. A jury could reasonably infer from these facts that the Deputies were motivated by ill will towards Mr. Saylor and/or had an improper motive in choosing to arrest him for a minor misdemeanor. *See Shoemaker*, 353 Md. at 157-64 (holding that jury could reasonably find malice where police, during removal of two minors from their home, forcibly restrained and handcuffed the children when they resisted, threatened them, and then detained them for several hours without counsel, and thus affirming denial of immunity on assault, battery, and false imprisonment claims). Accordingly, the Deputies are not immune from liability for the Plaintiffs' battery claim.

### 3. The Plaintiffs' State-Law Claims Are Not Barred by Contributory Negligence or Assumption of the Risk

As this Court has already held, the doctrines of contributory negligence and assumption of the risk are not applicable to a claim of battery. Dkt. 48, Mem. Op. at 27 (citing *Saba v.*

---

[26] The Deputies reference "the prolonged and consistently polite conversation Sgt. Rochford had with Mr. Saylor" as showing a lack of malice, Dkt. 102-1, DMSJ at 62, but there is a genuine dispute of fact regarding how long Sgt. Rochford spoke with Mr. Saylor before employing force.

*Darling*, 72 Md. App. 487, 492 (1987); *Janelsins v. Button*, 102 Md. App. 30, 44-45 (1994)).  As

for the Plaintiffs' gross negligence[27] and wrongful death claims, whether a plaintiff has been

contributorily negligent is ordinarily "for the jury, not the judge, to decide."  *Meyers v. Lamer*,

743 F.3d 908, 914 (4th Cir. 2014) (quoting *Campbell v. Balt. Gas & Elec. Co.*, 95 Md. App. 86,

93 (1993)).  The trial court should take the question from the jury and "rule that there was

contributory negligence as a matter of law [only] when the undisputed facts of the case support

such a finding as a matter of law."  *Campbell*, 95 Md. App. at 94.  *See also Meyers*, 743 F.3d at

914 ("It is only where the minds of reasonable persons cannot differ that the court is justified in

deciding [contributory negligence] as a matter of law." (quoting *Williamson Truck Lines, Inc. v.

Benjamin*, 244 Md. 1, 8 (1966)).

a.   **Contributory Negligence Does Not Bar the Estate's Gross
        Negligence Claim**

The Deputies assert that the Estate's gross negligence claim is barred because Mr. Saylor

was contributorily negligent in his death.  The very language used by the Deputies in their

argument indicates that reasonable minds could differ on the issue in this case.  The Deputies

state that "Mr. Saylor was evidently able to understand other people and to interact with them,"

Dkt. 102-1, DMSJ at 63, but cite to no evidence of the degree of Mr. Saylor's understanding or

the types of interactions he was able to have with various people.[28]  Similarly, the Deputies posit

---

[27] As the Plaintiffs pointed out in their brief in response to the Defendants' motions to dismiss,
"[a]lthough the Maryland Court of Appeals has not squarely held that contributory negligence
is not a bar to gross negligence, it has assumed so in its opinions."  Dkt. 30, Plaintiffs' Opp. to
Motion to Dismiss at 22 (citing *Liscombe*, 303 Md. at 636-37).  The Plaintiffs urge the Court to
again adopt this assumption as the operating legal standard in this case.

[28] Perhaps most tellingly, the Deputies offer no evidence that Mr. Saylor was able to understand
why he had to leave the movie theater, and consequently why the Deputies physically removed
him.  Indeed, the fact that both Mr. Rhodes and Sgt. Rochford had explained to Mr. Saylor that
he had to buy a ticket and yet he continued to sit in his seat indicates that he did not truly
understand the situation.

that "[i]t appears Mr. Saylor was in many respects more responsible for himself than a 5-year old child," yet support this claim with the bald assertion that "no 5-year old can be left alone on a public sidewalk while a caretaker goes to get her car." *Id.* at 64.  There is no evidence in the record to support either statement.  In fact, Ms. Saylor testified that Mr. Saylor's cognitive abilities could not be assigned a specific age.  Ex. 3, P. Saylor Dep., 38:21-39:13 ("He had the interests of a 26-year-old.  He had the reading ability of a preschooler.  He had the – perhaps the physical ability of a six-year-old so you can't assign one simple number to a person's functioning.").  Dr. Borcherding, Mr. Saylor's treating psychiatrist, confirmed that Mr. Saylor had a "range of behaviors and abilities" that could not easily be assigned to a specific age.  Ex. 8, Borcherding Dep. 32:18-33:7.

The Deputies also provide no evidence showing that the acts of Mr. Saylor they describe – defying Ms. Crosby and the Deputies' requests and resisting the Deputies – were truly "voluntary," Dkt. 102-1, DMSJ at 64, and not the result of Mr. Saylor's disability, nor do they present any evidence showing that Mr. Saylor had the capacity to foresee the dangers of his actions.  *See Reid v. Wash. Overhead Door, Inc.*, 122 F. Supp. 2d 590, 593-94 (D. Md. 2000) (stating that Maryland courts will find contributory negligence as a matter of law "where common experience reveals the foreseeable dangers of the plaintiff's actions").  The standard of care to which Mr. Saylor should be held in determining whether his own negligence contributed to his death must take into account his cognitive development.  *See Dodson v. South Dakota Dept. of Human Services*, 703 N.W.2d 353, 359 (S.D. 2005) ("If the patient's capacity for self care is so diminished by mental illness that it is lacking … an allocation of fault is not appropriate.  In making the fault comparison, the factfinder should always take into account the extent of the patient's diminished mental capacity to care for his own safety"); *Lynch v.*

*Rosenthal*, 396 S.W. 2d 272, 276 (Mo. Ct. App. 1965) (affirming submission of question of contributory negligence to jury where plaintiff was developmentally delayed, defendant knew of plaintiff's developmental delay, and expert testified that plaintiff did not have ability to appreciate dangerousness of situation).

Because the undisputed facts do not support a finding that Mr. Saylor was contributorily negligent as a matter of law, the Court should leave this issue for a jury.[29]

### b. The Saylors' Wrongful Death Claim Is Not Barred by Contributory Negligence or Assumption of the Risk

The Deputies claim that Patti and Ron Saylor were contributorily negligent in Mr. Saylor's death and that they assumed the risk of the consequences when they entrusted his care to Ms. Crosby, allowed him to see "Zero Dark Thirty" ("an 'R' rated violent movie"), failed to give Ms. Crosby extra money, and directed Ms. Crosby to leave Mr. Saylor at the entrance of the Regal Theater while she went to retrieve the car.[30] Dkt. 102-1, DMSJ at 64. The Deputies appear to argue that the Saylors' wrongful death claim should be barred based on their own contributory negligence and assumption of the risk, rather than the alleged contributory negligence of Mr. Saylor. However, the Deputies cite to no caselaw establishing that contributory negligence or assumption of the risk on the part of a wrongful death claimant bars a wrongful death claim. This is because Maryland law establishes that it is the decedent's

---

[29] The Deputies provide no cases in support of their claim that, as a matter of law, an individual with a developmental disability can be held to be contributorily negligent under facts similar to those here. *See Dix v. Spampinato*, 28 Md. App. 81, 106 (1975) *aff'd*, 278 Md. 34 (1976) ("The rule that contributory negligence will not be declared as a matter of law unless the act is distinctive, prominent and decisive about which reasonable minds would not differ as to its negligent character, is of ancient lineage and of current validity."). It is difficult to see how Mr. Saylor could be found contributorily negligent as a matter of law where there is no on-point, controlling precedent.

[30] There is no evidence in the record that Patti or Ronald Saylor directed Ms. Crosby to leave Mr. Saylor while she retrieved the car. Rather, Ms. Saylor suggested that Ms. Crosby call Mr. Perry, and Mr. Perry recommended that she get the car on her own.

contributory negligence or assumption of the risk that bars a wrongful death claim.[31]  *See*

*Wooldridge v. Price*, 184 Md. App. 451, 462 (2009) ("In survival actions and wrongful death

actions, contributory negligence of the decedent is a bar to recovery against a negligent

defendant." (citing *Smith v. Gross*, 319 Md. 138, 144 (1990)); *Dehn v. Edgecombe*, 152 Md.

App. 657, 694–97 (2003), *aff'd*, 384 Md. 606 (2005)); *see also Mummert v. Alizadeh*, 435 Md.

207, 221 (2013) (stating that decedent's assumption of the risk bars survivor's wrongful death

claim).  No precedent indicates that the Saylors' own contributory negligence or assumption of

the risk (neither of which the Plaintiffs concede is established by the evidence) would serve to

bar their wrongful death claim.

Even if the Saylors' own assumption of the risk could bar their wrongful death claim, the

Deputies have failed to meet their burden of establishing the defense.  "To prevail on the defense

of assumption of the risk, the defendant must show that the plaintiff: '(1) had knowledge of the

risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger.'"

*Blood v. Hamami P'ship, LLP*, 143 Md. App. 375, 386 (2002) (quoting *Liscombe*, 303 Md. at

630).  The Deputies have pointed to no evidence showing that Ms. Saylor knew that there was

any risk in allowing her disabled 26-year old son to go to the movies with trained, qualified

support staff who had enough money for the purchase of tickets to the show and concessions, or

that such actions would lead to Mr. Saylor's death.  Indeed, it is hard to understand how any

---

[31]  As discussed above, *see* § I.C.2.3.a, the evidence does not establish that Mr. Saylor was contributorily negligent, so even assuming the Deputies had argued that the Saylors' wrongful death claim is barred on that basis, their argument fails.  Moreover, affirmative defenses such as contributory negligence and comparative negligence do not apply to claims brought under § 1983.  *See Santiago v. Lane,* 894 F.2d 218, 224 (7th Cir.1990); *McHugh v. Olympia Entm't, Inc.*, 37 F. App'x 730, 736 (6th Cir.) *amended on denial of reh'g*, 41 F. App'x 758 (6th Cir. 2002); *Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991).  Accordingly, any purported contributory negligence on the part of Mr. Saylor – which the Plaintiffs do not concede – would not bar the Saylors' wrongful death claim premised on the Deputies' violations of § 1983.

parent could foresee a child's death based on these facts.  As for Ronald Saylor, his only

connection to the events of January 12, 2013 was through texts he received from Ms. Saylor after

Ms. Crosby first called her.  Ex. 20, R. Saylor Dep.,  42:11-43:3.  Consequently, the Deputies

have failed to show that the Saylors assumed any risk of Mr. Saylor's death, and their wrongful

death claim should move forward.

II.     **The State of Maryland Violated Title II of the ADA by Failing to Properly Train the Deputies, Which Resulted In the Deputies' Failure to Accommodate Mr. Saylor During an Arrest and Also Is Vicariously Liable for the Deputies' Violations**

Title II of the ADA prohibits discrimination by public entities, including the State.  42

U.S.C. § 12131.  Title II mandates that, "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

*Id*. § 12132.  To prevail on a claim under Title II of the ADA, a plaintiff must prove three

elements: "(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a

public service, program, or activity, and (3) she was excluded from participation in or denied the

benefits of such service, program, or activity, or otherwise discriminated against, on the basis of

her disability."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498

(4th Cir. 2005).  A Plaintiff is entitled to damages for an entity's discrimination under the ADA if

he can prove that the entity "intentionally or with deliberate indifference fail[ed] to provide

meaningful access or reasonable accommodation to disabled persons."  *Paulone v. City of*

*Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (quoting *Mark H. v. Lemahieu*, 513 F.3d

922, 938 (9th Cir. 2008)); *see also* Dkt. 48, Mem. Op. at 41-42 (adopting *Paulone* recognition of

deliberate indifference standard to support award of damages).

The evidence in this case, viewed in the light most favorable to the Plaintiffs, satisfies

this test.  First, Ms. Crosby informed Sgt. Rochford that Mr. Saylor had Down syndrome, and all

three Deputies testified that they recognized Mr. Saylor as an individual with Down syndrome.

Thus, Mr. Saylor unquestionably had a disability of which the Deputies were aware.  Second, as

a resident of Frederick County (and by extension the State of Maryland) and a patron of the

movie theater where the Deputies were working as security guards, Mr. Saylor was qualified to

receive the benefit of deputies who were properly trained to interact with members of the

community with developmental disabilities and who utilized that training.  Finally, the State

denied Mr. Saylor that benefit by failing to properly train the Deputies, such that they denied

Ms. Crosby's reasonable accommodation request for Mr. Saylor and failed to accommodate

Mr. Saylor throughout their encounter with him, including by using unreasonable force.  *See A

Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 362 (4th Cir. 2008) (grounds for relief

under the ADA include intentional discrimination or disparate treatment, as well as failure to

make reasonable accommodations).  The State's failure to train is evidenced by its lack of a

policy regarding how police should interact with people with developmental disabilities (distinct

from those policies dealing with mental illness).  Moreover, even if the FCSO's General Order

on Mental Illness could be found to substantively address interactions with people with

developmental disabilities, the Deputies' testimony, in conjunction with their actual training

records, demonstrates that they received inadequate training regarding that General Order and its

application to their work.

> **A.    The Deputies Discriminated against Mr. Saylor on the Basis of His Disability
> Because the State Failed to Properly Train Them Regarding Interactions
> with Developmentally Disabled Individuals**

The evidence in this case, viewed in the light most favorable to the Plaintiffs,

demonstrates that the State was deliberately indifferent to Mr. Saylor's rights through its failure

to train the Deputies as to how to properly interact with developmentally disabled individuals in

the community.  The State was aware of its obligation to adequately train the Deputies to comply

with Title II of the ADA.  *See Paulone*, 787 F. Supp. 2d at 387 ("Because the State, and not the

County, is liable for any ADA violation by the [Frederick] Sheriff's personnel, it follows that the

State, and not the County, would be liable for any failure to train.").  Despite that knowledge, the

State did not require any specific training by the FCSO or any other police department regarding

persons with developmental disabilities, nor did the State ensure that the Deputies were

adequately trained regarding any existing policies that might substantively apply to an encounter

with an individual with developmental disabilities like Mr. Saylor.

      Failure-to-train claims under the ADA are often analyzed by analogy to failure-to-train

claims against municipalities under § 1983.  *See, e.g., J.V. v. Albuquerque Pub. Sch.*, -- F.3d --,

No. 15-2071, 2016 WL 683282, at *6 (10th Cir. Feb. 19, 2016) ("We have relied on § 1983

decisions in addressing failure-to-train ADA claims."); *Roberts v. City of Omaha*, 723 F.3d 966,

976 (8th Cir. 2013) (applying deliberate indifference standard from failure-to-train claims under

§ 1983 to failure-to-train claims under ADA and Rehabilitation Act).  That line of precedent

provides that a plaintiff may hold a city (or here, the State) liable for training failures if the

plaintiff presents "evidence of a single violation of federal rights, accompanied by a showing that

a municipality has failed to train its employees to handle recurring situations presenting an

obvious potential for such a violation."  *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397

(1997).  *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006) (stating

that deliberate indifference may be proven by "failure to provide adequate training in light of

foreseeable consequences).  "[T]he identified deficiency in a city's training program must be

closely related to the ultimate injury." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  To

determine whether the deficiency and injury are related, one must ask: "Would the injury have

been avoided had the employee been trained under a program that was not deficient in the identified respect?"  *Id*.**Error! Bookmark not defined.**

Here, the Plaintiff's expert, Andrew J. Scott, III, stated that Mr. Saylor's arrest and subsequent death "illustrated the State of Maryland and the [FCSO's] failure to properly train the…deputies on how to deal with individuals with developmental disabilities."  Ex. 33, Report of Andrew Scott at 7.  Mr. Scott noted that the International Association of Chiefs of Police ("IACP") National Law Enforcement Policy Center has a Model Policy entitled "Encounters with the Developmentally Disabled."  *Id*. at 8.  That Model Policy makes clear that if officers "are not prepared to recognize and deal with symptomatic behaviors and reactions" of persons with developmental disabilities, it "may result in inappropriate or counterproductive police actions."  *Id*. at 8 (quoting Model Policy).  The Model Policy further states that "[t]aking custody of a developmentally disabled person should be avoided whenever possible as it will invariably initiate a severe anxiety response and escalate the situation."  *Id*. at 16.  This case perfectly illustrates the accuracy of that statement, where the Deputies' failure to grant Ms. Crosby's reasonable accommodation request and their decision to take Mr. Saylor into custody caused him to become highly anxious and upset, escalated the situation, and ultimately resulted in Mr. Saylor's death.

The State's own expert, Ken Katsaris, stated that he is "a 40+ year member of the IACP and regularly attend[s] annual conferences" and "use[s] the specific materials cited," thus confirming that the IACP's model policies are authoritative.  Ex. 40, Affidavit of W. Ken Katsaris at  9-10; *see also Thomas v. City of Wichita, Kan.*, No. 13-1040-CM, 2014 WL 3565476, at *3 (D. Kan. July 18, 2014) ("The court agrees that the… IACP policies are relevant to determine whether defendants acted negligently in the amount of force they used against

plaintiff."); *Morris v. Opsahl*, No. 12-CV-2134-RPM, 2014 WL 675419, at *4 (D. Colo. Feb. 21,

2014) (accepting IACP model policy as "industry standard").  Despite the existence of the Model

Policy on "Encounters with the Developmentally Disabled," the FCSO solely had a General

Order on Mental Illness.  However, the IACP Model Policy on "Encounters with the

Developmentally Disabled" is separate and distinct from a different IACP model policy

regarding mental illness, *id*. at 13, demonstrating that a policy on mental illness alone does not,

as the State contends, constitute "a comprehensive policy…concerning…interactions with the

disabled (whether mental, physical, or developmental)," Dkt. 100, State's MSJ at 13.[32]

Moreover, the FCSO General Order on Mental Illness instructs that the ADA "applies to people

who have a physical impairment that substantially limits one or more of their major life

activities."  Ex. 31 at 1.  Yet, the ADA defines a "disability" as "a physical *or mental* impairment

that substantially limits one or more major life activities" of an individual.  42 U.S.C. §

12102(1)(A) (emphasis added).  Thus, the General Order on Mental Illness does not even

properly instruct sheriff's deputies in Frederick that the ADA applies to individuals with mental

illness, much less those who have developmental disabilities.

Even if, in substance, the General Order on Mental Illness were deemed sufficient to

apprise the Deputies of the proper manner in which they should approach and interact with

individuals with developmental disabilities (which the Plaintiffs do not concede),[33] it is clear that

the Deputies received insufficient training regarding the contents of the General Order and how it

---

[32] For instance, the FCSO General Order on Mental Illness refers to symptoms such as loss of memory, delusions, depression, deep feelings of sadness, hopelessness or uselessness, hallucination, manic behavior, accelerated thinking and speaking, hyperactivity, confusion, incoherence, and extreme paranoia, none of which were relevant to dealing with Mr. Saylor or the effects of his developmental disability.  Ex. 31 at 2.

[33] The State argues that "the FCSO had a comprehensive policy that in substance, if not title, covered interacting with the developmentally disabled," but offers no evidence that the Deputies understood it to cover such interactions.  Dkt. 100, State's MSJ at 12.

should be implemented.  While all of the Deputies admitted to familiarity with the General Order

on Mental Illness, they also admitted that they did not think about or consider it on the night of

January 12, 2013.  Ex. 4, Rochford Dep. 48:11-49:6; Ex. 5, Jewell Dep. 86:17-87:6; Ex. 6, Harris

Dep., 65:1-14.   Additionally, Sgt. Rochford could not remember the last time he received

training for dealing with persons with mental illness, and he admitted that the training on mental

illness he did receive was "very basic."  Ex. 4, Rochford Dep., 50:13-51:1, 134:14-135:3.  Lt.

Jewell and DFC Harris, too, could not recall receiving training regarding individuals with mental

illness or mentally challenged individuals.  Ex. 5, Jewell Dep., 12:18-13:13; Ex. 6, Harris Dep.,

81:6-9.  In fact, none of the Deputies had received any training on mental illness since a four-

hour "Mental Health Refresher" in 2011, and it is unclear how much of that Refresher was

devoted to dealing with individuals with developmental disabilities.  Ex. 33 at 11.  Prior to the

2011 Refresher, Sgt. Rochford and DFC Harris had a training titled "Mental Health and Mobile

Crisis" in 2008, and Lt. Jewell received the same training in 2010.  *Id.*

Additionally, Plaintiffs' expert Mr. Scott found that "the training records reflect little to

no training on the topic of dealing with individuals who were developmentally challenged."  [*Id.*]

Further, as he noted, Frederick County Sheriff Jenkins testified that "there is no follow up by his

agency to determine if his deputies knew the agency's policies a few years after the training was

provided."  *Id.* (citing Jenkins Dep. at 72).  Ultimately, Mr. Scott concluded that "FCSO and the

State of Maryland did not properly train its officers how to deal with those individuals that are

developmentally disabled."  *Id.* at 13.  This finding plainly contradicts the State's assertion that

"Mr. Scott does *not* contend that the training was unreasonable or lacking," and that

Mr. Katsaris' testimony that the training was reasonable is "unrefuted."  Dkt. 100, State's MSJ at

17.

It is not enough for the State to point to the existence of a policy regarding mental illness if that policy did not properly address persons with developmental disabilities, and if the State did not ensure that the Deputies were adequately trained to follow that policy or apply it in the type of situation that occurred here. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("[Where] the officers were trained in an area that nominally addressed the needs of the relevant class of persons, but where the content and adequacy of that training was in dispute, we find that the City has not established that there exists no genuine issue of material fact as to the adequacy of the City's training."); *see also Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 740 (6th Cir. 2015) (finding that summary judgment on failure-to-train claim was inappropriate in part because, although private corporation contracted to provide medical care to inmates had policies and protocols, nurses had little to no training and admitted that they did not know the policies or used them at their discretion); *Holscher v. Mille Lacs Cty.*, 924 F. Supp. 2d 1044, 1057 (D. Minn. 2013) (holding that evidence that County had suicide-prevention policy but provided only an initial staff training and an annual refresher on it sufficient for a jury to infer that training was inadequate and County was deliberately indifferent in failing to revise it); *Keating v. Helder*, No. CIV. 08-5243, 2011 WL 3703264, at *5 (W.D. Ark. Aug. 23, 2011) ("More is encompassed in the notion of 'training' than simply making one's employees aware of a policy—it is incumbent upon superiors to train their subordinates that written policies are not mere window dressing—they are institutional practices the employees are expected to follow. Were the law otherwise, the mere placing of an acceptable policy on the books would insulate Washington County from liability."); Ex. 33 at 11 ("Regardless of how thorough an agency's policy is on a particular matter, the policy is only as good as the training provided to agency members to follow and carryout the directives of the agency.").

The Plaintiffs have presented sufficient evidence to show that the State failed to train the Deputies at all regarding interactions with individuals with developmental disabilities, including their obligation to respond to requests for reasonable accommodation made by or on behalf of such individuals, and that it did not even adequately train them to follow the General Order on Mental Illness.[34]  Moreover, it is clear that these failures to train are "closely linked" to Mr. Saylor's death.  *Canton*, 489 U.S. at 391.  If the Deputies had received proper training on dealing with individuals like Mr. Saylor – for instance, if they had truly been familiar with and had properly implemented the General Order on Mental Illness and had thus gathered information from Ms. Crosby, refrained from forcing discussion, refrained from touching Mr. Saylor, and considered alternatives to force– it is not only possible but virtually guaranteed that Mr. Saylor would still be alive.  Thus, the answer here to the question, "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" is undeniably "Yes."  *Id.*

The Deputies' violation of Mr. Saylor's federal rights under the ADA, coupled with the FCSO's inadequate training with respect to individuals with developmental disabilities, shows

---

[34] The Plaintiffs' evidence on the insufficiency of the Deputies' training distinguishes this case from *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006), on which the State relies.  In *Buchanan*, the First Circuit found both that the County had adequate policies in place regarding police response to the mentally ill and use of force, and that the defendant deputies were adequately trained on those policies.  *Id.* at 177.  Thus, it was not "sufficient that the Sheriff's Department provided its policy" in *Buchanan*, as the State argues.  Rather, the court considered the amount of training given the deputies on that policy, as well.  The State also cites *Buchanan* for the proposition that the ADA does not impose a "standard of care" on the State for the services it provides.  Dkt. 100, State's MSJ at 13.  As this Court already held in its previous opinion on the State's motion to dismiss, that portion of the *Buchanan* opinion was "addressed to the claims [made by the plaintiff in *Buchanan*] related to the care provided by [his] mental health care worker, not the conduct of the deputies.  This difference is based, in part, on the principle that 'courts normally should defer to the reasonable judgments of <u>public health officials</u>,' and, thus, this language quoted by the State has little relevance to the case at bar."  Dkt. 48, Mem. Op. at 38-39 n.11 (quoting *Buchanan*, 469 F.3d at 174 (emphasis added)).  The irrelevance of this portion of the *Buchanan* opinion to the current case has not changed.

that the State "has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Bryan Cty.*, 520 U.S. at 409.  The potential here is "obvious" if one considers that as of 2010, a full 18.7% of the U.S. civilian non-institutionalized population had a disability.[35]  The hypothetical situation provided by the Supreme Court in *Canton* to demonstrate when a single violation of federal rights could indicate a failure to train is instructive:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons.  The city has armed its officers with firearms, in part to allow them to accomplish this task.  Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Canton*, 489 U.S. at 390 n.10.  Here, the State knows (or should know) that a large number of its citizens have a disability of some kind.  The State also knows that it has given police officers license to use force and sent them into the community to enforce the laws in a reasonable manner, considering the "totality of the circumstances," including individuals' disabilities.  Thus, the "need to train officers" properly regarding the full reach of the ADA and its application to persons with both mental and physical disabilities of all types "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[36]  *Id.  See Williams v. City of New York*, 121 F. Supp. 3d 354, 375 (S.D.N.Y. 2015) ("[I]t

---

[35] Matthew W. Brault, "Americans With Disabilities: 2010," U.S. Department of Commerce, U.S. Census Bureau (July 2012), *available at* http://www.census.gov/prod/2012pubs/p70-131.pdf.

[36] Other courts have denied summary judgment on failure-to-train claims where the plaintiff has presented evidence of a single instance of a violation of federal rights, coupled with additional evidence of inadequate training.  *See, e.g., Russo*, 953 F.2d at 1047 (reversing summary judgment on claim that city failed to adequately train officers "on the use of force in handling mentally and emotionally disturbed individuals" where no pattern or practice was alleged); *Thomas v. Cumberland Cty.*, 749 F.3d 217, 225-26 (3d Cir. 2014) (finding sufficient evidence for the question of County's deliberate indifference to go to the jury in single-incident failure-to-

would be preposterous to believe that given the diversity of the population in the City of New York, the [New York Police Department] did not know full well that its officers would encounter persons with hearing impairments in connection with protecting and defending the City and that some of those people would need accommodation to interact with the police.").

### B.      It Is for the Jury to Determine the Credibility of the Parties' Experts

Generally, "it [is] for the jury to weigh the evidence and the credibility of each expert." *Mosser v. Fruehauf Corp.*, 940 F.2d 77, 83 (4th Cir. 1991).  Yet the State devotes an entire section of its brief to arguing that the Court should disregard Mr. Scott's opinions because they "consist[] largely of conjecture and speculation."  Dkt. 100, State's MSJ at 14.  Mr. Scott's opinions are not "based on assumptions which are speculative and not supported by the record," as the State baldly declares.  *Id.* (quoting *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  Mr. Scott supports his opinions through reference to the General Orders of the FCSO, the policies that are recommended by an international law enforcement organization, and the actual training records of the Deputies.  Moreover, a review of the report of the State's expert, Ken Katsaris, reveals the same types of "assumptions" and "speculation" of which the State accuses Mr. Scott.  For instance, Mr. Katsaris opines, "[w]hile the specific policy of the [FCSO] is entitled 'Investigation of Persons with Mental Illness'…, it is obvious that the definitions of 'mental illness' and the inclusion of the terms and conditions of the ADA, on issues of 'Developmental Disabilities' issues are included by <u>content</u> if not by title."  Ex. 40 at 6.

train case); *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 28 (1st Cir. 2005) (same); *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1188 (9th Cir. 2006) (reversing summary judgment on failure-to-train claim not based on pattern or practice); *Allen v. Muskogee, Okl.*, 119 F.3d 837, 844 (10th Cir. 1997) (collecting cases and stating that "*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), and *Canton* do not require evidence of more than one incident to establish a policy of inadequate training and that the training caused the constitutional deprivation. These cases simply require evidence in addition to the occurrence of a single incident. A plaintiff can properly rely on the single incident if there is other evidence of inadequate training.").

Yet Mr. Katsaris points to no supporting authority for the "obviousness" that these definitions and terms are included in the General Order on Mental Illness, nor does he support his opinion with evidence that the Deputies recognized this alleged obviousness.

Mr. Katsaris's report suffers from other faults, as well. He explicitly relies throughout his opinion on the Deputies' alleged knowledge that Mr. Saylor had "potential violent tendencies," *see id.* at 5, 8, yet this is a disputed material fact. Mr. Katsaris also opines that the Deputies' recognition of Mr. Saylor as having Down syndrome shows that they "absorbed" the training on mental illness, *id.* at 9, but all of the evidence indicates that the Deputies' previous life experience caused them to recognize Mr. Saylor's disability, rather than any training they received, *see* Ex. 4, Rochford Dep., 30:3-11, 42:13-16; Ex. 6, Harris Dep., 38:12-20 (Harris testified that a family close by had a child with Down syndrome). Further, Mr. Katsaris's opinion is far from "unrefuted," as the State claiMs. Dkt. 100, State's MSJ at 16. While Mr. Katsaris maintains that the Deputies' training was adequate, Mr. Scott comes to the opposite conclusion.

"Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures…. Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself." *Russo*, 953 F.2d at 1047. Mr. Scott's testimony is crucial to any consideration of the Plaintiffs' failure-to-train claim, and the State has failed to demonstrate that his opinion is unfounded, speculative, or unrefuted. Thus, the Court should leave it for a jury to consider and weigh Mr. Scott's testimony.

C.      **The Deputies Failed to Accommodate Mr. Saylor's Disability Throughout
        Their Encounter with Him**

The requirement that a public entity must reasonably accommodate persons with

disabilities "derives from the statute's reference to 'reasonable modifications to rules, policies, or

practices, the removal of architectural, communication, or transportation barriers, or the

provision of auxiliary aids and services.'" *Paulone*, 787 F. Supp. 2d at 371 (quoting 42 U.S.C. §

12131(2)).  The regulations interpreting Title II "further elucidate the requirement of reasonable

accommodations," stating that "a public entity must 'make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity.'"  *Id*. at 372 (quoting 28

C.F.R. § 35.130(b)(7).  To recover damages for a failure to accommodate a plaintiff need not

demonstrate discriminatory intent on the part of the defendant, but merely that the defendant

"'acted knowingly, voluntarily, and deliberately,' even if the violations resulted from mere

'thoughtlessness and indifference rather than because of any intent to deny Plaintiff's rights.'"

*Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 394 (D. Md. 2011) (quoting

*Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 828 (D. Md. 1998) (internal

quotation marks omitted)).

The State maintains that Sgt. Rochford met his obligation to reasonably accommodate

Mr. Saylor because his actions were consistent with the General Order on Mental Illness.

Dkt. 100, State's MSJ at 23.  However, the accommodations requested by Ms. Crosby and

needed by Mr. Saylor were time and patience to allow Mr. Saylor to sit in the theater, without

being touched by strangers, until his mother could arrive at the theater, none of which the

deputies provided.  Moreover, the only portion of the General Order on Mental Illness with

which Sgt. Rochford complied was the directive to speak calmly.  The General Order on Mental

Illness also directs deputies to avoid: forcing discussion with the individual with mental illness,

touching the person, engaging in continuous eye contact, or moving into the person's zone of

comfort.  Ex. 31, at 2.  Further, the General Order directs deputies to gather relevant information

and then to consider a range of options, including outright release, release to a care giver or

family member, or arrest.  *Id*.  Finally, the General Order makes clear that "[t]he arrest of a

mentally disordered individual may not be the best alternative in minor law violations, however

in *serious cases* such persons may be arrested the same as any other."  *Id*. at 4 (emphasis added).

   The contents of the General Order on Mental Illness show that reasonably

accommodating Mr. Saylor would have been in line with FCSO policy, and required no

"fundamental alteration" of the FCSO's services or activities.   Yet after Sgt. Rochford briefly

spoke calmly with Mr. Saylor, he did not follow any of the other directives in the General Order

on Mental Illness, such as refraining from touching Mr. Saylor.  This failure is especially

egregious considering that Ms. Crosby told Sgt. Rochford that Mr. Saylor did not like to be

touched, and the General Order has a specific instruction on the issue.  Moreover, none of the

Deputies even considered the General Order on Mental Illness and alternatives to arrest therein,

and all three of them believed that arresting Mr. Saylor was the only possible course of action,

though the General Order explicitly states that arrest is not desirable in the case of minor law

violations.[37]  If the Deputies' only "accommodation" of Mr. Saylor was speaking with him

calmly and professionally for a short time, it is difficult to see how they treated him any

---

[37] The Deputies' complete failure to consider or implement the General Order on Mental Illness illustrates that they did not view the Order as encompassing interactions with persons with developmental disabilities.

differently than they would a non-disabled individual.  Indeed, one would hope that Frederick County deputies extend such courtesy to all County residents.

To avoid the conclusion that the Deputies failed to reasonably accommodate Mr. Saylor, the State predictably relies on cases where exigency, crises, and clear threats of violence necessitated "split-second" decisions by officers.  *See* Dkt. 100, State's MSJ at 24-27.  At the risk of tiring the Court through repetition, the Plaintiffs again note that whether or not the Deputies were told Mr. Saylor could become violent is a disputed issue of material fact in this case.  Ms. Crosby merely requested a reasonable accommodation for Mr. Saylor from the Deputies, asking that they not touch Mr. Saylor and either let her handle the situation or wait for his mother to arrive.  Nothing in Ms. Crosby's testimony in telling the deputies that he did not like being touched and that he might curse at them if they did suggests violence.  Ex. 9, Crosby Dep., 182:6-14.  This evidence indicates that, at most, the Deputies may have equated "anger" with "violence" in their own minds, but a jury could find such a leap unreasonable.  The State also states as fact that "Mr. Rhodes wanted Mr. Saylor to leave," and Ms. Crosby was "an inexperienced teenager…was visibly upset…and unable to control or handle Mr. Saylor."[38] Dkt. 100, State's MSJ at 29.  These, too, are disputed, material facts.  Mr. Rhodes testified that he asked Sgt. Rochford to "help out" Ms. Crosby, and "*potentially* remove" Mr. Saylor.  Ex. 7, Rhodes Dep., 99:18-100:7 (emphasis added).  It is therefore disputed whether the Deputies removed Mr. Saylor based on a request by theater management.  As for Ms. Crosby, prior to

---

[38] The State makes the additional, inflammatory statement that "the movie scheduled to be shown was particularly violent." Dkt. 100, State's MSJ at 29.  There is absolutely no evidence in the record indicating that the subject or content of "Zero Dark Thirty" had anything to do with Mr. Saylor's actions on the night of January 12, 2013, save that he liked the movie so much he wanted to see it again.  It would set a dangerous precedent if police could act in movie theaters based on the content of the movie to be shown and the officers' associated assumptions about how that content will affect certain patrons.

working for Mr. Saylor she worked at a school for children with special needs, including

children with Down syndrome, for a full year.  Ex. 9, Crosby Dep., 36:9-37:3.  Patti Saylor

testified that Ms. Crosby did not sound like she was crying during their second call, when

Ms. Crosby was outside Theater 9.  Ex. 3, P. Saylor Dep., 126:9-21.  And Ms. Crosby

specifically explained Mr. Saylor's disability to Mr. Rhodes and asked him to let her handle the

situation with Mr. Saylor, thus belying the State's contention that she had lost control.  Ex. 9,

Crosby Dep. 107:14-18; Ex. 13 at State 0062.  Viewing this evidence in the light most favorable

to the Plaintiffs, as the Court must at this stage, the State simply cannot rely on its version of the

facts to justify the Deputies' actions or excuse their failure to accommodate Mr. Saylor's known

disability.

      Similarly, there was no exigency that necessitated the Deputies forcibly removing

Mr. Saylor from Theater 9 after mere minutes of speaking with him.  When Sgt. Rochford first

confronted Mr. Saylor, the lights in Theater 9 were still on, other patrons were continuing to

enter the theater and find seats, the movie had not yet started, and Mr. Saylor was sitting quietly.

The context here is thus easily distinguishable from the cases cited by the State.  *See Waller v.*

*City of Danville*, 556 F.3d 171, 172-73 (4th Cir. 2009) (officers confronted with a hostage

standoff with a mentally ill individual who would not permit his girlfriend to leave the

apartment, where individual had a criminal history, threatened the police, and came towards

them brandishing weapons); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 895 (8th Cir. 2014) *cert.*

*denied sub nom. De Boise v. St. Louis Cty., Mo.*, 135 S. Ct. 2348 (2015) (individual in midst of

psychotic episode was physically aggressive toward mother, broke glass and threw furniture in

home, and repeatedly ignored officers' directives and came towards them in a threatening

manner).[39]  An unarmed, developmentally disabled man sitting quietly in a movie theater, albeit

without a valid ticket, does not require the same sorts of "split-second decisions" as do violent,

threatening, armed individuals suffering from severe episodes of mental illness.  *See Wingard v.*

*Penn. State Police*, No. CIV.A. 12-1500, 2013 WL 3551109, at *6 (W.D. Pa. July 11, 2013)

(stating that "if an individual suffers from mental illness, but is not presenting a danger to

himself or anyone else, this duty [to accommodate]" might require better training, and "'[o]ne

potential accommodation…[is] to have the police refrain from taking aggressive action ... until

[the plaintiff] presented an immediate threat to human life.'" (quoting *Morais v. City of*

*Philadelphia,* 2007 WL 853811 *11–13 (E.D. Pa. 2007)).

    The State also relies on *Seremeth v. Board of County Commissioners of Frederick*

*County*, 673 F.3d 333 (4th Cir. 2012).  The *Seremeth* court found that the ADA applies to police

interrogations, but that the defendant police officers' failure to accommodate the plaintiff's

disability was reasonable "due to the exigencies inherent in responding to a domestic violence

situation."  *Id*. at 339.  The Fourth Circuit held that "while there is no separate exigent-

circumstances inquiry, the consideration of exigent circumstances is included in the

determination of the reasonableness of [an] accommodation."  *Id*.  Moreover, the court

specifically noted that "this view of the ADA has the ancillary benefit of encouraging the

provision of accommodations during exigent circumstances."  *Id*.  If reasonable accommodation

should be encouraged even in situations involving exigent circumstances, then in situations such

---

[39] Like the Deputies, the State also cites *Bates*, 216 F.3d 367, but as discussed earlier, in that case the Fourth Circuit noted that the officers did not know that the plaintiff was autistic at the start of their confrontation.  *Id*. at 372.  The court further found that the officers' use of force after being informed of the plaintiff's disability was reasonable because the plaintiff had already run from the officers and pushed, spat on, and bit one of the officers.  *Id*.  Here, the Deputies knew of Mr. Saylor's disability, and Mr. Saylor did nothing to provoke their use of force beyond cursing and refusing to leave his seat, both actions that were manifestations of his disability.

as the case at bar where there is no exigency at all, it was flatly unreasonable for the Deputies not to accommodate Mr. Saylor's known disability.

Like the qualified immunity analysis, "inquiry into whether officers reasonably accommodated [an] individual is 'highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns[.]'" *De Boise*, 760 F.3d at 899 (quoting *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 784–85 (8th Cir. 2012)).  Because it is a fact-specific inquiry and there are disputed facts in this case that are material to any determination of whether the Deputies failed to reasonably accommodate Mr. Saylor, the State's motion is due to be denied.

> **D.     The State's Liability Under the ADA for The Deputies' Actions and Inactions Does Not Turn on Whether or Not the Deputies Are Entitled To Qualified Immunity**

The State argues that where "law enforcement officers are entitled to qualified immunity because there is no underlying constitutional injury, a statutory employer like the State here may not be liable for failing to train them."  Dkt. 100, State's MSJ at 31.  However, the cases cited by the State in support of this argument – *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999), and *McCoy v. City of Monticello*, 411 F.3d 920, 922-23 (8th Cir. 2005) – involved failure-to-train claims brought under § 1983 that were based on alleged constitutional violations by individual officers.  In all three cases, because the courts found that the individual officers had not violated the plaintiffs' constitutional rights, the courts held that there was no basis for a failure-to-train claim.  Here, however, the Plaintiffs contend that the Deputies violated Mr. Saylor's rights under the ADA and that those violations

were in part because the State failed to properly train the Deputies.  Thus, the cases cited by the State have no bearing on the Plaintiffs' ADA failure-to-train claims.[40]

### E.    Failure to Train Claims Are Cognizable Under the ADA

This Court previously held "[t]hat the Fourth Circuit has yet to have the opportunity to reach the issue [of failure to train under the ADA] is no indication that it would not follow other courts and recognize such a claim."  Op. on MTD at 36.  The Plaintiffs adopt and incorporate by reference the arguments on this issue in their response to the State's motion to dismiss (Dkt. 45), and urge the Court to reject the State's contention that a failure to train claim is invalid due to the lack of Fourth Circuit precedent.

### F.    Even Absent a Failure to Train the State is Responsible In *Respondeat Superior* for the Deputies' Violations of the ADA

The Fourth Circuit has held that Title II of the ADA authorizes *respondeat superior* liability.  *Rosen v. Montgomery Cty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997).  Therefore, even absent a failure to train, the State of Maryland is responsible for the Deputies' violations of Title II that are set out in § II.C, *supra.*

## III.    Defendant Hill Management Is Liable for Negligence, Gross Negligence, and Battery

The sole question regarding Hill Management ("Hill") is whether it can be held liable for the Plaintiffs' damages under the law of agency.  It is undisputed that Hill hired the Deputies as security guards, and that the Deputies were on duty as private security guards on the night of January 12, 2013.  Further, the evidence is disputed that the Deputies reverted to on-duty status and became employees solely of the State as soon as they began to arrest Mr. Saylor.  Because

---

[40] In addition, as discussed above, the Deputies are not entitled to qualified immunity on the Estate's § 1983 claim because the Deputies violated Mr. Saylor's constitutional rights.  *See* § I(B).  The State's argument disclaiming liability based on the Deputies' qualified immunity is unavailing for this reason, as well.

this dispute is material to any determination of Hill's liability, the Court should deny Hill's

motion for summary judgment.

> **A.    A Jury Could Find that Hill Management Was a Joint Employer of the Deputies During the Arrest of Mr. Saylor**

Under Maryland law, "[a] worker may simultaneously be the employee of two

employers." *Whitehead v. Safway Steel Products*, 304 Md. 67, 79 (1985).  "The test for

determining whether dual employment exists is whether 'there is evidence to support an

*inference* that more than one individual or company controls or directs a person in the

performance of a given function.'"  *Auto. Trade Ass'n of Md. v. Harold Folk Enter., Inc.*, 301

Md. 642, 660 (1984) (quoting *Mackall v. Zayre Corp.*, 293 Md. 221, 230, (1982)); *see also id*.

("The decisive test in determining the existence of an employer-employee relationship is the

right of the employer to control and direct the employee in the performance of the work and in

the manner in which the work is to be done.").

In *Lovelace v. Anderson*, 366 Md. 690 (2001), the Maryland Court of Appeals reversed

the grant of summary judgment in a tort suit by a hotel guest against the hotel owners and

operators and an off-duty police officer serving as a private security guard at the hotel.  *Id*. at

694.  The security guard, Anderson, had fired his weapon during a gun battle in the hotel lobby

with two men attempting to rob the hotel, and the plaintiff, Lovelace, was struck and injured by a

bullet from Anderson's gun.  *Id*.  The Circuit Court granted summary judgment on the ground

that Anderson's qualified immunity extended to his hotel employer, and the Court of Special

Appeals affirmed, but on the ground that Anderson reverted to police officer status when the gun

battle began, so he was not the agent of the hotel but was acting exclusively in his capacity as a

law enforcement officer.  *Id*. at 709-710.  The Court of Appeals reversed on the basis of a joint

employer theory, holding that "the evidence that was before the Circuit Court for purposes of the

motions for summary judgment was more than sufficient to show an employment relationship between Anderson and the hotel during the attempted robbery, and to show that Anderson was acting within the scope of that employment relationship, even assuming *arguendo* that he was also acting as a Baltimore City police officer." *Id*. at 418-19.

In finding that there was sufficient evidence to hold the hotel liable as a joint employer, the Court of Appeals applied "five principal criteria for determining the existence of an employer-employee relationship:… '(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer.'" *Id*. at 717-18 (quoting *Great Atlantic Tea v. Imbraguglio*, 346 Md. 573, 590 (1997)). The Court of Appeals further noted that there are "numerous considerations" relevant to "whether a particular action is within the scope of the employment relationship," including:

> whether the action was in furtherance of the employer's business or was personal to the employee, whether it occurred during the period when the employee was on duty for the employer, whether it related to the employee's duties, whether the action was in a broad sense authorized by the employer, whether the employer had reason to expect that the type of action might occur, whether it occurred in an authorized locality, etc.

*Id*. at 718. "In applying these and other factors, 'there are few, if any, absolutes.'" *Id*. (quoting *Sawyer v. Humphries*, 322 Md. 247, 255 (1991)). Applying the factors to the facts in *Lovelace*, the court found relevant that: Anderson was on duty as a hotel employee when the shoot-out began and was paid by the hotel for the entire time in question; the hotel had authority to discharge him; "providing security for the hotel and its guests was part of the hotel's business"; and the hotel exerted control over Anderson's duties, "manner of dress," the requirement that Anderson conceal his weapon, and "the assignments given to Anderson and other security guards." *Id*. at 719. The court noted

that it was not necessary that the hotel management "exercise[e] control over all of the details of how a security guard would attempt to stop a robbery in progress," as long as it had the right to control Anderson's work generally.  *Id*. at 720.

Applying the factors identified in *Lovelace* to the case at bar demonstrates the existence of sufficient evidence to show an employment relationship between the Deputies and Hill during their interaction with Mr. Saylor, and to show that the Deputies were acting within the scope of that relationship.  In terms of the power to select and hire, Teresa Rosier, a Hill representative, testified that Bart Rupperthol, a FCSO deputy who worked as a courtesy patrol for Hill, scheduled and submitted paperwork for the other deputies who would work as off-duty security guards. Ex. 35, Rosier Dep., 18:3-20:3.  While Hill argues that the deputies chosen to work security "were selected by the Sheriff's Office," Dkt. 99-2, Hill's MSJ at 3,  it is not clear that Mr. Rupperthol chose and scheduled deputies as part of his duties as a Sheriff's deputy, rather than as part of his duties as an employee of Hill.  In addition, Hill's contract with the Regal Theater "authorizes Hill Management Services to employ security guards at Westview Promenade." Ex. 38.  Hill also admits that it had the power to approve the deputies who worked in secondary employment at the Westview Promenade.  Dkt. 99-2, Hill's MSJ at 3.

Turning to the other four criteria identified in *Lovelace* for determining an employer-employee relationship, there is no evidence in the record indicating that Hill did not have the power to discharge its private security guards.  The employer waiver between Hill and the FCSO expressly states that "[d]eputies while working secondary employment will be considered employees of the secondary employer," which indicates that Hill had control over the Deputies'

conduct during secondary employment.[41]  Ex. 38.  Hill also determined the number of off-duty

deputies who would work at any given time and their hours. *See* Ex. 35, Rosier Dep., 20:2-7.

While the evidence on this point is conflicting, the Deputies claim that Mr. Rhodes requested

that they remove Mr. Saylor from Theater 9, which indicates that they acted pursuant to the

direction and control of their secondary employer.  *See* Ex. 4, Rochford Dep., 25:7-26:9; Ex 5,

Jewell Dep., 42:10-17; Ex. 6, Harris Dep., 45:6-15.  In addition, there is conflicting evidence as

to whether the Deputies were wearing Hill uniforms or their official Sherriff's deputy uniforms

on the night of Mr. Saylor's death.  *See* Ex. 9, Crosby Dep., 111:9-20; Ex. 14 at State 0070, State

0075; Ex. 27, at Screenshots 3-7.  While Hill maintains that Westview Promenade, and not Hill,

paid the Deputies' wages, the payroll forms completed for each Deputy bore the signatures of

Hill agents.  Ex. 38; Ex. 35, Rosier Dep. 25:11-27:5.  Finally, the work performed by the

Deputies on the night of January 12, 2013 was part of the "regular business" of Hill, because Hill

specifically hired the Deputies to maintain security and order at Westview Promenade.  Indeed,

in a letter from Hill to Regal Cinemas after an armed robbery at Westview Promenade, Hill

wrote that it "does not take the incident lightly and is proactive in taking measures to ensure the

safety of patrons and employees at the Westview Promenade."[42]  Ex. 38.  This letter makes clear

that ensuring safety was part of the "regular business" of Hill.

---

[41] Hill argues that Lt. Jewell was "in control"  once the arrest began, based on his status as the
most senior officer on the scene, and therefore Hill no longer had the right to control the
Deputies from that moment forward.  In fact, Lt. Jewell testified that though he was "authorized
to take control of the situation," Ex. 5, Jewell Dep., 55:14-20, he never did so, and instead
limited his role to "backing up" Sgt. Rochford because it was "Sgt. Rochford's call as to how the
incident was going to be handled," *Id.* 64:16-65:7.  Whether or not Lt. Jewell could have exerted
control over the Deputies' interaction with Mr. Saylor is a hypothetical question that has no
bearing on whether Hill in fact controlled the Deputies during the same time.

[42] In addition, this letter indicates that when tenants of Westview Promenade wanted additional
security coverage, they requested it from Hill.  Ex. 38.

Finally, the other "considerations" identified in *Lovelace* support a finding of an employer-employee relationship between Hill and the Deputies, as well. The Deputies' interaction with Mr. Saylor was in furtherance of Hill's business, rather than any personal business of any of the Deputies. The incident occurred during each of the Deputies' official shift for Hill on January 12, 2013, related directly to the Deputies' duties to provide security and maintain order at Westview Promenade, and occurred in an "authorized locality" – indeed, the movie theater was the very area to which Hill assigned Sgt. Rochford that evening. Ex. 4, Rochford Dep., 11:8-12:1. Further, a reasonable juror could find that Hill would expect the Deputies to sometimes confront and arrest patrons, as Hill testified that off-duty deputies had had occasion to arrest individuals at the mall in the past. Ex. 35, Rosier Dep., 21:6-19.

Hill argues that the essential terms of the Deputies' employment are not in dispute, such that "the issue of an employment relationship is a matter of law." Dkt. 99-2, Hill's MSJ at 13. However, taken together, the foregoing evidence indicates that there are multiple disputes regarding the essential terms of the Deputies' employment. This evidence is "more than sufficient to show an employment relationship between [the Deputies] and [Hill] during the [arrest of Mr. Saylor], and to show that [the Deputies were] acting within the scope of that employment relationship." *Lovelace*, 366 Md. at 718. Therefore, the existence of an employer-employee relationship between Hill and the Deputies (even if as a joint employer with the State) is a question of fact to be determined by the jury, and Hill's motion should be denied.[43] *See*

---

[43] Hill's argument is confined to its status as the Deputies' employer during their interactions with Mr. Saylor, and its concomitant *respondeat superior* liability. Hill does not argue the substance of the Plaintiffs' claims against it, instead incorporating the other Deputies' arguments on the issue of gross negligence. *See* Dkt. 99-2, Hill's MSJ at 18. The Plaintiffs in turn incorporate their own arguments regarding their gross negligence claiMs. *See* § I.C.1.a. Further, because the Deputies' immunity from liability on the Plaintiffs' negligence claim does not run to Hill, *see Lovelace*, 366 Md. at 713, Hill is liable for the Deputies' negligence throughout the

*Mackall*, 293 Md. at 230 ("This Court has frequently reiterated that the question whether an

employer-employee relationship exists is one for the jury to determine.").

> **B.      Hill Management Was Indisputably the Employer of the Deputies When**
> **They First Confronted Mr. Saylor, Before They Initiated an Arrest, and Is**
> **Therefore Liable for the Deputies' Negligence and Gross Negligence in**
> **Initiating a Confrontation with Mr. Saylor**

No party to this case disputes that any action undertaken by the Deputies "prior to the

physical attempt to arrest Mr. Saylor…was undertaken…in their capacities as private security

guards." Dkt. 100, State's MSJ at 31.  That is, prior to Sgt. Rochford's initiation of physical

contact with Mr. Saylor, the Deputies were employees only of Hill, and there is no argument that

Hill and the State were joint employers at that time.  While Hill states that the "the negligent act

for which Hill Management is vicarious[ly] liable is the arrest of Mr. Saylor," Dkt. 99-2, Hill's

MSJ at 16, the Plaintiffs' claims are not so circumscribed.  Rather, the Plaintiffs have alleged

that Hill Management is liable generally for the negligence and gross negligence of the Deputies

that proximately caused Mr. Saylor's pain and suffering.  *See* Am. Comp. Counts III, VI; *see*

*also Barclay v. Briscoe*, 427 Md. 270, 282-83 (2012) ("This Court has recognized consistently

the doctrine of *respondeat superior*, as 'it is hornbook law that an employer is ordinarily

responsible for the tortious conduct of his employee committed while the servant was acting

within the scope of the employment relationship.'" (quoting *Embrey v. Holly*, 293 Md. 128, 134

(1982)).

When Sgt.  Rochford decided to enter Theater 9 and confront Mr. Saylor, he did so

knowing that Mr. Saylor had a disability that would affect his reactions to the situation, that he

would not react well to any confrontation, that his mother was on the way, and that waiting him

out was the best approach in the opinion of Ms. Crosby, the person on the scene who knew him

---

encounter with Mr. Saylor, including his arrest.  Hill has not challenged on the merits its liability
for the Deputies' negligent acts during the arrest of Mr. Saylor.

best.  Sgt. Rochford also knew that there was no exigency, as the lights were still on in Theater 9 and the movie had not started.  Despite this knowledge, Sgt. Rochford proceeded with the very course of action against which Ms. Crosby had advised.  It was Sgt. Rochford's insistence on trying to talk to and reason with Mr. Saylor that caused Mr. Saylor to become agitated.  Mr. Saylor then began to curse and get angry, as Ms. Crosby had predicted.  It was only after Sgt. Rochford's interaction with Mr. Saylor elicited these responses that he and the other Deputies decided to escalate the situation by initiating an arrest.

A reasonable jury, confronted with this evidence, could find that it was negligent for the Deputies to confront Mr. Saylor at all, based on the totality of the circumstances.  Negligence requires only that the plaintiff demonstrate "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."  *Horridge v. St. Mary's Cty. Dep't of Soc. Servs.*, 382 Md. 170, 182 (2004); *see also Doe v. Bd. of Educ. of Prince George's Cty.*, 982 F. Supp. 2d 641, 659 (D. Md. 2013) *aff'd*, 605 F. App'x 159 (4th Cir. 2015) (same).  A duty is defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."  *Horridge*, 382 Md. at 182.  Here, a reasonable jury could find that the Deputies had a duty to accommodate Mr. Saylor's disability and to act in conformity with the information Ms. Crosby gave them, but that they breached that duty by choosing to confront Mr. Saylor rather than wait a short time for his mother to arrive.  There is no dispute that the Plaintiffs suffered a horrible loss as a result of the Deputies' breach.  And a jury could also find that the Deputies' initial confrontation with Mr. Saylor proximately caused his pain and suffering, as it

74

was the triggering event for all of the Deputies' following choices and actions.[44]  Because the evidence is sufficient to establish that the Deputies were negligent in choosing to enter Theater 9 and confront Mr. Saylor, and Hill was indisputably the Deputies' employer at that time, Hill is liable for the Deputies' actions under a theory of *respondeat superior*.  Thus, Hill's motion should be denied.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny the Defendants' motions for summary judgment.

Respectfully submitted,

/s/
Sharon Krevor-Weisbaum (Fed. Bar No. 04773)
Joseph B. Espo (Fed. Bar No. 07490)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
skw@browngold.com
jbe@browngold.com

*Attorneys for Plaintiffs*

Dated:  April 11, 2016

---

[44] Hill argues that Mr. Saylor's death was not a foreseeable consequence of providing a "courtesy patrol" at Westview Promenade.  *See* Dkt. 99-2, Hill's MSJ at 18-19.  However, a jury could find that harm to Mr. Saylor, including his death, was reasonably foreseeable "as a result of the [Deputies'] particular tortious conduct," since Ms. Crosby had specifically warned them about the negative consequences of confronting Mr. Saylor.  *See Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 149 (1994) ("courts have given further effect to the social policy of limitation of liability for remote consequences by narrowing the concept of duty to embrace only those persons or classes of persons to whom harm of some type might reasonably have been foreseen as a result of the particular tortious conduct" (internal quotation marks and citation omitted)).  Because Hill is liable under *respondeat superior* for all of the Deputies' actions (and at a minimum for their initial confrontation with Mr. Saylor), it is immaterial whether any of the harm to Mr. Saylor was foreseeable merely as a result of hiring the Deputies as security guards.