IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE ESTATE OF ROBERT ETHAN        *
SAYLOR <u>et al.</u>                      *
                                  *
v.                                *    Civil Action No. WMN-13-3089
                                  *
REGAL CINEMAS, INC. <u>et al.</u>         *
                                  *
 *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

<u>**MEMORANDUM**</u>

Before the Court are motions for summary judgment filed by: the State of Maryland, ECF No. 98; Hill Management Services, Inc. (Hill Management), ECF No. 99; and three Frederick County Sheriff's Deputies – Defendants Sgt. Richard Rochford, Lt. Scott Jewell, and Deputy First Class (DFC) James Harris (the Deputies), ECF No. 102.  The motions are ripe.  Also pending is a motion to unseal filed by Plaintiffs, ECF No. 105, and a motion for leave to file a surreply, ECF No. 117, also filed by Plaintiffs.  Upon review of the filings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, that the Deputies' summary judgment motion will be denied, the State's summary judgment motion will be granted in part and denied in part, and Hill Management's summary judgment motion will also be granted in part and denied in part. Plaintiffs' motion to unseal and motion for leave to file a surreply will both be granted.

# I. INTRODUCTION AND PROCEDURAL BACKGROUND

This case arises out of the death of 26-year-old Robert Ethan Saylor, an individual with Down syndrome, on January 12, 2013. Mr. Saylor died after an encounter with the three Deputies as they attempted to remove him from a movie theater because he was attempting to view a movie for a second time without paying for a second ticket. When this incident began, the Deputies were working as security guards for Defendant Hill Management, the sub-management company for the mall in which movie theater was located, the Westview Promenade Mall (Westview Mall). A struggle ensued in the course of the attempted removal and, by the end of that struggle, Mr. Saylor suffered a fractured larynx and died shortly thereafter of asphyxiation.

Mr. Saylor's parents, Patricia and Ronald Saylor, filed this suit, individually and as personal representatives of the Estate of Robert Ethan Saylor (the Estate), on or about October 17, 2013. The Deputies, Hill Management, the Frederick County Sheriff's Office ("FCSO"), and Regal Cinemas, Inc., the owner and operator of the movie theater (Regal Cinemas), were named as defendants in the original Complaint. ECF No. 1. Plaintiffs asserted federal claims for violations of 42 U.S.C. § 1983 against the Deputies for their use of excessive force against Mr. Saylor. Plaintiffs asserted violations of the Americans with Disabilities Act ("ADA") against the FCSO based upon its alleged failure to

train the Deputies and its vicarious liability for the Deputies'
failure to accommodate Mr. Saylor's disability.  Plaintiffs also
asserted state-law claims for wrongful death against all the
Defendants; negligence and gross negligence against Regal Cinemas,
the Deputies, and Hill Management; and battery claims against the
Deputies and Hill Management.  Plaintiffs subsequently amended the
Complaint to substitute the State of Maryland (the State) for
the FCSO.  ECF No. 17.

   The Deputies, the State, and Regal Cinemas all filed
motions to dismiss.  In its ruling on those motions, the Court
dismissed all claims against Regal Cinemas, the negligence claim
against the Deputies, and the wrongful death claim against the
State.  Estate of Saylor v. Regal Cinemas, Inc., 54 F. Supp. 3d
409, 422, 424, 430-434 (D. Md. 2014).  The Court denied the
Deputies' motion as to the § 1983 claim, finding that the
allegations in the Amended Complaint supported the conclusion
that the Deputies' conduct could be found to have constituted an
unreasonable use of force under the three factor analysis set
out in Graham v. Connor, 490 U.S. 386 (1989), and that the
Deputies were not entitled to qualified immunity under Harlow v.
Fitzgerald, 457 U.S. 800 (1982).  Id. 417-421.  The Court denied
the Deputies' motion as to Plaintiffs' gross negligence claim,
finding, inter alia, that the allegations in the Amended
Complaint supported the conclusion that the Deputies acted in

3

reckless disregard of the consequences of their actions.  The
Court denied the motion as to the battery claim, finding that
the alleged excessive use of force overcame the privilege to use
force in effectuating an arrest.  Id. at 423.  The Court also
rejected the Deputies' argument that Plaintiffs' wrongful death
claim was improperly pled as a single count.  Id. at 424.  As to
the ADA failure to train claim against the State, the Court
concluded that, from the allegations in the First Amended
Complaint, it did not appear that the Deputies were trained to,
nor did they, make any modifications in their conduct or
response to accommodate Mr. Saylor's developmental disabilities.
Id. at 427.  The Court also found that the State, as the
statutory employer of the Deputies, would be vicariously liable
for any ADA violation made by the Deputies.  Id. at 428.

      After a period of extensive discovery, all of the
Defendants remaining in this action filed the instant motions
for summary judgment.  The Court finds that the evidence
generated in discovery as to the claims against the Deputies and
the State, when viewed in the light most favorable to
Plaintiffs, generally supports the allegations and claims in the
Amended Complaint and the Court will deny their motions for
summary judgment on similar grounds as it denied the motions to
dismiss, except as to the ADA failure to train claim against the

State.  As to the claims against Hill Management, the Court will
deny the motion, except as to the battery claim.

## II. FACTUAL BACKGROUND

The facts, viewed in the light most favorable to
Plaintiffs, are as follows.[1]

### A. Events of January 12, 2013

Mr. Saylor had an I.Q. of about 40, the physical and facial
features common to individuals with Down syndrome, and was
readily recognizable as someone with this disability.  The
Deputies all testified that they recognized that he was an
individual with Down syndrome as did Kevin Rhodes, the Regal
Cinemas manager on the night in question.  In addition to his
Down syndrome, Mr. Saylor had been diagnosed with Attention
Deficit Hyperactivity Disorder ("ADHD") as a child, and
Oppositional Defiance Disorder ("ODD"), Impulse Control
Disorder, and Anxiety Disorder Not Otherwise Specified in
adulthood.  He was also both short and obese, standing at about
5 feet 6 inches tall and weighing almost 300 pounds.

Mr. Saylor lived in a separate apartment connected to his
mother's home.  A full-time aide, Mary Crosby, was employed to
assist Mr. Saylor with the activities of daily living, such as

---

[1] Many of the central facts related to this incident are
undisputed.  The Court will cite to the record only when there
is a dispute about a particular allegation or when the Court is
directly quoting from the record.

shopping, meal preparation, and taking him on outings.  Ms.
Crosby was 18 years old at the time and had been working for Mr.
Saylor for about three months.  On the evening of January 12,
2013, Ms. Crosby took Mr. Saylor to see the film "Zero Dark
Thirty," using cash provided by Ms. Saylor for that purpose.
Mr. Saylor was an avid movie goer and Ms. Crosby took him to the
movies most of the weekends that she worked for him, always at
Regal Cinemas.  Mr. Saylor had a regular place in the theater in
which he liked to sit.

The film, which was showing in Theater 9, ended around 10
o'clock and, according to Ms. Crosby, Mr. Saylor "stood up,
clapped and had a big smile on his face."  Crosby Dep. at 82,
ECF No. 98-3.  As they were leaving the theater, however, Mr.
Saylor "started getting a little frustrated," "was unhappy," and
when Ms. Crosby asked him if he was ready to go home, he "showed
a little aggression" by punching the window of the store by
which they were walking.  Id. at 83-4.  Because Ms. Crosby was
"a little frightened" by his behavior and was uncertain as to
how to handle the situation, she called Mr. Saylor's mother.
Id. at 85.  Ms. Crosby told Ms. Saylor that Mr. Saylor was upset
and was yelling at her because he wanted to see the movie again.
Saylor Dep. at 111.  Ms. Saylor told Ms. Crosby that "[h]e'll be
fine," and to "just wait him out."  Id. at 112.  Ms. Saylor also
suggested that Ms. Crosby call Christopher Perry, another one of

6

Mr. Saylor's caregivers who had been working with him for several years.

Ms. Crosby called Mr. Perry and he opined, based upon his previous experience, that Mr. Saylor might be upset about having to walk some distance to the car. He suggested that Ms. Crosby get the car by herself and drive to the front of the theater and pick up Mr. Saylor there. She followed that advice and, as she parked in front of the theater, she observed Mr. Saylor walk back into the theater.

Mr. Saylor walked back into Theater 9 and returned to the same seat in which he had been sitting. Mr. Rhodes was cleaning that theater between showings and was told by an usher that there was customer sitting in the theater. Mr. Rhodes approached Mr. Saylor and told him that, if he wanted to see the movie again, he would need to purchase another ticket. When Mr. Saylor informed him that he had no money, Mr. Rhodes talked to him about how he could purchase a ticket online using a smartphone. Mr. Rhodes and Mr. Saylor then walked out of the theater together. Mr. Rhodes went on to another theater and Mr. Saylor went back into Theater 9 and returned to the same seat, without buying a ticket.

After Ms. Crosby parked the car, she assumed that Mr. Saylor had returned to Theater 9 and started to walk in that direction. While doing so, she called Ms. Saylor a second time

and informed her that Mr. Saylor had reentered the theater.  Ms. Saylor responded that she was on her way and would be there shortly.

As Ms. Crosby attempted to enter Theater 9, Mr. Rhodes was on his way out and stopped her and asked if she was with the "special needs gentleman."  Crosby Dep. at 105.  She acknowledged that she was and Mr. Rhodes related that Mr. Saylor had not purchased a ticket and would need to leave.  He also indicated that he was about to, or already had, called security. Id. at 107.  Ms. Crosby explained that Mr. Saylor has Down syndrome and does not understand and requested that Mr. Rhodes just wait him out, let her handle the situation, and let her call his mother.  Ms. Crosby called Ms. Saylor a third time and informed her that the theater management had called security because Mr. Saylor was in the theater and did not have a ticket. Ms. Saylor told Ms. Crosby that she would come to the theater and either purchase him a ticket or persuade him to leave.  She also advised Ms. Crosby to make sure that no one goes in to speak to Mr. Saylor.

Ms. Crosby then walked over to Mr. Rhodes who was talking with Sgt. Rochford who, by that time, had responded to the call for security.  Ms. Crosby told Mr. Rhodes and Sgt. Rochford that she did not have any more cash or other form of payment with her, so she could not purchase another ticket for Mr. Saylor,

but that his mother was on her way and that she would either pay
for Mr. Saylor's ticket or get him to leave as soon as she
arrived.  She also tried to explain Down syndrome individuals to
Mr. Rhodes and Sgt. Rochford and related that Mr. Saylor
particularly did not like to be touched and, if touched, "[h]e
will curse at you" and "may get angry."  Crosby Dep. at 182.
She cautioned, "[d]on't go in there but if you do these are
going – these are going to be the results of it."  Id.
According to Ms. Crosby, Mr. Rhodes responded that Mr. Saylor
needed to get out right away because the next showing was about
to start.  Id. at 116-17.[2]  Ms. Crosby testified that Sgt.
Rochford then said with a "smirk," "[b]etter get the boys.
We're going to have some trouble tonight."  Id. at 121.

    Sgt. Rochford then entered the theater.  The lights were
on, there were about twenty-five patrons in the theater, and Mr.
Saylor was sitting quietly in his seat.  Sgt. Rochford began to
speak with Mr. Saylor and told him that he needed to leave the
theater or else he would be removed.  Mr. Saylor refused and, as
Ms. Crosby predicted, he cursed at Sgt. Rochford and became
agitated.  He also told Sgt. Rochford that he "worked for the
CIA" and he was "done talking" to him.  Rochford Dep. at 45.
While the Deputies represented in their motion that Sgt.

---

[2] Mr. Rhodes testified that he requested that the Deputies "help
out the caretaker" and "potentially remove" Mr. Saylor from the
theater.  Rhodes Dep. at 100, ECF No. 98-4.

Rochford attempted for ten minutes to persuade Mr. Saylor to leave the theater, ECF No. 102-1 at 17, other testimony would indicate that Sgt. Rochford spoke to Mr. Saylor for as little as 2 or 3 minutes before initiating his arrest.  See, e.g., Crosby Dep. at 128.

As this verbal exchange was going on, Lt. Jewell and DFC Harris came up alongside of Sgt. Rochford.  After they arrived, Sgt. Rochford told Mr. Saylor that he was going to be arrested and Sgt. Rochford placed his hands on Mr. Saylor's arm to get him out of his seat.  Again, as Ms. Crosby predicted, Mr. Saylor reacted to being touched by flailing back his arm.  Lt. Jewell and DFC Harris then assisted Sgt. Rochford in forcibly removing Mr. Saylor from his seat.  Mr. Saylor continued to struggle, cursed, yelled that they were hurting him, and called out for his mother.  As the Deputies and Mr. Saylor went down the sloped hallway leading out of the theater, they all fell to the ground. The Deputies then attempted to handcuff Mr. Saylor and, because of his size, eventually had to use three sets of handcuffs, linked together, to accomplish the task.

As soon as he was handcuffed, however, Mr. Saylor became silent and the Deputies realized that he had stopped breathing. They immediately removed the handcuffs and attempted to resuscitate him.  While Mr. Saylor resumed breathing on his own, he remained unresponsive.  Emergency medical personnel arrived

and transported Mr. Saylor to the Frederick Memorial Hospital where he was pronounced dead at 11:58 p.m.  An autopsy performed the next day reported that he died of asphyxia.

### B. State Training and Procedures

On the issue of the training provided to Sheriff's Deputies, the State represents that it does not actually train Deputies or even create or provide the training materials. Instead, the Maryland Police and Correctional Training Commission (MPCTC) sets certain minimum standards for entry-level law enforcement officers.  See Md. Code Ann., Pub. Safety § 3-207.  Local and county agencies operate several law enforcement academies that do the actual training.  MPCTC provides to those academies a list of over 500 training "objectives" that must be included in the curriculum.  In 2011 or 2012, the MPCTC added a training objective regarding interactions with individuals with "disabilities in general." Dep. of Albert Liebno at 25.[3]  Until 2014, after Mr. Saylor's death, the MPCTC did not have any training standards specifically geared to interactions with individuals with developmental disabilities.

---

[3] Liebno, the deputy director of MPCTC, described this objective as dealing with "autism, disabilities in general, not specifically just mental disabilities, but disabilities in general."  Id.

The MPCTC also requires all Maryland law enforcement officers to complete at least 18 hours of in-service training each year.  With the exception of the requirement that training on sexual offenses be given at least every three years, the MPCTC imposes no content requirements for this training.

In addition to this state mandated training, the FCSO conducts its own in-service training.  The content of that training is often guided by specific incidents.  For example, after a lawsuit that arose from a deputy's encounter with a deaf individual, the FCSO added training material for dealing with the deaf or hearing impaired.  The FCSO provides a block of training on mental health issues that is repeated every three years, the last time being in 2011.

To supplement its training, the FCSO utilizes a General Orders manual that includes administrative and operational directives and guidelines.  As of 2013, one of those guidelines was titled "General Order 41.4 – Investigation of Persons with Mental Illness."  ECF No. 98-24.  Although the State suggests that this General Order is broad enough to provide guidelines for "dealing with persons with a wide range of disabilities," it appears more narrowly tailored to the Court.  "Mental illness" is defined as "[a]ny of various conditions characterized by impairment of an individual[']s normal cognitive, emotional, or behavioral functioning, and caused by social,

12

psychological, biochemical, genetic, or other factors, such as infection or head trauma." Id. at 1.  For interactions with individuals with mental illnesses, the General Order provides the following guidelines: "Remain calm and avoid overreacting;" "Understand that a rational discussion may not take place;" and "Gather information from family or bystanders."  Id. at 3.  The General Order specifically cautions that deputies should avoid: "Forcing discussion;" "Touching the person (unless essential to safety);" and "Crowding the person or moving into his or her zone of comfort."  Id. at 3-4.  The General Order then advises that "[o]nce sufficient information has been collected about the nature of the situation, and the situation has been stabilized, there are a range of options deputies should consider when selecting an appropriate disposition."  Id. at 4.  Those options include: "Outright release," "Release to care of family, care giver or mental health provider," or "Arrest, if a crime has been committed."  Id.  As to that last option, deputies are cautioned to "remember that having mental illness is not a crime.  No individual should be arrested for behavioral manifestations of mental illness that are not criminal in nature."  Id.

Prior to their encounter with Mr. Saylor, all three of the deputies had completed their entry level training and completed the 2011 mental health refresher training.  Sgt. Rochford had also received in-service training on de-escalation techniques, Autism awareness, and sensitivity training.  Lt. Jewell also completed training in nonviolent crisis intervention and Autism awareness.  DFC Harris completed training in Autism awareness and use of force. While the Deputies all completed this training according to training records, Sgt. Rochford testified that the training pertaining to mental illness was "very basic" and he did not remember any specific training pertaining to interactions with individuals with developmental disabilities.  Rochford Dep. at 134-35.  Lt. Jewell did not recall receiving, during his entry level training, any instruction regarding developmentally or mentally disabled individuals.  Jewell Dep. at 13.  Similarly, DFC Harris did not recall any specific training having to do with mentally challenged individuals.  Harris Dep. at 81.[4]

---

[4] This page of Harris's deposition is the subject of Plaintiffs' "Motion to Unseal One Exhibit Being Filed Under Seal."  ECF No. 105.  Plaintiffs' counsel represents that this exhibit was only marked confidential because, during the course of the deposition, he forgot to terminate the previous confidential

### C. The Deputies' Employment With Hill Management

On the date of this incident, Hill Management was the sub-management company for the owner of Westview Mall.  The management services provided by Hill Management included security services.  In or about 2004, Hill Management entered into an agreement with the FCSO to permit off-duty deputies to provide those security services.  ECF No. 98-31, Frederick County Sheriff's Office Sworn Security Related Secondary Employment Employer Waiver ("Employment Agreement").

The Employment Agreement provided:

> 1. Frederick County Sheriff's Office Employees are responsible to their positions 24 hours daily, and shall give priority to those responsibilities in all instances.  They are subject to 24 hour emergency call in procedures.
>
> 2. Any unlawful act brought to the attention of or observed in the presence of a sworn officer shall be acted upon in their official capacity.
>
> 3. Any action taken by a sworn officer in their official capacity while on-duty or off-duty shall be in conformance with Office policy.
>
> . . .
>
> 7. Deputies while working secondary employment will be considered employees of the secondary employer, not independent contractors.

portion of the deposition.  Regardless, Plaintiffs' counsel notes that this page contains no confidential information.  The State opposed the motion to unseal, but pointed to nothing in the testimony that is confidential.  The motion to unseal will be granted.

Id.  The Employment Agreement also provided that the deputies
could use their service weapons and handcuffs while working this
secondary employment.  They could not wear their FCSO uniform,
but instead were permitted to wear a generic type shirt
reflecting "deputy sheriff" on the back and a badge or similar
symbol on the front, so long as it did not reference the FCSO or
the State of Maryland.   Id.

Hill Management determined the number of off-duty deputies
that would be working at any given time and determined their
hours.  There is evidence in the record that Hill Management
would vary the number of deputies scheduled in response to
requests for additional security coverage from mall tenants,
including Regal Cinemas.  ECF No. 106-38 (letter from Hill to
Regal Cinemas reporting the scheduling of additional security
coverage in response to a recent armed robbery in the mall).  A
FSCO deputy who also worked for Hill Management as a security
guard, Bart Rupperthol, actually scheduled the deputies.  Hill
Management had the theoretical authority to notify Rupperthol
that it did not want a particular deputy to be scheduled but
never exercised that authority.

The wages of the off-duty deputies working at the mall were
paid by Westview Mall but at least some of the employment
documents identified Hill Management as the deputies' employer,
including the Employment Agreement.  ECF No. 98-31; see also ECF

16

No. 37 (federal income tax forms).  It is undisputed, however,
that, consistent with the provision in the Employment Agreement,
when the deputies act upon any unlawful activity reported to
them or observed by them, they are acting in their official
capacities as deputies of the FCSO.  Furthermore, once they
commence acting in their official capacities, the deputies are
no longer paid by their secondary employer.  This reversion to
official duty status was reflected in the time sheets submitted
for the date of this incident, i.e., the Deputies clocked out of
their Hill Management jobs as soon as the arrest of Mr. Saylor
commenced.  ECF No. 98-32.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986) (citing predecessor to current Rule 56(a)).  The burden
is on the moving party to demonstrate the absence of any genuine
dispute of material fact.  Adickes v. S.H. Kress & Co., 398 U.S.
144, 157 (1970).  If sufficient evidence exists for a reasonable
jury to render a verdict in favor of the party opposing the
motion, then a genuine dispute of material fact is presented and
summary judgment should be denied.  See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).  However, the "mere

17

existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. Id. at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, Scott v. Harris, 550 U.S. 372, 378 (2007); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## IV. DISCUSSION

### A. Claims Against the Deputies

### 1. Use of Excessive Force under § 1983

To establish a claim under 42 U.S.C. § 1983, a plaintiff must show that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States. Wahi v. Charleston Area Med. Ctr. Inc., 562 F.3d 599, 615 (4th Cir. 2009). Here, there is no dispute that the Deputies were acting under color of state law when they attempted to arrest Mr. Saylor. As to the constitutional right

allegedly infringed, Plaintiffs have asserted that Mr. Saylor was deprived of his Fourth Amendment right to be free from the use of excessive and unreasonable force.

As the Deputies note, Plaintiffs have clarified that they are not bringing a claim for false arrest.  While Plaintiffs are not bringing a formal claim for false arrest, they do argue, as discussed below, that there is a material dispute of fact as to whether the arrest was lawful.  ECF No. 106 at 24 n.13.  To counter the Deputies' suggestion that Mr. Saylor's resistance to their efforts to arrest him somehow posed a threat to their safety, Plaintiffs note that, under Maryland law, an individual can resist an unlawful arrest.  Id. (citing State v. Wiegmann, 714 A.2d 841 (Md. 1998)).

Plaintiffs also do not contend that Sgt. Rochford's initial interaction with Mr. Saylor constituted a seizure or implicated the Fourth Amendment.  The Deputies opine "that the earliest time when a Fourth Amendment seizure may have occurred in this case was when Sergeant Rochford touched Mr. Saylor's arm, however gently," ECF No. 102-1 at 40, and the parties all seem to agree with that opinion.  This demarcation as to the point at which the arrest began has significance in determining the specific roles in which the Deputies were functioning at different times during the course of their interactions with Mr. Saylor.  As also discussed below, at least during the timeframe

19

prior to the initiation of the arrest, the Deputies were
functioning as private security guards for Hill Management.
Once they commenced arresting Mr. Saylor, they took on the role
of law enforcement officers.

To establish their excessive force claim, Plaintiffs must
show that the force used by the Deputies in making the arrest
was not "objectively reasonable" in light of the facts and
circumstances confronting them. Graham v. Connor, 490 U.S. 386,
397 (1989). Objective reasonableness is highly fact-specific
and requires a "totality of the circumstances" analysis.
Tennessee v. Garner, 471 U.S. 1, 8-9 (1985). "Determining
whether the force used to effect a particular seizure is
'reasonable' under the Fourth Amendment requires a careful
balancing of 'the nature and quality of the intrusion on the
individual's Fourth Amendment interests' against the
countervailing governmental interests at stake." Graham, 490
U.S. at 396 (citation omitted). The Supreme Court in Graham set
out the following three factors to be considered in conducting
that analysis: (1) "the severity of the [suspected] crime at
issue," (2) "whether the suspect poses an immediate threat to
the safety of the officers or others," and (3) "whether he is
actively resisting arrest or attempting to evade arrest by
flight." Id.

There is no genuine question that Mr. Saylor was not committing a serious crime when the Deputies commenced the arrest and, accordingly, the first Graham factor weighs strongly in favor of Plaintiffs.  At most, Mr. Saylor was committing minor misdemeanors – trespassing and theft of services.  If, as the evidence could support, the Deputies were aware that his mother was on the way to the theater and had agreed to purchase his ticket if she could not convince him to leave, one could at least argue that even those misdemeanors were being committed more technically than actually.

The Deputies seek to tilt that first factor in their favor by arguing that Mr. Saylor committed assault on Sgt. Rochford after Sgt. Rochford touched him.  There is a genuine dispute, however, as to whether Mr. Saylor actually struck Sgt. Rochford.  Lt. Jewell testified that he did not recall that Mr. Saylor attempted to strike any of the Deputies but simply pulled his arm away.  Jewell Dep. at 56-57.  DFC Harris testified that when Sgt. Rochford grabbed Mr. Saylor's arm, Mr. Saylor drew his arm back and made a fist, but did not attempt to swing at Sgt. Rochford.  Harris Dep. at 48-49.  Mr. Rhodes did testify that Mr. Saylor "stiff-armed" Sgt. Rochford, hitting him in the chest.  Rhodes Dep. at 53.  Sgt. Rochford testified that Mr. Saylor "flailed his arm back" and, after the other two Deputies started to lift Mr. Saylor out of his seat, "[a]t some point, I

don't remember him hitting me, but at some point in time he, he struck me in the chest."  Rochford Dep. at 82.  Viewing the evidence in the light most favorable to Plaintiffs, it is certainly questionable as to whether Mr. Saylor intentionally struck Sgt. Rochford or whether he simply made an involuntary reaction to his being touched.[5]  Furthermore, if he did "strike" Sgt. Rochford, it was after the decision to arrest was made and the process of arrest had commenced.

Viewing the evidence in the light most favorable to Plaintiffs also weighs the second factor strongly in favor of Plaintiffs.  Mr. Saylor was sitting quietly in his seat and there is absolutely nothing in the record to support the conclusion that, if left alone, he would not have remained there until his mother arrived.  To support the conclusion that Mr. Saylor somehow posed a threat to the officers or other patrons in the theater, the Deputies claim that Ms. Crosby told Sgt. Rochford that Mr. Saylor would become "violent" were he to be touched.  ECF No. 102-1 at 46.  They also suggest that Ms. Crosby appeared to be frightened and, from that, attempt to

---

[5] Mr. Saylor's flailing of his arms is consistent with the description of Mr. Saylor's movements given Mr. Perry.  In response to a question in his deposition as to whether Mr. Saylor was ever aggressively physical, Mr. Perry responded, "he would like swing his arms because that is how he expressed himself, like with his arms almost like a bird ruffling his feathers almost and – but he would never strike."  Perry Dep. at 62.

support the conclusion that it was reasonable for them to

believe that Mr. Saylor posed a threat to others.[6]

There are material disputes of fact, however, as to what

Ms. Crosby told Sgt. Rochford and whether she conveyed the

impression that she was frightened.  As noted above, Ms. Crosby

testified that she told Sgt. Rochford only that Mr. Saylor, if

confronted, "will curse at you" and "he may get angry."  Crosby

Dep. at 182.  While she stated that she was "a little

frightened" when Mr. Saylor punched the store window, when she

spoke with Mr. Rhodes and Sgt. Rochford, she assured them that

she was able to handle the situation.  That is consistent with

Ms. Saylor's testimony that, while Ms. Crosby sounded upset

during the first phone call, during the second phone call, which

---

[6] In a tenuous, somewhat cryptic, and internally inconsistent
argument, the Deputies suggest that "although the Deputies did
not have personal knowledge of Mr. Saylor's extended history of
violent conduct, it would be artificially formulaic to pretend
that this history played no part in the totality of the
circumstances."  ECF No. 102-1 at 46.  They then hypothesize
that this supposed history of violent conduct "would have been
part of what the caretaker told the Deputies about Mr. Saylor
and how she described specifically what would happen if he
became angry."  Id.  Not only is there no evidence that Ms.
Crosby relayed any information concerning an "extended history
of violent conduct," there is no evidence that Mr. Saylor had
any such history.  To the extent that the Deputies are referring
to Mr. Saylor's oppositional or defiant behavior related to his
Oppositional Defiant Disorder, the Deputies acknowledge that
Sgt. Rochford "had not been told that Mr. Saylor's behavior was
the classic symptom of Mr. Saylor's diagnosed mental illness."
Id. at 12.  Regardless, oppositional or defiant conduct is not
synonymous with violent conduct.

was made about the same time that she was talking to Sgt.
Rochford, she did not sound upset.  Saylor Dep. at 126-27.

To justify their assertion that Mr. Saylor somehow posed a
threat, the Deputies focus, of course, not on the circumstances
presented when Mr. Saylor was sitting quietly in the theater
waiting for the movie to start, but instead on the situation as
it "escalated in seriousness."  ECF No. 102-1 at 41.  Viewing
the evidence in the light most favorable to Plaintiffs, however,
one could conclude that the situation only escalated because the
Deputies proceeded to do precisely what they were told would
lead to that escalation.  Whether the subsequent actions taken
by the Deputies may have been reasonable responses to those
evolving circumstances does not render the preceding actions
reasonable.

As it did in ruling on the motions to dismiss, the Court
finds instructive the Fourth Circuit Court of Appeals decision
in Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994), noting
that,

> the Fourth Circuit has cautioned courts when analyzing
> the objective reasonableness of the amount of force
> used by a law enforcement officer not to adopt a
> "segmented view of [a] sequence of events," where
> "each distinct act of force becomes reasonable given
> what [the officer] knew at each point in this
> progression."  Rowland [], 41 F.3d [at] 173. . . .
> Such an approach, the court opined, "miss[es] the
> forest for the trees."  Id.  Instead, the Fourth
> Circuit instructed, "[t]he better way to assess the
> objective reasonableness of force is to view it in

24

> full context, with an eye toward the proportionality
> of the force in light of all the circumstances.
> Artificial divisions in the sequence of events do not
> aid a court's evaluation of objective reasonableness."
> Id.

Estate of Saylor, 54 F. Supp. 3d at 417.

The Deputies suggest that the Fourth Circuit, in Waterman

v. Batton, 393 F.3d 471 (4th Cir. 2005), subsequently "clarified

the holding in Rowland" to confirm "the notion that the

reasonableness of force employed can turn on a change of

circumstances during an encounter lasting only a few seconds."

ECF No. 102-1 at 43 (quoting Waterman, 393 F.3d at 481).  As

quoted by the Deputies, the Fourth Circuit did hold in Waterman

that

> "[i]t is established in this circuit that the
> reasonableness of an officer's actions is determined
> based on the information possessed by the officer at
> the moment that force is employed. . . .  To simply
> view all of the force employed in light of only the
> information possessed by the officer when he began to
> employ force would limit, for no good reason, the
> relevant circumstances to be considered in judging the
> constitutionality of the officer's actions."

Id.  This Court notes that, if the testimony of Ms. Crosby is

believed, the "information possessed by the officer[s]" at each

step of the escalation included the information that it was the

Deputies' own actions that were causing that escalation.

As to the last Graham factor, whether Mr. Saylor was

resisting arrest, Mr. Saylor certainly was resisting being

dragged out of the theater.  There is some question, though, if

a developmentally disabled individual who had just declared that

he "worked for the CIA" understood that he was being arrested.[7]

Nor could it be inferred that Mr. Saylor was "attempting to

evade arrest by flight."  His clear goal was to remain in the

theater and it could be readily inferred, from information

possessed by the Deputies, that his resistance was resistance to

being touched, not resistance to arrest.  One could conclude

that, like the mentally disabled individual who was suddenly

grabbed by a police officer in Rowland, Mr. Saylor did not

resist arrest but was simply frightened and "instinctively tried

to free himself."  Rowland, 41 F.3d at 172.

In addition to the Graham factors, courts have also

considered the extent of the injury caused by the use of force

in determining whether the use of that force was unreasonable.

Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).  As this

Court previously noted, while the extent of Mr. Saylor's injury

was not foreseeable, "the possibility of significant injury

would certainly have been evident when the decision was made to

drag an obese individual with a mental disability out of his

---

[7] As noted above, in discussing whether the arrest of Mr. Saylor
was lawful, Plaintiffs posit that, if unlawful, Mr. Saylor would
have been permitted to resist.  ECF No. 106 at 24 n.13.  The
Court finds this discussion somewhat irrelevant.  If, as the
evidence suggests, Mr. Saylor may have been unable to understand
that he was being arrested, it seems highly unlikely that he
would have been able to discern if the arrest was lawful or
unlawful and tailor his response accordingly.

chair and down a ramp, particularly when the Deputies were told that, because of his disability, Mr. Saylor was likely to become upset and angry." Estate of Saylor, 54 F. Supp. 3d at 418. Plaintiffs also suggest in opposing the Deputies' Motion for Summary Judgment that the Deputies were aware of the particular danger of positional asphyxia when they restrained Mr. Saylor on his stomach and yet they restrained him in that manner, nevertheless.  ECF No. 106 at 31 (citing Rochford Dep. at 89; Jewell Dep. at 78; Harris Dep. at 83).  While the actions that led up to Mr. Saylor and the Deputies struggling and then stumbling on the ramp may have been unreasonable, the evidence does not support the conclusion that the Deputies caused the fall itself or that their brief restraint of Mr. Saylor after the fall was objectively unreasonable.  Mr. Saylor was not "positioned" on his stomach, he fell on his stomach and was kept there for less than a minute.  While one witness stated that, while trying to handcuff Mr. Saylor, one of the Deputies had his knee in Mr. Saylor's lower back, pinning him to the ground, ECF No. 106-14 at State 0047, the Fourth Circuit has held, under similar circumstances, that applying "just enough weight to immobilize an individual continuing to struggle during handcuffing is not excessive force." Estate of Armstrong ex. rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 906 n.11 (4th Cir. 2016) (internal quotations omitted).

As highlighted in the discussion above, Mr. Saylor's development and mental disabilities were a significant part of the "totality of the circumstances" confronting the Deputies and their conduct must be assessed in light of their awareness of those disabilities.  Relying on Bates ex rel. Johns v. Chesterfield County, Virginia, 216 F.3d 367, 372 (4th Cir. 2000), the Deputies argue that the Fourth Circuit has "refused to create a special exception to the generally applicable Fourth Amendment use of force analysis for mentally ill or mentally disabled individuals."  ECF No. 102-1 at 50.  In Bates, a police officer responded to a 911 call and was told that there was a teenage boy running through the woods, acting crazy, maybe on drugs or alcohol.  216 F.3d at 369.  The officer located the boy, spoke to him, but the boy walked away.  The officer ordered him to return and the boy then sat on the officer's motorcycle, without permission.  The officer pushed him off the motorcycle, the boy then pushed the officer and then walked away.  The situation escalated with the boy ultimately scratching, spitting and biting the officer before the officer, with the assistance of another officer, managed to handcuffed the boy.  The officers did not learn until after the boy was restrained and his parents arrived at the scene that the boy suffered from autism.  Id. at 369-70.

The Deputies posit that the Fourth Circuit in Bates "refused to hold law enforcement officers responsible for taking into consideration possible or apparent mental disabilities of those individuals with whom they are dealing."  ECF No. 102-1 at 50.  As support for that proposition, however, they cite the following language from Bates, "'in the midst of a rapidly escalating situation, the officers cannot be faulted for failing to diagnose Bates' autism.  Indeed, the volatile nature of a situation may make a pause for psychiatric diagnosis impractical and even dangerous.'"  Id. at 50-51 (quoting Bates, 216 F.3d at 372).  Here, however, if Ms. Crosby told the officers the nature of Mr. Saylor's disabilities and the likely outcome of their actions because of those disabilities, there was no need for any diagnosis, and, as noted above, the rapid escalation was the result of the Deputies' action, not Mr. Saylor's.

The Deputies also suggest that Bates stands for the proposition "that an individual with a mental disability is subject to no different legal standards for his or her conduct than other members of the public."  ECF No. 102-1 at 51.  While that is true, Bates does not permit an officer to ignore the implications of a known disability.  "Just like any other relevant personal characteristic – height, strength, aggressiveness – a detainee's known or evident disability is

part of the Fourth Amendment circumstantial calculus." Bates,
216 F.3d at 373.

Viewing the evidence in the light most favorable to
Plaintiffs and resolving the material disputes of fact in their
favor, the Court concludes that the force used by the Deputies
in making the arrest was not objectively reasonable in light of
the facts and circumstances confronting them.

### 2. Qualified Immunity

The Deputies next argue that they are shielded from
liability under the doctrine of qualified immunity.  The
qualified immunity analysis consists of a two-pronged inquiry:
(1) Did a constitutional or statutory violation occur?; and (2)
If so, was the right violated clearly established at the time of
the officer's conduct?  Saucier v. Katz, 533 U.S. 194, 201
(2001), overruled in part by Pearson v. Callahan, 555 U.S. 223
(2009).  As this Court has concluded that a jury could find that
the Deputies violated Mr. Saylor's right to be free from the use
of excessive and unreasonable force, the Court turns to the
second prong.  In ruling on the Deputies' motion to dismiss, the
Court found that Fourth Circuit's decision in Rowland gave fair
warning to the Deputies that their conduct was unreasonable, at
least if the allegations in the First Amended Complaint were
true.  Estate of Saylor, 54 F. Supp. 3d at 421.  As there is
evidence in the record that generally supports those

allegations, the Court again concludes that the Deputies are not entitled to summary judgment.

The Deputies suggest that a recent Supreme Court decision, City and County of San Francisco, California v. Sheehan, 135 S. Ct. 1765 (2015), should direct the Court to a different conclusion.  The plaintiff in that action lived in a group home for individuals with mental illness.  When she began acting erratically and threatened to kill her social worker, two officers were dispatched to help escort her to a facility for temporary evaluation and treatment.  When the officers first entered her room, she grabbed a knife and threatened to kill them.  They retreated, closed the door, and called for backup. Concerned that the door was closed and worried that she might be gathering more weapons or attempting to flee out of the window, they decided to reenter her room.  When they did so, she was still holding the knife.  One of the officers pepper sprayed her in the face but, when she would not drop the knife, the other officer shot her several times.  She survived and brought suit under § 1983 alleging that the officers violated her Fourth Amendment rights.

The district court granted summary judgment for the officers, holding that they did not violate the Fourth Amendment.  The Ninth Circuit reversed that decision, holding that a jury could find that the officers "provoked" the

31

plaintiff by needlessly forcing the second confrontation and that it was clearly established that an officer cannot "forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1229 (9th Cir. 2014). The Supreme Court held that the officers were entitled to qualified immunity, distinguishing the case before it from other Ninth Circuit decisions and concluding that "no precedent clearly established that there was not 'an objective need for immediate entry' here." 135 S. Ct. at 1777. "Considering the specific situation confronting [the officers], they had sufficient reason to believe that their conduct was justified." Id. at 1778 (emphasis added).

The Deputies appear to suggest that Sheehan stands for the proposition that it was not, and is not, clearly established that police officers need to make any accommodation in any circumstances for an individual's disabilities. They argue that

> the Sheehan Court's qualified immunity holding did not turn on the specific circumstances of that case which differed from the circumstances here, such as the fact Sheehan had knives and Mr. Saylor did not. The question in Sheehan was whether the officers violated the Fourth Amendment when they decided to reopen her door and confront her rather than attempt to accommodate her disability, and the Court's holding was that any such Fourth Amendment right was not clearly established. Therefore, even if to this Court it appears that a jury could find the Deputies'

> failure to wait instead of confronting or arresting
> Mr. Saylor was objectively unreasonable, the Deputies
> would be entitled to qualified immunity because they
> did not violate clearly established law, under the
> ruling in Sheehan.

ECF No. 116 at 27 (citing Sheehan, 135 S. Ct. at 1775).

This Court does not read Sheehan so broadly.  Throughout
its opinion, the Supreme Court focused on the particular
circumstances confronting the officers and whether the officers
should have known that making the accommodation of not
reentering Sheehan's room was required under those
circumstances.  In distinguishing the case before it from
Graham, the Court noted, Graham "did not involve a dangerous,
obviously unstable person making threats, much less was there a
weapon involved."  135 S. Ct. at 1776.  In distinguishing the
case before it from another Ninth Circuit decision, the Court,
after reciting the particular facts confronting the officer in
interacting with an unarmed emotionally disturbed person who had
not committed any serious offence, opined, "the differences
between that case and the case before us leap from the page."
135 S. Ct. at 1776 (citing Deorle v. Rutherford, 272 F.3d 1272
(9th Cir. 2001)).  The Supreme Court's citation to the Fourth
Circuit's decision in Bates, noted by the Deputies, speaks only
to whether the officers should have known that making an
accommodation was required under the particularly dangerous
circumstances confronting the officers: "'Knowledge of a

33

person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public.'"  Id. at 1778 (quoting Bates, 216 F.3d at 372); see also id. (citing Menuel v. Atlanta, 25 F.3d 990 (11th Cir. 1994), as "upholding use of deadly force to try to apprehend a mentally ill man who had a knife and was hiding behind a door").

This Court concludes that Rowland continues to provide fair and clear warning of what the constitution requires of officers confronted with an individual with disabilities who is not endangering the officers or others.  As recently recounted by the Fourth Circuit:

> our determination that the officer was not entitled to qualified immunity in Rowland was not based on any case that was factually on all fours.  Rather, it was based on the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect instinctively attempted to defend himself.

Smith v. Ray, 781 F.3d 95, 104 (4th Cir. 2015).

For these reasons, the Court will deny the Deputies' motion as to the § 1983 claim (Count IX).

### 3. State Law Claims

In ruling on the motions to dismiss, the Court denied the Deputies' motion as to Plaintiffs' gross negligence (Count V), battery (Count VII), and wrongful death (Count XII) claims.  The

34

Court will deny the Deputies' motion for summary judgment as to those claims for similar reasons.

As the Maryland Court of Appeals recently reiterated, gross negligence under Maryland law:

> "is an intentional failure to perform a manifest duty
> in reckless disregard of the consequences as affecting
> the life or property of another, and also implies a
> thoughtless disregard of the consequences without the
> exertion of any effort to avoid them.  Stated
> conversely, a wrongdoer is guilty of gross negligence
> or acts wantonly and willfully only when he inflicts
> injury intentionally or is so utterly indifferent to
> the rights of others that he acts as if such rights
> did not exist."

Beall v. Holloway-Johnson, 130 A.3d 406, 415 (Md. 2016) (quoting Barbre v. Pope, 935 A.2d 699, 717 (Md. 2007)).  While it is true, as the Deputies assert, that a claim of gross negligence "'sets the evidentiary hurdle at a higher evidentiary elevation'" than a claim of negligence, ECF No. 116 at 28 (quoting Beall, 130 A.3d at 415), the Maryland Court of Appeals also noted that "[t]he distinction between negligence and gross negligence [] can be a difficult one to establish in practice, [and a] legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." Beall, 130 A.3d at 415.

Here, the Court finds that the question as to whether the Deputies' conduct rises to the level of gross negligence should go to the jury for many of the same reasons discussed above in

35

reference to the § 1983 claim.  The evidence, viewed in the light most favorable to Plaintiffs, could support the conclusion that the Deputies acted with a "thoughtless disregard of the consequences."  Despite the lack of any exigent circumstances compelling them to act, they proceeded to do exactly those things that they were told would escalate the situation.

The Deputies move for summary judgment on the battery claim arguing that, unless the arrest of Mr. Saylor was a false imprisonment, then the physical force used to effectuate that arrest does not constitute a battery.  ECF No. 102-1 at 58.  Plaintiffs counter that, even where there is no claim of false arrest, if the evidence supports a claim that excessive force was used to effectuate the arrest, then the state law battery claims should also go forward as well.  ECF No. 106 at 42 (citing <u>Rowland</u>, 41 F.3d at 174).  In their Reply, the Deputies do not dispute that principle, but simply argue that the evidence does not support an excessive force claim.  ECF No. 116.  Because the Court concludes that the evidence, viewed in the light most favorable to Plaintiffs, does support an excessive force claim, then the battery claim will go forward as well.

As to Plaintiffs' wrongful death action, the Deputies do not dispute that Plaintiffs can bring such an action based upon the state law claims for gross negligence or battery.  ECF No.

102-1 at 59.  They do challenge this action to the extent it is
based upon the alleged constitutional claim asserted under §
1983.  They argue that there is no allegation that Plaintiffs'
constitutional rights were violated and that Plaintiffs have no
standing to bring a wrongful death action premised on the
violation of Mr. Saylor's constitutional rights.  Id.  In the
alternative, the Deputies submit that, should the Court permit
such an action, the action would be subject to the same state
law statutory defenses, immunities, and limitations applicable
to other state law statutory causes of action.  Id. at 60-61.

Maryland's Wrongful Death Statute provides that "[a]n
action may be maintained against a person whose wrongful act
causes the death of another."  Md. Code Ann., Cts. & Jud. Proc.
§ 3-902(a).  The statute authorizes an action "for the benefit
of the wife, husband, parent, and child of the deceased person."
Id. § 3-904(a)(1).  Significantly, a wrongful death action is
"separate, distinct, and independent from a survival action,"
and "[w]hile certainly based on the death of another person, . .
. is not brought in a derivative or representative capacity to
recover for a loss or injury suffered by that person but,
rather, is brought by a spouse, parent, or child, or a secondary
beneficiary who was wholly dependent on the decedent, to recover
damages for his or her own loss accruing from the decedent's
death."  FutureCare Northpoint, LLC v. Peeler, No. 2602, Sept.

Term 2014, 2016 WL 4061381, at *9 (Md. Ct. Spec. App. July 28, 2016) (internal quotation omitted).

Plaintiffs readily acknowledge that they are not asserting that their own constitutional rights were violated.  ECF No. 106 at 43 n.25.  Instead, they posit that the violation of their son's constitutional rights was the "wrongful act" which supports their wrongful death action.  The Wrongful Death Statute defines "wrongful act" as "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued."  Id. § 3-901(e).  The Deputies proffer no compelling argument that the constitutional violation supporting the § 1983 survivor claim does not satisfy that definition.[8]  The Court, however, does agree that this state statutory claim would be subject to the same state law statutory defenses, immunities, and limitations,

---

[8] The Deputies cite Moor v. County of Alameda, 411 U.S. 693 (1973) and Bell ex rel. Bell v. Board of Education of County of Fayette, 290 F. Supp. 2d 701 (S.D.W. Va. 2003), for the proposition that Plaintiffs "cannot bring a wrongful death action as a new and independent cause of action under Section 1983."  ECF No. 116 at 30.  Three years after the issuance of the Bell decision, another decision of that same court roundly criticized it as misreading Moor and being at odds with the decisions of every circuit court to have addressed the issue. Green ex rel. Estate of Green v. City of Welch, 467 F. Supp. 2d 656, 663 (S.D.W. Va. 2006); see also, Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996) (holding that "individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under § 1983 for their own injuries resulting from the deprivation of decedents' constitutional rights").

regardless of the wrongful act on which it is based.  See Momot
v. City of Philadelphia, Civ. No. 11-7806, 2012 WL 1758630, at
*4 (observing that "[c]ourts have uniformly treated wrongful-
death claims in the context of civil-rights cases as state-law
claims" and concluding that such a claim, if recognized, would
be subject to the state's municipal tort claims act).

     In defense of all the state law claims asserted against
them, the Deputies raise the defenses of qualified statutory
immunity, contributory negligence, and assumption of risk.  As
to the qualified immunity defense, the Maryland Tort Claims Act
provides that state personnel are immune from tort liability for
any acts or omissions that are within the scope of their public
duties and that are "made without malice or gross negligence."
Md. Code Ann., Cts. & Jud. Proc. § 5-522(b).  As the Court has
concluded that the evidence could support a finding that the
Deputies acted with gross negligence, they are not entitled to
judgment on the issue of immunity at this stage of the
litigation.[9]

     As to the contributory negligence and assumption of risk
defenses, the Court has already held that those defenses are not

---

[9] Plaintiffs argue that the evidence also supports a finding of
malice on the part of the Deputies.  While malice might be
inferred from Sgt. Rochford's smirking comment, "Better get the
boys. We're going to have some trouble tonight," it is a tenuous
argument.  To defeat immunity, however, Plaintiffs need only
establish gross negligence or malice, not both.

applicable to claims of battery.   Estate of Saylor, 54 F. Supp.
3d at 423.[10]   Regarding the claims brought on behalf of the
Estate, the Deputies assert that Mr. Saylor may be barred from
recovery by his own contributory negligence.   Noting that, under
Maryland law, a child of five years of age or over can be guilty
of contributory negligence, and positing that "Mr. Saylor was in
many ways more responsible for himself than a 5-year old," the
Deputies argue that by "voluntarily def[ying] his caretaker and
the Deputies" and "voluntarily choos[ing] to resist the Deputies
when they tried to escort him out," Mr. Saylor was
contributorily negligent in causing his own death.   ECF No. 102-
1 at 64 (citing Taylor v. Armiger, 358 A.2d 883, 889 (Md.
1976)).   Regarding the wrongful death claim brought on
Plaintiffs' own behalf, the Deputies argue that Plaintiffs
contributed to their son's death and/or assumed the risk of his
death by sending him to a violent "R" rated movie with an
inexperienced caregiver and no extra money and then failing to
give that caregiver appropriate instructions to deal with the
evolving situation.   Id. at 64-65.

_____

[10] This Court also noted that the question as to whether
contributory negligence can be a bar to a gross negligence claim
is an unsettled question under Maryland law.   Id.   Because the
Court concludes that neither Mr. Saylor nor his parents could be
found contributorily negligent as a matter of law on the current
record, the Court will leave that as an open question at this
time.

Under Maryland law, "[c]ontributory negligence is the failure to observe ordinary care for one's own safety.  It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." Menish v. Polinger Co., 356 A.2d 233, 236 (Md. 1976) (internal quotations omitted). Maryland courts have found that "contributory negligence is ordinarily a jury question" although they "have not hesitated to find a plaintiff contributorily negligent as a matter of law where common experience reveals the foreseeable dangers of the plaintiff's actions." Reid v. Washington Overhead Door, Inc., 122 F. Supp. 2d 590, 593-94 (D. Md. 2000).  "To prevail on the defense of assumption of the risk, the defendant must show that the plaintiff: '(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger.'" Blood v. Hamami P'ship, LLP, 795 A.2d 135, 141 (Md. Ct. Spec. App. 2002) (quoting Liscombe v. Potomac Edison Co., 495 A.2d 838, 843 (Md. 1985)).

In considering the applicability of these defenses to Mr. Saylor's causes of actions, the finder of fact must take into account his cognitive disabilities.  Mr. Saylor's ability to understand the foreseeable risks of his conduct was certainly different than the ability of someone not similarly disabled. Likewise, there is a question as to whether his acts of defiance

41

were truly voluntary or were simply the result of his
disability.  The case that the Deputies cite for the proposition
that a child of five years of age or older may be guilty of
contributory negligence, also notes that a child over five "is
bound only to use that degree of care which ordinarily prudent
children of that age and like intelligence are accustomed to use
under the circumstances, and they assume the risk only of
dangers the existence of which they know, or which, in the
exercise of this degree of care, they ought to have known."
Taylor, 358 A.2d at 889.  A child "is not held to the same
degree of care required of a reasonably prudent adult."  Id.
While Mr. Saylor was not a child, his ability to foresee risk
and take voluntary action was certainly less than a non-disabled
adult.  How much less is a disputed question of fact.

As to the wrongful death claim, Plaintiffs argue that no
precedent indicates that Plaintiffs' own contributory negligence
or assumption of the risk could serve to bar that claim.
Instead, Plaintiffs maintain it is only the decedent's conduct
that can serve as such a bar.  ECF No. 106 at 48-49.  The Court
disagrees.  The principle behind the defense of contributory
negligence is that no individual should recover damages for an
injury for which that individual was a material cause.  In their
wrongful death action, Plaintiffs are seeking damages for their
own loss because of the death of their child and if their own

negligent acts contributed to his death, the same principle would apply.  See Hall v. United States, 381 F. Supp. 224 (D.S.C. 1974) (applying this reasoning and holding that a parent of an adult child, suing under a wrongful death statute, can be barred from recovery by his own contributory negligence).

While the Deputies point to no Maryland decision holding that a parent's contributory negligence can bar their wrongful death claim, and the Court is aware of no decision directly so holding, Judge Howard Chasanow, of the Maryland Court of Appeals has noted that that court has "never before held that a parent's contributory negligence in the death of a child does not bar or at least reduce the parent's own recovery for the wrongful death of a child." Matthews v. Amberwood Associates Ltd. P'ship, Inc. 719 A.2d 119, 152 (Md. 1998) (dissent).  In Matthews, because the majority held that the trial judge did not abuse her discretion in refusing to permit the defendants to amend their answer on the eve of trial to add the defenses of contributory negligence and assumption of the risk, it did not reach the issue of whether they would be viable defenses.  In his dissent, Judge Chasanow argued that the jury should have been permitted to determine whether the mother's negligence was a contributing cause of the death of her child.  While acknowledging that the mother's contributory negligence would not affect the survival action or the father's recovery, he opines that it would be a

43

potential defense against the mother's wrongful death claim. Id.

Although the Court believes that contributory negligence and assumption of the risk are theoretical defenses to the Plaintiffs' wrongful death claim, the record does not support the establishment of either as a matter of law.   The Deputies submit no evidence or argument regarding any act or omission of Ronald Saylor that contributed to Mr. Saylor's death.   Nor is there evidence that Patricia Saylor could have foreseen the risk in sending Mr. Saylor to an "R" rated movie with a trained caregiver.[11]

Accordingly, the Court will deny the Deputies' motion in its entirety.

### B. Claims Against the State

The two remaining claims against the State are both claims for violations of Title II of the ADA.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

---

[11] In their Reply, the Deputies attempt to foist responsibility for Mr. Saylor's death on Ms. Crosby, asserting that she made a series of "poor choices" with "disastrous consequences."   See ECF No. 116 at 2-5.   Plaintiffs moved for leave to file a surreply, ECF No. 117, primarily to respond to this newly intensified attack on Ms. Crosby.   The Court finds that this is a sufficiently new attack warranting a response and will grant the motion for leave to file a surreply.   The Court also finds, as Plaintiffs set out in their surreply, that the Deputies' attack on Ms. Crosby is not supported by the record.

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a claim under Title II, Plaintiffs must prove that (1) Mr. Saylor was disabled, (2) he was otherwise qualified to receive the benefits of a public service, program, or activity, and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005). To recover damages for a violation of Title II of the ADA, Plaintiffs must show that the State "intentionally or with deliberate indifference fail[ed] to provide meaningful access or reasonable accommodation to [Mr. Saylor]." Paulone v. City of Frederick, 787 F. Supp. 2d 360, 373 (D. Md. 2011).

There is no dispute that Mr. Saylor was disabled within the meaning of the ADA. Plaintiffs assert that the State violated Title II in two ways. First, Plaintiffs argue that Mr. Saylor was qualified to receive the benefit of law enforcement officers who were properly trained to interact with individuals with developmental disabilities but the State failed to provide that proper training (Count X). While the Fourth Circuit has yet to explicitly recognize a failure to train claim under Title II, this Court has opined that there is no reason to believe that

45

the Fourth Circuit would not follow other courts that have recognized such a claim.  Estate of Saylor, 54 F. Supp. 3d at 426.  Second, Plaintiffs assert the Deputies denied Mr. Saylor the reasonable accommodation requested by Ms. Crosby, that he be permitted to remain sitting quietly in the theater until his mother arrived to either convince him to leave or pay for another ticket (Count XI).  Because the Fourth Circuit has held that there is respondeat superior liability under Title II of the ADA, the State would be liable for any violation committed by the Deputies regardless of whether Plaintiffs prevail on their failure to train claim.

### 1. Failure to Train

Failure to train claims under the ADA are generally analyzed under the same framework as failure to train claims brought against municipalities under 42 U.S.C. § 1983.  J.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1298 (10th Cir. 2016); Green v. Tri-County Metro. Transp. Dist. of Oregon, 909 F. Supp. 2d 1211, 1220 (D. Ore. 2012).  Under that framework, establishing liability requires a showing not only that the defendant failed to implement proper training but that the failure to train amounted to "deliberate indifference," which is "a stringent standard of fault, requiring proof that a [State] actor disregarded a known or obvious consequence of his action." Bd. of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown, 520 U.S.

397, 410 (1997).  The Court assumes, without deciding, that training provided for dealing with individuals with mental illnesses, discussed above, was inadequate as training for dealing with individuals with developmental disabilities.  The question then is whether the State was aware of a need for such training to which it was deliberately indifferent.

The obviousness of the need for training is typically established by pointing to a pattern of similar violations by untrained employees.  Thomas v. Cumberland Cty., 749 F.3d 217, 223 (3rd Cir. 2014).  The Supreme Court has posited, however, that in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 (1989). In this "narrow range of circumstances," a pattern of violations might not be necessary if plaintiffs could demonstrate with a single violation that the entity has failed to train its employees to handle recurring situations presenting an obvious potential for a violation.  Bryan Cty., 520 U.S. at 398.

Because there is no pattern of similar violations of the ADA in this action, Plaintiffs rely on this single-incident method of proof.  Plaintiff's only support for the conclusion that the need for training was obvious, however, is a statistic

from a 2012 report of the U.S. Census Bureau which states that,
"as of 2010, a full 18.7% of the U.S. civilian non-
institutionalized population had a disability."  ECF No. 106 at
58 (citing "Americans With Disabilities: 2010," by Matthew
Brault).  The State challenges the obviousness of the need for
training regarding interactions with the developmentally
disabled, suggesting that "general statistics concerning
unspecified disabilities within the general population
nationwide" are not probative of any "'recurring situation' in
Maryland, much less Frederick County specifically." ECF No. 113
at 5.  Most significantly, this statistic reports disabilities
of all types, not specifically developmental disabilities.  The
State also notes that, prior to this incident, it had never
received a request to generate a policy for encounters with the
developmentally disabled, nor was it otherwise put on notice of
the need for this specific training.

The Court finds that the evidence in the record is
insufficient for a jury to conclude that there was an obvious
potential that such a violation would occur such that the
failure to train to prevent it amounted to "deliberate
indifference."  As the Supreme Court in City of Canton
cautioned,

> [it will not] suffice to prove that an injury or
> accident could have been avoided if an officer had had
> better or more training, sufficient to equip him to

avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

489 U.S. at 391.

In each of the "single-incident" cases relied upon by Plaintiffs there was significantly more evidence from which a jury could posit the inevitability of the violation.   In Williams v. City of New York, a deaf individual brought a failure to train claim based upon the circumstances of her arrest and overnight detention.  121 F. Supp. 3d 354 (S.D.N.Y. 2015).  In denying the defendant's motion for summary judgment, the court did note, as Plaintiffs selectively quote, that

> "it would be preposterous to believe that given the diversity of the population in the City of New York, the [New York Police Department (NYPD)] did not know full well that its officers would encounter persons with hearing impairments in connection with protecting and defending the City and that some of those people would need accommodation in order to interact with the police."

ECF No. 106 at 58-59 (quoting Williams, 121 F. Supp. 3d at 375). The court also noted, however, that the NYPD had previously received numerous complaints from deaf individuals that actually gave rise to a settlement agreement between the City of New York and the United States under which the city agreed to provide

49

auxiliary aids to persons with hearing disabilities, an agreement which the city subsequently failed to implement. The court concluded that, in light of those prior incidents and the settlement agreement, "a jury could easily find that the City was fully on notice of the need to have effective policies and procedures for dealing with hearing impaired individuals prior" to the incident involving the plaintiff. 122 F. Supp. 3d at 375 n.23.

In Russo v. City of Cincinnati, which involved the fatal shooting of a mentally ill individual, the defendant police officers conceded that they were "frequently called upon to deal with mentally and emotionally disturbed and disabled individuals." 953 F.2d 1036, 1046 (6th Cir. 1992). In Thomas v. Cumberland County, an inmate brought a § 1983 action after being attacked by another inmate. 749 F.3d 217 (3rd Cir. 2014). The Third Circuit Court of Appeals held that the single-incident failure to train claim should have been permitted to go to the jury after noting that the plaintiff "put forward evidence that fights regularly occurred in the prison" and that the "frequency of fights" along with "the volatile nature of the prison" made a violation of rights likely to occur if the guards were not given de-escalation and intervention training. Id. at 225-26. Young v. City of Providence ex rel. Napolitano, arose out of a "friendly fire" accidental shooting of an African American off-

duty police officer by on-duty officers.  404 F.3d 4 (1st Cir.

2005).  The First Circuit held that the claim that the defendant

failed to train its officers on on-duty/off-duty interactions

and misidentifications should have gone to a jury after noting

that, while there was no evidence of a prior friendly fire

shooting, "it was common knowledge within the [police

department] that misidentifications of off-duty officers

responding to an incident often occurred in Providence,

particularly misidentification of minority officers."  Id. at

28.

Here, there is no similar evidence from which a jury could

conclude that there was an obvious potential for this kind of

violation.  Thus, the Court finds that this is not one of the

"rarest of circumstances" where the State could be found liable

without proof of a pre-existing pattern of violations.  The

State's motion will be granted as to Count X.

### 2. Failure to Accommodate

The Court finds that there is more than enough evidence,

however, to support Plaintiffs' failure to accommodate claim.

There is no dispute that Title II requires public entities to

make reasonable accommodations for persons with disabilities.

Paulone v. City of Frederick, 787 F. Supp. 2d 360, 371 (D. Md.

2011).  Under the regulations implementing Title II, the

reasonable accommodations that are required to be made include

"reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R § 35.130(b)(7). When considering the failure to accommodate claim at the motion to dismiss stage, the Court concluded that "following the advice of the caregiver of a clearly disabled individual and simply waiting would have been the most logical accommodation." Estate of Saylor, 54 F. Supp. 3d at 427. While recognizing that Title II does not require States to employ "any and all means to make . . . services accessible to persons with disabilities," or to create "an exhaustive set of particular accommodations and policies to be proactively implemented with respect to every conceivable disability," the Court found that the requested accommodation came nowhere near to approaching those limits. Id. Thus, under the facts as alleged in the First Amended Complaint, the Court found the requested accommodation to be reasonable.

Now at the summary judgment stage, the conclusion that the requested accommodation was reasonable is further bolstered by the report of Plaintiffs' expert witness, Andrew Scott. Mr. Scott notes that the International Association of Chiefs of Police ("IACP") National Law Enforcement Policy Center has a

separate Model Policy specifically addressing "Encounters with the Developmentally Disabled" that instructs:

> "Taking custody of a developmentally disabled person should be avoided whenever possible as it will invariably initiate a severe anxiety response and escalate the situation.  Therefore, in minor offense situations, officer shall explain the circumstances to the complainant and request that alternative means be taken to remedy the situation.  This normally will involve the release of the person to an authorized caregiver."

ECF No. 106-33 at 10 (quoting Model Policy).  As noted above, the FCSO's own General Order 41.4 offers similar options including "Outright release," and "Release to care of family, care giver or mental health provider."  ECF No. 98-24 at 4.  The finder of fact could conclude that the Deputies never considered these options set out in the General Order.

In moving for summary judgment on this claim and in an effort to explain the Deputies' failure to consider those other options, the gravamen of the State's argument is that Sgt. Rochford was told that Mr. Saylor could become violent and that "[o]nce Sgt. Rochford heard that under some circumstance, Mr. Saylor could become violent, removing him from the movie theater without further delay was necessary."  ECF No. 100 at 22 n.6. The States repeats throughout its motion that Ms. Crosby said Mr. Saylor "could become violent."  Id. at 19, 22, 23, 29, & 30. The opinion of the State's expert that leaving Mr. Saylor in the

theater was not a reasonable accommodation is clearly based upon that same factual conclusion.  He stated, "it is my opinion that once the Deputies were on notice of Saylor's potential violent tendencies as related by his care giver Ms. Crosby, and the response to the [D]eputies by Saylor, the Deputies had limited recourse given the public venue, the on-going business nature of the theater, and the safety of the public."  ECF No. 98-26 at 5.

As noted above, however, there is a factual dispute if Ms. Crosby ever said anything about Mr. Saylor becoming violent.  In an attempt to obscure the nature of this dispute, the State materially misquotes Ms. Crosby's testimony regarding what she told Sgt. Rochford.  The State characterizes the dispute as "Plaintiffs will predictably point out that there is a dispute about whether Ms. Crosby said that Mr. Saylor could be violent, as Sgt. Rochford recalls, or whether she qualified her statement by saying that he could be violent if touched."  ECF No. 100 at 22 n.6.  What Ms. Crosby testified she told Sgt. Rochford is that if touched, "[h]e will curse at you" and "may get angry." Crosby Dep. at 182.  Hopefully, the Deputies understand that one can be angry without being violent.  If not, their failure to grasp that distinction might explain the course of events.

The State's other primary argument appears to be that, once the theater manager told the Deputies that Mr. Saylor "must be removed" from the theater, they no longer had the discretion to

permit him to remain.  ECF No. 100 at 15 n.5, 22; see also ECF

No. 113 at 13-15, n.8, n.9.  The State supports this argument

with inapt hypotheticals that misconstrue the nature of the

requested accommodation.  In response to the opinion of Mr.

Scott, Plaintiffs' expert, that a reasonable course of action

would have been to issue a summons to Mr. Saylor and allow him

to remain in the theater, the State counters in its motion,

"[i]f someone was trespassing in Mr. Scott's home and the police

were called to respond and remove the trespasser, it is unlikely

that Mr. Scott would be satisfied with the trespasser being

issued a summons but being left in his home - particularly

someone with a propensity for aggression and even violence."

ECF No. 100 at 15 n.5.  In its Reply, the State queries, what if

Mr. Saylor's mother was unsuccessful in coaxing Mr. Saylor from

the theater, "Plaintiffs might suggest that the ADA requires the

theater to allow Mr. Saylor to remain there in perpetuity."  ECF

No. 113 n.8.  Mr. Saylor, of course, was not in a private home,

but was in a public movie theater and Ms. Crosby's request was

not that he be permitted to remain in the theater "in

perpetuity" but simply for the few minutes until his mother

arrived.  Furthermore, there is a dispute of fact as to whether

Mr. Rhodes actually requested that Mr. Saylor be removed from

the theater or simply requested that the Deputies "help out" Ms.

Crosby and "potentially" remove him.  Rhodes Dep. at 100, ECF No. 98-4.

The State's motion will be denied as to Count XI.

### C. Claims Against Hill Management

Plaintiffs have asserted three state law claims against Hill Management: negligence (Count III), gross negligence (Count VI), and battery (Count VIII).  These claims are premised on the contention that, as the Deputies' secondary employer, Hill Management was vicariously liable for all aspects of the conduct of the Deputies.  In moving for summary judgment, Hill Management focuses on the fact that, once the Deputies commenced the arrest of Mr. Saylor, i.e., when Sgt. Rochford touched Mr. Saylor's arm, they were no longer employed by Hill Management but were functioning exclusively in their official capacities as sheriff's deputies.  As for Sgt. Rochford's conduct prior to the initiation of the arrest, Hill Management contends that simply talking to Mr. Saylor could not be construed as grossly negligent conduct, or even negligent conduct.  Regardless, Hill Management proffers that Sgt. Rochford's engagement in that conversation with Mr. Saylor was not the proximate cause of Mr. Saylor's death.

Plaintiffs do not dispute that, once the Deputies commenced the arrest of Mr. Saylor, the Deputies were functioning in their official capacities as sheriff's deputies.  Their claims against

the State are directly premised on that proposition.  Plaintiffs
contend, however, that under Maryland law, Hill Management
remained a "joint employer" of the Deputies.  In making this
argument, Plaintiffs rely heavily on a decision of the Maryland
Court of Appeals, Lovelace v. Anderson, 785 A.2d 726 (Md. 2001).

In Lovelace, an off-duty Baltimore City police officer was
employed by a hotel in Baltimore County as a private security
guard.  While working at the hotel, the officer became involved
in a gun battle with two individuals who were attempting to rob
the hotel.  The plaintiff, a guest of the hotel, was
accidentally struck by a bullet fired from the officer's service
weapon.  The plaintiff brought claims of negligence and gross
negligence against, inter alia, the officer, the owners of the
hotel,[12] and the State of Maryland, asserting that both the hotel
owners and the State were the employers of the officer at the
time of the shooting and, thus, were vicariously liable for his
injury.

The State was dismissed from the action on a motion to
dismiss.  After discovery, the Circuit Court dismissed the
officer on the ground of qualified immunity, finding his conduct
did not amount to gross negligence.  The court also granted

---

[12] Because, by happenstance, the ownership of the hotel changed
on the day of the incident, there was some dispute, not relevant
to this discussion, as to which entity owned the hotel at the
time of the incident.

summary judgment for the owners of the hotel on the ground that
the officer's qualified immunity extended to his hotel employer.
The Court of Special Appeals affirmed the grant of summary
judgment for the hotel owners, but on different grounds than
that of the trial court.  The Court of Special Appeals held
that, when the gun battle began, the officer "reverted to his
police officer status" and was no longer the employee of the
hotel and thus, the hotel owners were not vicariously liable for
his conduct.  Lovelace v. Anderson, 730 A.2d 774, 786 (Md. Ct.
Spec App. 1999)).

　　　In reversing the decision of the Court of Special Appeals
as to the grant of summary judgment for the hotel owners, the
Court of Appeals noted that the Court of Special Appeals
overlooked "the settled principle of Maryland law that '[a]
worker may simultaneously be the employee of two employers.'"
785 A.2d at 741 (quoting Whitehead v. Safway Steel Products,
Inc., 497 A.2d 803, 809 (Md. 1985)).  While the court assumed,
arguendo, that the officer was acting in the scope of his
employment as a Baltimore City police officer during the
incident, that assumption did not foreclose the possibility that
he was also acting within the scope of his employment with the
hotel.  Id.

　　　The Court then identified the factors or criteria used for
determining whether an employer-employee relationship existed at

a particular time and whether an employee's actions were within the scope of that employment relationship.  Those criteria include: "(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." Lovelace, 785 A.2d at 742.  In determining whether a particular action is within the scope of the employment relationship, the Court of Appeals identified numerous considerations, including:

> whether the action was in furtherance of the
> employer's business or was personal to the employee,
> whether it occurred during the period when the
> employee was on duty for the employer, whether it
> related to the employee's duties, whether the action
> was in a broad sense authorized by the employer,
> whether the employer had reason to expect that the
> type of action might occur, [and] whether it occurred
> in an authorized locality.

Id.

Examining those factors in the context of the officer's hotel employment, the Maryland Court of Appeals concluded "the evidence that was before the Circuit Court for purposes of the motions for summary judgment was more than sufficient to show an employment relationship between [the officer] and the hotel during the attempted robbery, and to show that [the officer] was acting within the scope of that employment relationship, even assuming arguendo that he was also acting as a Baltimore City police officer." Id.  The court noted that the evidence showed

that "providing security for the hotel and its guests was part
of the hotel's business;" the officer was told, when hired,
"that one of his duties for the hotel was to prevent robberies
if he could;" the hotel had the authority to discharge him, and
the hotel controlled the manner of the dress of the security
guards, required that they keep their weapons concealed, and
gave them particular security assignments.  Id. at 742-43.

The court also noted, however, that the officer was "paid
by the hotel for the entire period of time in question" and was
on duty as a hotel employee at the time he first confronted the
robbers.  Id. at 742.  Although the court assumed for the
purposes of the appeal that the security guard was acting within
the scope of his employment as a Baltimore City police officer
during the incident, it also observed that "[i]n light of the
evidence presented in the Circuit Court, as well as the
pertinent regulations and statutory provisions, [the plaintiff]
makes a forceful argument in support of the Circuit Court's
holding that [the officer] was acting entirely as a private
security guard for the hotel and not as a Baltimore City police
officer."  Id. at 740-41 (emphasis added).  This observation was
based upon the evidence that, while the officer had received
permission from the Baltimore City Police Department to work as
a security officer at that hotel, he had not obtained the
requisite permit to carry a handgun while engaged in that

employment.  This observation was also based upon the testimony
of a former Superintendent of the Maryland State Police that the
officer's "secondary employment was in violation of Baltimore
City Police Department regulations concerning secondary
employment [and] that he was not acting as a Baltimore City
Police Officer during the gun battle."  Id. at 733.

In arguing that this case is distinguishable from Lovelace,
Hill Management focuses on the language of the Employment
Agreement that expressly provides that, when responding to a
report of an unlawful act, the deputies shall be acting in their
official capacity as FCSO deputies.  As a result of this
reversion to deputy status, unlike the officer in Lovelace, the
Deputies were no longer being paid by a secondary employer once
the arrest was initiated.  Of greater significance, under the
terms of the Employment Agreement, once the arrest was
initiated, the Deputies were no longer under the control of Hill
Management but were obliged to conform their conduct to FCSO
policy.

While Maryland courts have identified the five criteria
listed above as relevant to whether there is an employer-
employee relationship, they have also stressed that "the factor
of control stands out as the most important."  Whitehead, 497
A.2d at 809.  Whether the employer "has the right to control and
direct the employee in the performance of the work and in the

manner in which the work is to be done is the 'decisive,' or 'controlling' test." Id. (citations omitted).  Here, by expressed agreement between FCSO and Hill Management, Hill Management relinquished all control over the Deputies' actions once any law enforcement activities commenced.  Although one might ponder whether some representative of Hill Management might have been able to ask or demand that the Deputies stop effecting the arrest once it was commenced, there is no evidence in the record that Hill Management retained any element of such control and the Court cannot simply speculate that it might have.  For these reasons, the Court concludes, as a matter of law, that once the arrest began, the Deputies were no longer the agents of Hill Management and, therefore, no liability extends to Hill Management based upon the Deputies' conduct from that point forward.

As for the pre-arrest conduct, the questions are whether that conduct was negligent and/or grossly negligent[13] and whether that conduct was a proximate cause of Mr. Saylor's injury.  For all the reasons discussed above, viewing the evidence in the

---

[13] Plaintiffs make no argument that this pre-arrest conduct could give rise to a claim of battery and the Court finds no support for such a claim.  See Sumpter v. Ahlbrecht, Civ. No. 10-580, 2012 WL 252980, at *17 (D. Colo. Jan. 26, 2012) (finding no authority to support the argument that "any person who helps set in a motion a series of events that eventually leads to physical contact can be liable for battery").  The battery claim against Hill Management will be dismissed.

light most favorable to Plaintiffs, a jury could find that it
was negligent if not grossly negligent for Sgt. Rochford to
enter the theater and confront a developmentally disabled
individual after having been told that doing so would create an
adverse reaction, particularly when there was no exigent need
for any immediate intervention.[14]   Whether Sgt. Rochford's
decision to confront Mr. Saylor was a proximate cause of his
injury is perhaps a closer question.

In ruling on the motions to dismiss, this Court discussed
at some length the principles of proximate cause under Maryland
law in considering the claims against Regal Cinemas.  See Estate
of Saylor, 54 F. Supp. 3d at 431-33.  The Court noted that "the
proximate cause analysis is generally 'reserved for the trier of
fact.'"  Id. at 433 (quoting Pittway Corp. v. Collins, 973 A.2d
771, 792 (Md. 2009)).  Nonetheless, the Court concluded that the
extremely limited conduct of Regal Cinemas - which consisted of
Mr. Rhodes telling Mr. Saylor he needed to purchase a second

---

[14] Hill Management makes a somewhat spurious argument that

> Sgt. Rochford's activity in talking and reasoning with
> Mr. Saylor cannot reasonably be construed as
> negligent.  That is exactly what he was hired by Hill
> Management to do.  If he had not talked and reasoned
> with Mr. Saylor, then he would have had ignored the
> security concerns of the Regal tenant, which would
> have then breached Hill Management's responsibilities
> to Regal.

ECF No. 112 at 5.  The fact that he was hired to do a particular
task does not forego the possibility that he might perform that
task negligently.

ticket and then calling for the assistance of the mall security guards when he did not - was not a legally cognizable cause of Mr. Saylor's death in that it was "'highly extraordinary and unforeseeable'" that Mr. Saylor would be harmed as a result of that limited conduct.  Id.

A jury could reach a different conclusion as to Sgt. Rochford's conduct as an agent of Hill Management.  When Sgt. Rochford approached Mr. Saylor, he was aware from his conversation with Ms. Crosby that Mr. Saylor might react negatively if confronted.  If the jury credits Ms. Crosby's testimony that Sgt. Rochford remarked before going in to speak with Mr. Saylor that he needed the assistance of other officers because "[w]e're going to have some trouble tonight," the jury could conclude that it was highly foreseeable that he was anticipating a confrontation.  It is also difficult for Hill Management to argue that intervening negligent acts rose to the level of a superseding cause when the actor committing those intervening negligent acts was Sgt. Rochford, albeit in a different capacity.  Sgt. Rochford could certainly foresee what his own next steps might be.  As an experienced law enforcement officer, Sgt. Rochford could also foresee the possibility of injuries that could arise while making an arrest.

Accordingly, Hill Management's motion for summary judgment will be denied as to Plaintiffs' negligence and gross negligence

64

claims.  Hill Management's liability will be limited, however, to liability for the conduct of Sgt. Rochford prior to his initiation of the arrest of Mr. Saylor.

## V. CONCLUSION

For the above stated reasons the Deputies' motion for summary judgment will be denied in its entirety.  The motion for summary judgment filed by the State will be granted as to the ADA failure to train claim (Count X), but denied as to the ADA reasonable accommodation claim (Count XI).  Hill Management's motion for summary judgment will be granted as to the battery claim (Count VIII), but denied as to the negligence and gross negligence claims (Counts III and VI).  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: September 9, 2016